# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



Civil Case No. _____

SKAGEN AS, DANSKE INVEST
MANAGEMENT A/S, DANSKE INVEST
MANAGEMENT COMPANY,
OPPENHEIMER DEVELOPING MARKETS
FUND, OPPENHEIMER QUEST FOR VALUE
FUNDS, ON BEHALF OF ITS SERIES
OPPENHEIMER GLOBAL ALLOCATION
FUND, OFIGTC EMERGING MARKETS
EQUITY FUND, and OFI GLOBAL:
EMERGING MARKETS EQUITY FUND, LP,

                       Plaintiffs,

v.

PETROLEO BRASILEIRO S.A. –
PETROBRAS, PETROBRAS GLOBAL
FINANCE B.V., THEODORE MARSHALL
HELMS, CITIGROUP GLOBAL MARKETS
INC., JP MORGAN SECURITIES LLC,
SCOTIA CAPITAL (USA) INC., HSBC
SECURITIES (USA) INC., BB SECURITIES
LTD., BANK OF CHINA (HONG KONG)
LIMITED, BANCO BRADESCO BBI S.A., and
BANCA IMI S.p.A.,

                       Defendants.

## COMPLAINT



RECEIVED
MAR 23 2015
U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................................ 2

    A.  Overview of the Case ....................................................................... 2

    B.  The Claims Asserted in this Complaint ................................................ 9

II.  JURISDICTION AND VENUE .......................................................................... 11

III.  PARTIES ......................................................................................................... 13

    A.  Plaintiffs .......................................................................................... 13

    B.  Petrobras ......................................................................................... 14

    C.  The Securities Act Defendants ......................................................... 15

        1.  PGF ...................................................................................... 15

        2.  Helms ................................................................................... 15

        3.  The Underwriter Defendants ................................................. 15

    D.  Relevant Non-Parties ...................................................................... 17

IV.  FACTUAL BACKGROUND ............................................................................. 19

    A.  History and Structure of Petrobras ................................................... 19

    B.  Petrobras Required Extraordinary Amounts of Capital to Exploit Brazil's Oil and Gas Resources ........................................................ 22

    C.  Petrobras Focused on the United States Capital Markets ................... 24

    D.  Petrobras Was Legally Required to Engage in Open and Honest Bidding With Outside Contractors ..................................................... 25

    E.  Petrobras Trumpets Its Transparency in Response to a 2009 Investigation into Pricing Irregularities ............................................. 27

V.  PETROBRAS'S FRAUDULENT SCHEME DURING THE RELEVANT PERIOD .... 30

    A.  Petrobras Touts New Capital Projects as Critical to Its Future and Emphatically Denies Allegations of Pricing Irregularities ................... 31

1.      The Pasadena, Texas Refinery ................................................... 31

2.      The Abreu Refinery ................................................................. 32

3.      The Comperj Refinery ............................................................ 34

4.      SBM Offshore Projects ........................................................... 35

5.      Transpetro Subsidiary ............................................................. 36

B.      Unbeknownst to Investors, Petrobras's Contract Costs, Asset Values and Net Income Were Grossly Inflated by Cartelization and Graft .................... 37

    1.      Petrobras and Its Contractors Engaged in Bid-Rigging ............................................................................... 39

        (a)      Petrobras's Contractors Dictated Which Companies Would Bid on Petrobras Projects .............................. 39

        (b)      Bid-Rigging by the Cartel Inflated Petrobras's Project Costs ........................................... 42

    2.      Petrobras Executives Demanded that All Contracts Include an Additional "Bribe Fee" ................. 44

    3.      The Company's Senior Officers Orchestrated and Covered Up the Scheme ................................................ 52

        (a)      Foster and the Executive Directorate Silenced Velosa and Closed Their Eyes to Evidence of Fraud ....................................................... 52

        (b)      Gabrielli and Duque Retaliated Against Fernando After Fernando Warned of Fraud at Abreu ..................................................................... 57

        (c)      Petrobras Removed an Independent Director From the Audit Committee After He Raised Concerns About the Company's Financial Statements ................................................................. 59

    4.      The Kickback Scheme Had an Enormous Impact on Petrobras's Financial Statements Throughout the Relevant Period .......................................................... 60

(a)     Petrobras's Accounting for the Bribes and Overpayments on Contracts Violated GAAP and IFRS ............................................................................ 60

(b)     Petrobras Has Admitted It Must Record a Massive Writedown to PP&E to Account For Improperly Capitalized Expenses ................................................. 63

5.     "Operation Car Wash" Has Provided Extensive Testimony and Documentary Evidence Demonstrating the Mechanisms of the Scheme ....................................... 66

(a)     Bribery in the International Division ........................................... 69

(b)     Abreu and Comperj Refineries: Hundreds of Millions in Bribes and Overpayments ......................................... 70

(c)     Bribery by SBM ........................................................................ 74

(d)     Bribery at Transpetro ............................................................... 76

C.     Following the Commencement of Operation Car Wash, Petrobras Continued to Mislead Investors by Forcefully Denying the Existence of Corruption ............................................................................ 77

VI.     THE TRUTH IS REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES .......................................................................................... 80

VII.     RECENT EVENTS CONTINUE TO EVIDENCE MASSIVE FRAUD AT THE COMPANY .................................................................................................. 94

VIII.     MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO THE EXCHANGE ACT CLAIMS .......................................................................... 97

A.     Petrobras's Materially False and Misleading Statements Concerning Its Financial Condition and Compliance with GAAP and IFRS .......................... 97

B.     Petrobras's Materially Misleading Omissions and False Denials Concerning the Overpricing of Its Refineries and Other Projects ..................... 107

1.     Pasadena, Texas Refinery ..................................................... 107

2.     Abreu Refinery ...................................................................... 108

3.     Comperj Refinery ................................................................... 112

4.     SBM Contracts ....................................................................... 113

5. Transpetro Contracts ..................................................................... 116

6. Repar Refinery .............................................................................. 116

C. Petrobras's Materially False and Misleading Statements Attesting to Its Transparency and Denying the Existence of Corruption ............................. 117

D. Petrobras's Materially False and Misleading Statements About Competitive Bidding ......................................................................... 123

E. Petrobras's Materially False and Misleading Denials of Fraud, Bribery and Corruption as Investigations Commence ......................................... 125

F. Petrobras's Materially False and Misleading SOX Certifications and Statements Concerning the Adequacy and Effectiveness of Its Internal Controls ................................................................................. 129

IX. SUMMARY OF SCIENTER ALLEGATIONS ................................................ 131

A. Petrobras's Scienter Is Established Through the Admissions of Senior Officers ................................................................................. 134

1. Costa ............................................................................................ 134

2. Barusco ....................................................................................... 138

B. Foster Knew About or Recklessly Disregarded the Bid-Rigging and Kickback Scheme Prior to and During the Relevant Period ............................. 140

C. Additional Members of the Executive Directorate Have Been Implicated in the Fraudulent Scheme ............................................. 145

1. Gabrielli ...................................................................................... 145

2. Duque .......................................................................................... 146

3. Cerveró ........................................................................................ 147

D. Additional Evidence of Scienter ............................................................ 149

1. The Magnitude and Scope of the Scheme ................................... 149

2. Petrobras's Retaliatory Efforts .................................................... 150

3. Resignations and Terminations of Petrobras Executives ................................................................................... 151

X.      PLAINTIFFS' RELIANCE ...................................................................................... 152

        A.      The Fraud-On-The-Market Doctrine Applies ...................................... 152

        B.      SKAGEN's Allegations of Direct Reliance .......................................... 153

XI.     THE STATUTORY SAFE HARBOR IS INAPPLICABLE ......................................... 154

XII.    EXCHANGE ACT CAUSES OF ACTION ................................................................ 155

XIII.   SECURITIES ACT CLAIMS ...................................................................................... 158

        A.      Petrobras Issued Materially False and Misleading Statements in the
                Offering Documents .......................................................................... 159

                1.      False Financial Statements .................................................... 160

                2.      False SOX Certifications ........................................................ 165

                3.      False Statements in the Underwriter Agreement .................... 166

XIV.    SECURITIES ACT CAUSES OF ACTION ............................................................... 167

XV.     PRAYER FOR RELIEF .............................................................................................. 171

XVI.    JURY DEMAND ........................................................................................................ 172

Plaintiffs SKAGEN AS ("SKAGEN"), Danske Invest Management A/S, Danske Invest Management Company, and Oppenheimer Developing Markets Fund, Oppenheimer Quest for Value Funds, on behalf of its series Oppenheimer Global Allocation Fund, OFIGTC Emerging Markets Equity Fund, and OFI Global: Emerging Markets Equity Fund, LP (together, "Oppenheimer Funds"; and collectively with SKAGEN, Danske Invest Management A/S, and Danske Invest Management Company, "Plaintiffs"), by and through their undersigned counsel, bring this action against Defendants Petróleo Brasileiro S.A.—Petrobras ("Petrobras" or the "Company"); its wholly-owned subsidiary Petrobras Global Finance B.V. ("PGF"); Theodore Marshall Helms; and the Underwriter Defendants (defined herein) (collectively, "Defendants") to recover damages for losses Plaintiffs have suffered on certain securities issued by Petrobras and purchased or acquired by Plaintiffs between March 24, 2010 and January 27, 2015, inclusive (the "Relevant Period").  Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of:  (i) documents filed by Petrobras and PGF with the U.S. Securities and Exchange Commission ("SEC") and the Comissão de Valores Mobiliários ("CVM"); (ii) securities analysts' reports about Petrobras; (iii) transcripts of Petrobras conference calls; (iv) Petrobras press releases; (v) media reports published in the United States and Brazil concerning Petrobras and "Operation Car Wash," including online news sources; and (vi) documents, deposition testimony, plea bargain proffers, criminal complaints and other evidence submitted by Brazilian prosecutors and other Brazilian governmental authorities in Brazilian federal court proceedings.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after Plaintiffs have had a reasonable opportunity to conduct discovery.

## I.    NATURE OF THE ACTION

### A.    Overview of the Case

1.    This securities action arises from a massive scheme to funnel billions of dollars in kickbacks to executives at Petrobras, an oil and gas company that stood as a central pillar of Brazil's economy.  As several of the Company's senior executives have now testified, Petrobras's and its executives' participation in this long-running scheme caused the Company to overstate by billions of dollars the value of its refineries, oil rigs, and other assets.  Rather than accounting for these bribes and overstated costs as expenses in its financial statements, which would have decreased the Company's reported assets and net income, Petrobras fraudulently capitalized the bribes as assets to mask the kickback scheme, in violation of both U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS").  Petrobras's January 27, 2015 earnings release indicates that, as a result of this scheme, its assets will have to be written down by a staggering amount, ranging from ***$1.5 billion to $34 billion***.[1]  This admitted fraud—which pervaded virtually every aspect of Petrobras's business and caused the Company to issue admittedly false financial statements—has caused billions of dollars in losses to Petrobras's investors on the New York Stock Exchange ("NYSE").

2.    Throughout the Relevant Period, Petrobras and its senior officers, including former Chief Executive Officer ("CEO") Maria das Graças Silva Foster ("Foster"), insisted that Petrobras was a global leader in corporate governance and transparency.  For example, the Company stated

---

[1] All currency amount are expressed in United States dollars, except where indicated as "R$."  Wherever possible, Plaintiffs' Counsel have provided the approximate U.S. dollar amount from the contemporaneous exchange rate, as provided by Brazil's Central Bank: http://www4.bcb.gov.br/pec/taxas/ingl/ptaxnpesq.asp?id=quotations.  Unless otherwise noted, all emphasis is added.  Many of the sources quoted herein were originally published in Portuguese.  Plaintiffs have made good faith and reasonable efforts to translate these sources into English.

that it "***reject[ed] any corruption practices and use[d] strict management methods*** to assure the protection of its shareholders' interests." Then, as the costs of Petrobras's massive capital projects inexplicably doubled, and then tripled, and then quadrupled, the Company repeatedly stated that "there is ***no overbilling, overpricing, or any other irregularity***" in Petrobras's contracts. For the avoidance of any doubt, Foster announced in 2012 that "***[o]ur results are absolutely true and legitimate***."

3.     These statements—and the dozens of other similar statements during the Relevant Period—were false. In reality, since no later than 2004, Petrobras executives colluded with dozens of the world's largest engineering and construction firms to overbill and inflate the costs of their contracts with Petrobras and funnel billions of dollars in bribes directly into the hands of Petrobras executives and Brazilian government officials.

4.     These facts began to emerge in late 2014 when former Chief Downstream Officer (also referred to as the Director of Supply), Paulo Roberto Costa ("Costa"), a former C-level executive who served on the Company's "Executive Directorate," confessed to criminally conspiring with other Petrobras senior executives to operate a longstanding bribery and bid-rigging scheme. Specifically, Costa stated in sworn testimony that he colluded with Renato Duque ("Duque"), former Chief Services Officer and Executive Directorate member; Pedro Barusco ("Barusco"), Duque's right-hand man and former Executive Manager of Engineering; Nestor Cerveró ("Cerveró"), former Chief International Officer and Executive Directorate member; and Sergio Machado ("Machado"), former CEO of Petrobras's subsidiary Petrobras Transporte S.A. ("Transpetro"); along with some of Brazil's top politicians, a "cartel" of engineering and construction companies, and criminal money launderers to use the Company as a giant slush fund. All of these individuals and entities collaborated to rig Petrobras's bids for outside contractors and

to inflate contract costs by up to 20%. In exchange, Petrobras officials demanded a standard 3% bribe for themselves and the Brazilian political parties that sponsored their appointment to the Company's Executive Directorate.

5.      All told, Petrobras paid billions of dollars in illegal bribes and inflated contracts pursuant to this scheme, and went to great lengths to conceal these payments from investors. Indeed, as Petrobras would later reveal, it improperly recorded these inflated contract amounts *as assets* in the Company's financial statements. Petrobras then used these misstated financial statements to raise billions of dollars from investors through the U.S. capital markets, including an $8.5 billion offering of debt securities on or around March 11, 2014 (the "Offering").

6.      As revealed by Costa's and Barusco's sworn testimony, the "cartelization" and bribery scheme was "endemic" and "institutionalized" at Petrobras. Barusco testified and provided documentation demonstrating that the scheme, which dates back to at least 2004, actively continued well into 2014.

7.      In concealing this criminal activity, the Company misled investors concerning the nature of Petrobras's contracts and overstated the value of its assets. These overstated values include, among others:

- The value of Petrobras's refinery in Pasadena, Texas. In 2006, Petrobras agreed to purchase—at Cerveró's instigation—a 50% stake in the Pasadena refinery from Astra Oil for $370 million, a price that eventually ballooned to $1.18 billion. Only years later did investors learn from Costa's confession that Astra Oil paid millions of dollars to Petrobras's Executive Directorate to "not hinder" this white elephant of a deal.

- Petrobras's flagship modern oil refinery, Abreu e Lima ("Abreu"). Abreu was originally budgeted in 2007 to cost $2.5 billion, and by the time of its completion in 2014, supposedly cost an astounding $18.5 billion. Costa and Barusco (among others) provided detailed testimony regarding the multiple specific large-scale Abreu projects whose costs were wildly inflated by the Cartel (defined below) bid-rigging and bribery of Petrobras executives.

- The reported $20 billion value of oil platforms that were the subject of lease

agreements with Dutch company SBM Offshore. Barusco testified in detail that he personally accepted $22 million in bribes in connection with SBM contracts and that Duque received even more. The exposure of the SBM bribes may result in a ban on contracts with SBM, potentially reducing Petrobras's profits by $15 billion over the next several years.

8.　　Petrobras's senior executives, including Foster and her predecessor as CEO, Jose Sergio Gabrielli de Azevedo ("Gabrielli"), carried on a long-running cover-up of this bribery scheme that had become Petrobras's standard operating procedure. For example, a former senior Petrobras executive, Venina Velosa da Fonseca ("Velosa"), who reported directly to Costa and worked closely with Foster before Foster's elevation to CEO in 2012, has recently revealed that she repeatedly, and noisily, objected to Petrobras's improper practices. Velosa informed both Gabrielli and Foster about problems with bidding relating to the construction of the Abreu refinery, including payments for services that were never rendered, overbilled contracts, and violations of the Company's ethical code. Velosa stated that she made her concerns widely known within the Company, including to Foster and Gabrielli:

> [I]n 2008, as an executive manager, I informed . . . the director at the time, Paulo Roberto Costa. I informed other directors, like Graças Foster. And, at a different time, as a general manager, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my executive manager at the time. I informed director Cosenza, in his position as director, since he was my peer, and as executive manager. I informed president Gabrielli.

9.　　After months of raising objections and seeking to change the Company's practices, Velosa began to receive anonymous personal threats to herself and her daughters. Then, in 2011, Petrobras summarily removed Velosa from her position and transferred her to the Company's office in Singapore, where she was instructed to spend her time in a "training course." Velosa conveyed her outrage at the Company's practices and her exile directly to Foster, with whom she was "close," through an October 7, 2011 email that has recently become public. Velosa informed Foster that, as result of the widespread improper practices at Petrobras, and because of "the

5

immense pride that I had for my company, I started to feel ashamed." In the email, Velosa told Foster that she was considering what she should do and explicitly noted that part of the incriminating documentation that she had about irregularities was already in Foster's possession: "There are alternatives I'm evaluating despite fears of risking myself and my daughters. ***I would like to present to you part of the documentation that I already have. Part of it, I know you are already aware of.*** I would like to hear from you before taking the next step." Foster never responded.

10.    Petrobras eventually terminated Velosa's employment without explanation in late 2014, at which point she again emailed Foster:

> Since 2008 my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit]. By fighting it, I was threatened and harassed. I even had a gun pointed to my head and received threats against my daughters.
>
> \*        \*        \*
>
> I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting. I presented the matter to the company's competent authorities, including the Legal and Audit [departments], ***which was in vain***.

11.    Despite these and other efforts to cover-up the institutionalized culture of bribery at Petrobras, Defendants' scheme began to unravel in March 2014. On March 20, 2014, Costa was swept up in a Brazilian sting operation concerning money laundering and embezzlement, which was code-named "Operation Car Wash" (or Operation "Lava Jato"—the Brazilian slang for "car wash"). After news of Costa's arrest emerged, both Petrobras and Costa strenuously denied any connection between Costa's arrest and his Petrobras activities. Indeed, for months following Costa's arrest, Petrobras officials, including Foster, denied any accusations of "irregularities" at Petrobras and claimed that others were using Petrobras as a "political weapon" in an election year.

12.     However, in August 2014, Costa accepted a plea bargain whereby he agreed to turn state's evidence.  In his plea agreement and confidential video testimony, which were later made public, Costa explained the broad outlines of the Cartel's operations and the payments of bribes to himself and to significant Brazilian politicians.  In an attempt at damage control, Petrobras immediately responded that, if any misconduct did in fact occur, ***the Company*** was the victim.

13.     Faced with overwhelming evidence of misconduct, the Company finally admitted that Petrobras executives were part of the money laundering and bribery scheme, and that this corruption had directly impacted the Company.  On November 13, 2014, after the market closed, Petrobras issued a press release acknowledging, for the first time, that if the evidence provided by Costa was true, it would "potentially impact the Company's financial statements."  Petrobras reported that it would delay filing its third-quarter 2014 financial statements in light of the investigation.

14.     On Friday, November 14, 2014, the scandal intensified with the arrest of another former Company executive, Duque, and 22 other people in connection with Operation Car Wash.  The next business day (November 17), before the market opened, the Company held its earnings conference call with investors during which CEO Foster and Chief Financial Officer ("CFO"), Almir Guilherme Barbassa ("Barbassa"), discussed the delayed earnings and tried to maintain control over the deepening crisis.  During three hours of questioning, first from analysts, and then from journalists, the CEO and other top executives could not explain how Petrobras would recover or account for the billions of dollars in inflated contract payments.  However, Foster admitted that "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, ***could potentially affect the Company's financial statements***."  In particular, Barbassa further admitted that the allegations, if true, would require the Company to record a substantial writedown to its

Property, Plant and Equipment ("PP&E"), its largest and most valuable asset. In response to this news, Petrobras American Depositary Shares ("ADSs") fell dramatically in value.

15.     Then, on December 15, 2014, Brazilian criminal authorities announced the formal indictment of Cerveró for acts of corruption and money laundering. Cerveró was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with his facilitation of Petrobras's acquisition of the Pasadena, Texas refinery. As former Chief of Petrobras's International Division, Cerveró's arrest indicated that the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope. In response to the news of Cerveró's indictment, the Company's ADSs fell approximately 12% in a single day.

16.     Finally, after the markets closed on January 27, 2015, and after a two-month delay, Petrobras released wholly incomplete and unaudited third-quarter 2014 financial statements. Notably, these financial results did not contain the expected writedowns because ***the scope of the fraud was too vast for the Company or its auditors to estimate***. Petrobras disclosed that the corruption scheme impacted at least "1/3 of the company's total fixed assets," and provided a range of potential asset writedowns on these assets from ***R$4 billion (US$1.5 billion) to R$88.6 billion (US$34 billion)***. Petrobras further admitted that it had improperly accounted for overpayments and bribes as assets during the Relevant Period, leading to "errors" in its published financial statements. In a letter to shareholders accompanying Petrobras's financial results, Foster acknowledged the commission of "unlawful acts" by former Petrobras employees and stated that the "payments to . . . suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments." However, because Petrobras and its auditors allegedly could not agree upon the amount of the adjustment, the Company's financial statements did not contain any writedowns.

17.     The scope of the potential writedowns revealed by this disclosure, coupled with Petrobras's admissions concerning the falsity of its financial statements, stunned investors and immediately caused the price of the Company's ADSs to plunge 11.9%.  On January 29, Moody's downgraded Petrobras to the lowest level of investment grade, citing as a main reason for the downgrade the risk resulting from the Company's inability to quantify the costs of the corruption scandal, and the liquidity pressures that follow as investors are left in the dark.

18.     The impact of the fraud continues to reverberate through the Company.   On February 4, Foster and CFO Barbassa—along with the rest of the Executive Directorate—left the Company due to the corruption scandal.  In addition to the ongoing criminal prosecutions in Brazil, the SEC and DOJ have also launched investigations into the Petrobras kickback scheme and potential violations of the U.S. Federal Corrupt Practices Act ("FCPA").

**B.     The Claims Asserted in this Complaint**

19.     Plaintiffs assert securities fraud claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act" and the "Section 10(b) Claims") in connection with their purchases of Petrobras securities on the NYSE during the Relevant Period. The Section 10(b) Claims allege that Petrobras engaged in a fraudulent scheme to artificially inflate the price of Petrobras securities.

20.     SKAGEN also asserts claims pursuant to Section 18 of the Exchange Act (the "Section 18 Claims," and together with the Section 10(b) Claims, the "Exchange Act Claims") in connection with certain of its purchases of Petrobras securities on the NYSE.  These claims arise out of SKAGEN's reliance upon material misstatements and omissions contained in Petrobras's Forms 20-F filed with the SEC during the Relevant Period.

21.     Danske Invest Management A/S separately asserts claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") (the "Securities Act Claims")

in connection with its purchase of certain U.S.-listed debt securities issued by PGF (and guaranteed by Petrobras) pursuant and/or traceable to the Offering, which occurred on or around March 11, 2014.

22.     Danske Invest Management A/S alleges that the Securities Act Defendants (as defined below) are liable for material misstatements and omissions in the offering documents issued in connection with the Offering. For purposes of the Securities Act Claims, Danske Invest Management A/S is not alleging that the Securities Act Defendants committed fraud or acted with deceitful intent. Rather, the Securities Act Claims are based solely on strict liability and negligence. The Securities Act Claims do not allege, arise from, or sound in, fraud.

23.     The Exchange Act Claims and Securities Act Claims arise from a series of materially false and misleading statements and omissions made by Defendants in Petrobras's SEC filings, the Offering Documents (as defined herein) and other public statements issued by Defendants throughout the Relevant Period concerning, *inter alia*, (i) the value of Petrobras's PP&E; (ii) the amount of Petrobras's expenses and net income; (iii) the Company's compliance with GAAP and IFRS; (iv) the adequacy of the Company's internal controls over financial reporting; (v) the Company's failure to disclose the fact that certain of Petrobras's contracts were overstated by billions of dollars that were paid out in bribes to Petrobras employees and government officials; and (vi) Defendants' affirmative representations that Petrobras's contracts were not overpriced and that the Company was not involved in the payment of bribes during the Relevant Period. The truth about Petrobras was revealed through a series of disclosures, which caused a precipitous decline in the market value of Petrobras and PGF securities and caused significant damages to Plaintiffs.

## II.    <u>JURISDICTION AND VENUE</u>

24.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C §§ 77k, 77*l*, and 77*o*, and Sections 10(b) and 18 of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78r(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

26.    Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on the NYSE, engaged in the public offering of ADSs and debt securities that are listed on the NYSE, and certain of the acts that constitute the violations of law complained of herein, such as the dissemination of materially false and misleading information to the investing public, including in Petrobras's filings with the SEC, occurred in and/or were issued from this District.

27.    Plaintiffs' claims are premised upon their purchases of Petrobras securities on the NYSE.

28.    In a Deposit Agreement governing Petrobras's common and preferred ADSs, filed with the SEC on Form F-6 on December 7, 2011, Petrobras stated that it "consents and submits to the jurisdiction of any state or federal court in the State of New York in which any such suit or proceeding may be instituted."  Furthermore, in that same Deposit Agreement, the Company agreed that: "This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York[.]"

29.     Likewise, in the prospectus supplement filed on September 28, 2010 pursuant to which the Company issued ADSs on the NYSE, Petrobras stated:  "Each deposit agreement and the [ADSs] issued thereunder shall be governed by and construed in accordance with the laws of the State of New York.  In each deposit agreement, we have submitted to the jurisdiction of the courts of the State of New York and appointed an agent for service of process on our behalf."

30.     The underwriting agreements entered into by Petrobras, PGF and/or the Underwriter Defendants (as defined below) in connection with the public offerings of securities that occurred during the Relevant Period—including the underwriting agreement entered into in connection with the Offering—stated that the parties to the agreement "agree that any suit, action or proceeding against them, arising out of or based upon this Underwriting Agreement or the transactions contemplated hereby, may be instituted in any State or federal court in the Borough of Manhattan, City of New York, New York."  The underwriting agreements further state that the parties "waive any objection which they may now or hereafter have to the laying of venue of any such proceeding and any right to which any of them may be entitled on account of places of residence or domicile, and irrevocably submit to the jurisdiction of such courts in any suit, action or proceeding."  The underwriting agreement that Petrobras filed with the SEC on Form 6-K on September 29, 2010 in connection with its September 2010 offering of ADSs contained identical statements and waivers.  Plaintiffs allege, among other things, that Petrobras's denials of fraud and corruption contained in these underwriting agreements were false and misleading, as set forth in Sections VIII.C and XIII.A.3, *infra*.

31.     The Company conducted the registered public offerings of all securities at issue in this Action in this District.

32.     Additionally, a number of the Underwriter Defendants (as defined herein) maintain their principal places of business in this District.

33.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiffs

34.     Plaintiff SKAGEN AS ("SKAGEN") is a Norwegian independent portfolio management company holding approximately $15.4 billion in assets. As reflected in Appendix A, SKAGEN AS purchased Petrobras securities on the NYSE during the Relevant Period and suffered substantial losses as a result of the conduct complained of herein.

35.     Plaintiff Danske Invest Management A/S is a Danish asset management company with approximately $62.4 billion in assets under management. As reflected in Appendix B, Danske Invest Management A/S purchased Petrobras securities on the NYSE during the Relevant Period and suffered substantial losses as a result of the conduct complained of herein.

36.     Plaintiff Danske Invest Management Company is a Luxembourgian asset management company affiliated with Danske Invest Management A/S with approximately $5 billion in assets under management. As reflected in Appendix C, Danske Invest Management Company purchased Petrobras securities on the NYSE during the Relevant Period and suffered substantial losses as a result of the conduct complained of herein.

37.     Plaintiffs Oppenheimer Funds are four investment funds managed, advised, and distributed by non-party OppenheimerFunds, Inc. ("OFi") and its affiliates. OFi is a leading asset

management company headquartered in New York, New York with over $200 billion in assets under management.

38.     Plaintiff Oppenheimer Developing Markets Fund is a Delaware business trust. It purchased Petrobras preferred ADSs on the NYSE during the Relevant Period and suffered losses as a result of the conduct complained of herein.

39.     Plaintiff Oppenheimer Quest for Value Funds, on behalf of its series Oppenheimer Global Allocation Fund, is a Delaware business trust. It purchased Petrobras preferred ADSs on the NYSE during the Relevant Period and suffered losses as a result of the conduct complained of herein.

40.     Plaintiff OFIGTC Emerging Markets Equity Fund is a collective investment trust organized under the laws of New York. It purchased Petrobras preferred ADSs on the NYSE during the Relevant Period and suffered losses as a result of the conduct complained of herein.

41.     Plaintiff OFI Global: Emerging Markets Equity Fund, LP is a limited partnership organized under the laws of Delaware. It purchased Petrobras preferred ADSs on the NYSE during the Relevant Period and suffered losses as a result of the conduct complained of herein.

**B.     Petrobras**

42.     Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil. Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022. The Company also maintains a trading and procurement office in Houston, Texas. The Company employs more than 400 people in its U.S. operations. The Company's common and preferred shares are listed on the São Paulo Stock Exchange, the BM&FBOVESPA ("Bovespa"), trading under the ticker symbols "PETR3" and "PETR4," respectively. Since 2000, Petrobras has sponsored ADSs representing the Company's common

and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.

### C.     The Securities Act Defendants

43.     In addition to Petrobras, the following parties are named herein as Defendants under Danske Invest Management A/S's Securities Act Claims.  The Defendants appearing in ¶¶ 44-53 below are not named as Defendants in the Exchange Act Claims.

#### 1.     PGF

44.     Defendant PGF is a wholly-owned finance-related subsidiary of Petrobras incorporated in the Netherlands.  PGF maintains its principal executive offices at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.   PGF sold $8.5 billion in debt securities to investors, including Danske Invest Management A/S, through the U.S. capital markets in the Offering.  PGF's publicly-issued debt securities are registered with the NYSE and are unconditionally guaranteed by Petrobras.

#### 2.     Helms

45.     Defendant Theodore Marshall Helms ("Helms") serves as the Authorized Representative in the United States for Petrobras and PGF. Helms signed the 2012 Registration Statement pursuant to which the Company engaged in the Offering.

#### 3.     The Underwriter Defendants

46.     Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter and joint bookrunner of the Offering.  Citigroup maintains its principal place of business at 388 Greenwich Street, New York, New York 10013.

47.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter and joint bookrunner of the Offering.  J.P. Morgan maintains its principal place of business at 277 Park Avenue, New York, New York 10172.

48.     Defendant Scotia Capital (USA) Inc. ("Scotia Capital") acted as an underwriter and co-manager of the Offering.  Scotia Capital maintains its principal place of business at 1 Liberty Plaza, 165 Broadway, 25th Floor, New York, New York 10006.

49.     Defendant HSBC Securities (USA) Inc. ("HSBC") acted as an underwriter and joint bookrunner of the Offering.  HSBC maintains its principal place of business at 354 Sixth Avenue, New York, New York 10011.

50.     Defendant BB Securities Ltd. ("BB Securities") acted as an underwriter and joint bookrunner of the Offering.  BB Securities, a subsidiary of Banco do Brasil S.A. incorporated in the United Kingdom, has its principal place of business at 4th Floor, Pinners Hall, 105-108 Old Broad Street, London, EC2N lER, United Kingdom.  Banco do Brasil S.A. maintains an office at 535 Madison Avenue, 34th Floor, New York, New York 10022.

51.     Defendant Bank of China (Hong Kong) Limited ("Bank of China") acted as an underwriter and joint bookrunner of the Offering.  Bank of China maintains its principal place of business at Bank of China Tower, 1 Garden Road, Hong Kong.  Bank of China maintains an office at 410 Madison Avenue, New York, New York 10017.

52.     Defendant Banco Bradesco BBI S.A. ("Bradesco") acted as an underwriter and joint bookrunner of the Offering.  Bradesco has its principal place of business at Avenida Paulista, 1450 8th Floor, Sao Paulo, Brazil, and maintains an office at 450 Park Avenue, New York, New York 10022.

53.     Defendant Banca IMI S.p.A. ("Banca IMI") acted as an underwriter and co-manager of the Offering. Banca IMI has its principal place of business at Largo IVIattioli, 3 Milan, MI 20121, Italy, and through its subsidiary Banca IMI Securities Corporation, maintains an office at 1 William Street, New York, New York 10004.

54.     The Defendants listed in ¶¶ 46-53 are referred to collectively as the "Underwriter Defendants."

55.     Petrobras, PGF, Helms and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

### D.     <u>Relevant Non-Parties</u>

56.     Foster served as CEO and President of Petrobras from February 13, 2012 until February 2015.  During this time, Foster was also a member of Petrobras's Executive Directorate and a member of the Company's Board of Directors (the "Board of Directors").  Previously, Foster served as the Company's Director of Gas and Energy.  Foster signed the 2012 Registration Statement pursuant to which the Company conducted the Offering.  Foster also signed Petrobras's 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F reporting the Company's financial results and other misstated information about the Company and its business.  Foster also made a series of false and misleading statements in investor conference calls, press releases and other communications during the Relevant Period.  On February 4, 2015, Foster purportedly resigned as a result of her role in the misconduct alleged herein.

57.     Barbassa served as CFO of Petrobras from 2005 to February 2015 and was a member of the Executive Directorate.  Barbassa signed the 2012 Registration Statement pursuant to which the Company conducted the Offering.  Barbassa also signed each of Petrobras's Relevant Period Forms 20-F and each of Petrobras's Relevant Period Forms 6-K reporting the Company's financial results and other misstated information about the Company and its business.  On February 4, 2015, Barbassa purportedly resigned as a result of the misconduct alleged herein.

58.     Gabrielli served as CEO and member of the Executive Directorate for Petrobras until February 13, 2012.  Gabrielli signed Petrobras's 2009 Form 20-F and 2010 Form 20-F reporting the Company's financial results and other misstated information about the Company and

its business. On December 16, 2014, prosecutors in Brazil announced that they were planning to indict Gabrielli on fraud charges and sought an order freezing Gabrielli's assets. On January 29, 2015, a Brazilian court granted that request, froze Gabrielli's assets, and granted access to Gabrielli's and other suspects' bank records.

59. Costa served as Petrobras's Chief Downstream Officer from May 14, 2004 to around April 27, 2012 and was a member of the Executive Directorate during that time. Costa also served as the chairman of the boards of directors of the Alberto Pasqualini Refinery (REFAP), the Abreu Refinery (RNEST) and the Complexo Petroquimico do Rio de Janeiro ("Comperj"). Costa was also a member of the board of directors of Petrobras Transportes ("Transpetro").

60. Duque served as Petrobras's Chief Services Officer (also referred to as Chief Engineering, Technology and Procurement Officer and Services Director) from January 31, 2003 to around April 29, 2012. Duque also served as Chairman of Petrobras's Services Board and was a member of Petrobras's Executive Directorate and of the board of directors of Petrobras Gas S.A. (Gas Petro).

61. Barusco served as Executive Manager of Engineering, reporting directly to Duque, from approximately 2003 until March of 2011. Thereafter, Barusco was appointed by Gabrielli to the position of Head of Operations at Sete Brasil, a company founded in 2010 to lease oil rigs and deepwater drilling platforms to Petrobras, where he stayed until his resignation in 2013.

62. Cerveró served as a director of Petrobras's International Division from 2003 to 2008, and was a member of the Executive Directorate during that time. Cerveró then served as CFO of Petrobras's fuel distribution subsidiary, BR Distribuidora, until March 2014.

63. Machado served as CEO and President of Petrobras's transport unit, Transpetro, from June 2003 to February 5, 2015.

## IV.  FACTUAL BACKGROUND

### A.  History and Structure of Petrobras

64.  Petrobras was incorporated in 1954 in order to carry out crude oil and natural gas production and refining activities on behalf of the Brazilian federal government.  At the beginning of the Relevant Period, Petrobras was the largest corporation in Brazil (and in the Southern Hemisphere) by market capitalization, and one of the largest integrated oil and gas conglomerates in the world.  Petrobras also operates in 22 other countries, including in the United States, where the Company focuses on deepwater oil exploration in the Gulf of Mexico.

65.  While investors in the Company's NYSE-traded ADSs hold the equivalent of approximately 25% of the Company preferred stock and 21% of the Company's common shares, Brazilian law requires that the Brazilian federal government own a majority of Petrobras's voting stock.  As a result of this arrangement, the Brazilian federal government has the power to elect a majority of the Company's Board of Directors and, through them, the "Executive Directorate," which was selected by and reported directly to the Board of Directors.  The Executive Directorate (also known as the "Executive Board") was composed of the Company's CEO and six senior-most officers and was responsible for the Company's day-to-day management. These executives included, among others, Gabrielli and Foster, in their capacities as Company CEOs and, for Foster, in her previous capacity as Chief of Gas and Energy; Barbassa, as Company CFO; Costa as Chief Downstream Officer; Duque as Chief Services Officer; and Cerveró, as Chief International Officer.

66.  For over a decade, the ruling party in Brazil has been the Workers Party (known by its Portuguese acronym "PT").  The PT and its coalition allies thus have the power to appoint a majority of Petrobras's Board of Directors and to select members of Petrobras's Executive Directorate.  Indeed, Brazil's current President, Dilma Rousseff, was Chairwoman of Petrobras's

Board of Directors from 2003 until she was elected President of Brazil in 2010. During her time

as Chairwoman, Rousseff acted as cabinet minister to former president Luis Inácio Lula da Silva

("Lula"). In 2012, after she was elected President, Rousseff nominated Foster for the position of

Petrobras's CEO.

67. During the Relevant Period, Petrobras's revenue was derived from five separate

business segments:

a. *Exploration and Production* ("E&P" or "Upstream"): The Upstream Division included all of Petrobras's oil and gas exploration, development, and production in Brazil. The E&P Division searched for potential underground or underwater crude oil and natural gas fields, drilled exploratory wells, and subsequently drilled and operated the wells that recovered and brought the crude oil and/or raw natural gas to the surface.

b. *Refining, Transportation and Marketing* ("Downstream" or "Supply"): The Downstream Division included all of Petrobras's refining, logistics, transportation, oil products and crude oil exports and imports and petrochemicals that took place in Brazil. Costa was the Director of this Division until he departed in April 2012.

c. *Gas and Energy*: The Gas and Energy Division handled Petrobras's gas transportation and distribution, fertilizer production, and electric power generation using natural gas and renewable energy sources. Foster was Director of this Division before she was promoted to CEO in February 2012.

d. *Distribution*: The Distribution Division distributed Petrobras's oil products to wholesalers and through the Company's "BR" retail network in Brazil. Cerveró was CFO of this Division prior to being terminated in December 2014.

e. *International*: The International Division included all of Petrobras's revenue-generating activities (including exploration and production, refining, transportation and marketing, distribution and gas and energy operations) in the 22 countries in which Petrobras operated outside of Brazil, including the United States. Cerveró was Director of this Division prior to 2008.

68. In addition, as discussed further below, the Company had other non-revenue

generating divisions, including the "Engineering, Technology and Materials" (or "Services")

Division. This Division was responsible for designing and overseeing the construction and

development of Petrobras's large-scale capital projects, including the building of new refineries. Duque was Director of this Division from 2003 until his departure in 2012.

69.     Petrobras's Divisions were organized within the Company as follows:



70.     The Company also operated several subsidiaries, including its fully owned subsidiary, Transpetro.  Transpetro is the largest oil and gas transportation company in Brazil. Transpetro's financial results are rolled up into the Company's consolidated financial results. Machado served as CEO of Transpetro throughout the Relevant Period.

71.     As the Company reported in its Forms 20-F filed with the SEC: "Our most important tangible assets are wells, platforms, refining facilities, pipelines, vessels and other

21

transportation assets, and power plants." Petrobras reported the value of these tangible assets as PP&E on its balance sheet, which constituted by far the majority of the Company's assets during the Relevant Period.

| | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| PP&E | $218,567 | $182,465 | $204,901 | $227,901 |
| Total Assets | $308,683 | $319,410 | $331,645 | $321,423 |
| PP&E as % of Total Assets | 70.80% | 57.12% | 61.78% | 70.90% |
| *All dollar amounts in $ millions* | | | | |

### B. Petrobras Required Extraordinary Amounts of Capital to Exploit Brazil's Oil and Gas Resources

72.     Petrobras's business activities were extremely capital-intensive.  In order for the Company to exploit Brazil's oil reserves, the Company first had to invest billions of dollars in exploratory drilling, oil rigs, and infrastructure.  In the Company's Downstream operations, oil refineries cost billions to build, including the real estate, construction costs, pipelines, roads and other infrastructure.

73.     Petrobras's need for outside capital exploded beginning in 2006 with the discovery of several mega oil fields buried miles off Brazil's coastline.  These "pre-salt" fields—so-called because they lie under a two-kilometer thick layer of sodium chloride—were the biggest oil discoveries in the Americas in decades and promised to elevate Brazil to one of the top oil-producing countries in the world.  Indeed, the discovery of the pre-salt fields doubled Brazil's known oil resources and placed Brazil second only to the Middle East in oil reserves.

74.     When the pre-salt fields were discovered, the Brazilian government immediately suspended all new development while it re-wrote the laws to grant Petrobras a larger stake in pre-salt development.  Before 2010, Petrobras was required to compete on a level playing field with other companies for exploration and production agreements with the government.  However, in

December 2010, the Brazilian government passed regulations aimed at reducing competition against Petrobras and increasing government control over the new pre-salt fields. Specifically, the government passed regulations that allowed Petrobras to be the sole operator of oil fields where licenses had not yet been auctioned, and granted Petrobras a minimum 30 percent stake in joint ventures to bid for exploration licenses. As Costa stated at the time, the new legislation "represent[ed] a strong position of the state to keep this wealth."

75.    However, the exploration and development of oil in the pre-salt layers was technologically challenging and expensive. Indeed, at the time, analysts were concerned that the Company could risk being "overwhelmed" with projects, given the complicated financing and project management required of these sprawling developments. Some of the main difficulties included the fact that the pre-salt fields were located 300 kilometers from Brazil's coastline, in ultra-deep water (greater than 2,000 meters), laying below a thick salt layer (more than 2,000 meters), with often severe oceanic conditions. Analysts estimated that a single pre-salt well would cost $100 to $150 million to develop, and one significant pre-salt field alone could require up to 200 wells and $600 billion over the life of the wells. Petrobras was then required to build or lease enormous floating production, storage and offloading vessels ("FPSOs"), each of which cost hundreds of millions of dollars. As one analyst put it: "What Petrobras is planning to do this decade in the deepwater has never been attempted by any single company anywhere, ever. It really is on a different scale."

76.    As Petrobras was embarking upon these expensive new pre-salt developments, it announced plans to build Brazil's first new oil refineries since 1980, in an effort to become less dependent on foreign oil imports. Gabrielli claimed in 2008 that Petrobras's major refinery

projects—specifically, "Abreu" and "Comperj"—would transform Brazil's economy by enabling the country to reach "self-sufficiency in oil refining by 2015."

77.     In 2008, the Company announced an enormous capital investment program in which the Company intended to spend *$175 billion* from 2009-2013. Similarly, in 2012, the Company announced a plan to spend an additional *$236 billion* between 2013 and 2016.

78.     During the each year within the Relevant Period, the Company reported billions of dollars in annual capital expenditures and investments.

## C.     Petrobras Focused on the United States Capital Markets

79.     The Company relied heavily on its access to U.S. securities markets to fuel these massive capital expenditures. For instance, in September 2010, Petrobras conducted an enormous offering of common and preferred ADSs on the NYSE, concurrent with an offering of common and preferred shares in Brazil. In the U.S. offering, the Company sold at least 235 million common and preferred ADSs for proceeds of $7.7 billion. Upon the conclusion of the ADS offering and the concurrent offering in Brazil, Petrobras immediately became the fourth-largest company in the world measured by market capitalization.

80.     Similarly, between 2012 and 2014, the Company raised over $27 billion through debt offerings on the NYSE, including the Offering in March 2014, where the Company and PGF raised approximately $8.5 billion on the NYSE. The Offering was underwritten by major Wall Street banks, as discussed further below.

81.     Evidencing the importance of the NYSE to Petrobras's capital-raising efforts, Petrobras based its Global Investor Relations department out of its New York office, which was headed by Executive Manager and Global Head of Investor Relations, Theodore Helms. Since 1999, Petrobras's New York office (under Helms) has "actively participated in Petrobras's efforts

to access the international debt and equity capital markets, including working with the ratings agencies to obtain an investment grade rating for Petrobras."

82.     In order to fund these investments through the U.S. capital markets, the Company had to convince investors and ratings agencies that its financial statements were accurate, and that it would adhere to the strict disclosure requirements of public companies that are listed on U.S. exchanges. The Company repeatedly claimed that it "met the requirements of" the Sarbanes-Oxley Act ("SOX") and was subject to "oversight by the Securities and Exchange Commission in the US (SEC), and to all the rules of governance and disclosure of relevant information to the market."

83.     Indeed, the Company's emphasis on its compliance with U.S. disclosure obligations was critical to its access to U.S. capital markets, which, in turn, was foundational to the Company's growth. In fact, Petrobras's initial public offering of its ADSs on the NYSE in 2000 was, at the time, one of the largest such offerings in U.S. history. At the time, analysts observed that Petrobras's listing on the NYSE would have a transformational effect on the Company's ability to raise capital. For example, an August 7, 2000 article in *Oil & Gas Journal* observed that "[t]he much-anticipated Petrobras global offering and its listing on the NYSE will make its shares more attractive to foreign investors, many of whom have been reluctant to buy the OTC-traded instruments. In addition, ***an NYSE listing will make the company's accounting standards more transparent***, similar to other large US companies, analysts said."

D.     **Petrobras Was Legally Required to Engage in Open and Honest Bidding With Outside Contractors**

84.     As described in detail below, several former Petrobras executives and business associates have admitted that it was Company practice to avoid open bidding and to accept gross overpricing in contracts with a large cartel of contractors in exchange for hundreds of millions of

dollars in kickbacks and bribes. These practices were in direct violation of Petrobras's stated legal obligation to engage in open and honest bidding with its contractors.

85. As is typical of oil and gas companies, Petrobras worked with numerous outside contractors that supplied goods and/or services to the Company's different segments in order to complete all of these resource-intensive projects, including the construction of new refineries. Given the critical role of outside contractors to Brazil's state-owned enterprises—particularly Petrobras—the Brazilian government issued special procurement rules to govern bidding practices. In 1997, the government of Brazil amended its Constitution in order to approve by Presidential Decree Petrobras's Simplified Bidding Procedure Regulations. In anticipation of the 2014 World Cup and the 2016 Olympic Games, in 2011, Brazil introduced legislation called the Differential Public Procurement Regime to streamline procurement bids and contracts at Brazilian companies, including Petrobras.

86. During the Relevant Period, procurement processes at Petrobras were internally governed by the Simplified Bidding Procedure Regulations and the Petrobras Procurement Manual. The process was supposedly "underpinned by legal, technical, quality and cost criteria, and formally oblige[d] suppliers to carry out their activities based on ethics and also social and environmental responsibility." In addition to these governmental regulations, according to Petrobras, "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it. We also established limits of authority, updated and approved periodically by the Executive [Directorate], for the signing of contracts."

87. Petrobras's procurement processes were largely conducted under the auspices of Petrobras's Engineering & Services Division (defined above as the "Services Division"). As Costa

later explained to Brazilian federal prosecutors, the Downstream/Supply, Gas & Energy, and Exploration & Production Divisions were "business areas," whereas the Services Division offered support to the business areas. When the business areas commissioned new projects for their divisions, they "hired" the Services Division to create the basic design, conduct the bidding process, select the outside contractor(s) to execute the project, and oversee the construction of the project. Upon completion, the business areas took over the project. Duque was the Director of the Services Division from 2003 to 2012, and his "right hand man" was Barusco, Executive Manager of Engineering. As discussed below, Costa, Duque and Barusco were central figures in executing the massive bribery and bid-rigging scheme at Petrobras.

     E.     **Petrobras Trumpets Its Transparency in Response to a 2009 Investigation into Pricing Irregularities**

88. In 2009, before the beginning of the Relevant Period, the Brazilian federal government's public auditor (Tribunal de Contas da União, or the "TCU") identified "irregularities" in Petrobras's construction contracts. The TCU was responsible for auditing procurement processes financed by the Brazilian federal government and had oversight over every Petrobras capital investment and contract. Pointing to the TCU's findings, political opponents of the ruling PT party called for a Parliamentary Commission of Inquiry, known by its Portuguese-language acronym "CPI," to investigate concerns about overpricing in connection with Petrobras projects. Because the CPI was initiated by the opposition party, and Rousseff was the Chairwoman of the Company's Board of Directors and Brazilian President Lula's chosen successor, the investigation was largely perceived to be a political attack.

89. The Company unequivocally denied all allegations, stating that there were "[n]o problems with Petrobras contracts. ***There [was] no overpricing***."

90.     In further response to the CPI's investigation, the Company launched a massive investor relations campaign to promote and enhance the Company's transparency.  Among other measures, the Company created an official website linked directly to its corporate webpage titled "*Fados e Dados*," or "*Facts and Data*" in English, which was designed to allow the Company "to achieve maximum possible transparency in the relationship with its stakeholders."  The Company repeatedly made it clear that *Facts and Data* was its official channel of communications with investors, press, and other stakeholders. In a June 10, 2009 post, the Company stated that "Petrobras reaffirms that the blog *Facts and Data* has been launched to disseminate information from Petrobras, the [Company's] position on issues relating to CPI and also guarantees full disclosure of [the] responses sent to the press."  Similarly, in a June 7, 2009 *Facts and Data* post the Company stated that:

> [T]he goal of Petrobras [is] to achieve maximum possible transparency in the relationship with its stakeholders.
>
> \*       \*       \*
>
> The initiative to create the blog *Facts and Data* is, in the opinion of Petrobras, a milestone in the building of new bridges of communication with the public that has a relationship with the company, in a new era of digital information in real time.  The so-called blogosphere allows a direct relationship between the disclosing source of information and readers, without filters, so that the decision about what is in fact of interest to the recipient is selected thereby, so that the recipient has full access to the questions and answers.

91.     Throughout 2009, both on *Facts and Data* and through traditional news media, Petrobras emphasized to investors that it was a model corporate citizen.  For example, Rousseff, as Chairwoman of the Board, insisted in a press interview in 2009 that: "Petrobras has **one of the most accurate accounting standards in the world** . . . . If it wasn't the case, investors would not be seeking out the company as one of the great investment targets."  In June 2009, the Company wrote on *Facts and Data* that:

Petrobras has *a strict code of ethics, widely reported for its workforce, and that governs relations with its suppliers*, whether small or large companies. *There is no political or partisan interference in their decisions.* We emphasize that the company – systematically subjected to internal and external audits, with shares traded on the stock exchanges of São Paulo, New York, Madrid and Buenos Aires – is considered a *benchmark in transparency and corporate governance in Brazil and abroad*.

92.     In a June 20, 2009 posting on *Facts and Data*, Petrobras quoted an interview that Gabrielli gave to *Época* Magazine elaborating on the Company's transparency and ethics. During this interview, Gabrielli emphasized the Company's transparency and its robust internal controls, stating: "We are very transparent, more than most private and public companies" and "we have a code of ethics, formal procedures and audit and control systems. If we identify failures and deviations in these processes, we will investigate."

93.     After a five-month congressional investigation, the CPI (led by the PT, which had an overwhelming electoral majority at the time) finished its work without identifying any irregularities in Petrobras's contracts. Indeed, the CPI's final report (filed in December 2009) found that "[t]he set of signs of irregularities pointed out by the TCU in the works of Abreu Refinery, after the analysis undertaken by the CPI, was shown to be inconsistent. In view of this finding, we consider it unnecessary to adopt additional measures concerning this investigation." Given these conclusions, investors were assured that Petrobras had been exonerated. Indeed, in a November 10, 2009 *Bloomberg* article discussing the CPI committee's expected conclusions, a Banco do Brasil SA analyst observed that, because the CPI probe had not turned up anything problematic for the Company, "*Petrobras became the biggest winner out of this debate*."

94.     Significantly, years later when the contract-fixing and kickback scheme at Petrobras began to be revealed, investors learned that a key member of this 2009 CPI committee was paid a $10 million bribe in order to whitewash the investigation of Petrobras.

## V.    PETROBRAS'S FRAUDULENT SCHEME DURING THE RELEVANT PERIOD

95.    In the wake of the CPI's 2009 investigation into Petrobras's potential overbilling and subsequent public exoneration of the Company, Petrobras and its executives boosted their efforts to publicize Petrobras's purported "strong ethical principles" and its commitment to "carrying out its business with transparency and integrity." Indeed, throughout the Relevant Period, Petrobras repeatedly touted the Company's purported anti-corruption practices. For example, in SEC filings and conference calls with investors, Petrobras consistently emphasized the Company's "Code of Ethics," which stated that the Company was purportedly committed to "select[ing] and hir[ing] suppliers and service providers based on criteria strictly legal and technical of quality, cost and timeliness" and "[r]efusing any corruption and bribery and bribery practices and keeping formal control and disciplinary procedures for any possible violation of this principle."

96.    The Company continued to firmly contend that there were no "irregularities," overbilling, or corruption associated with its massive capital spending projects. Given the Company's high debt-earnings ratio, the Company's capital spending was of significant interest to analysts and investors. As UBS wrote in a February 10, 2010 report, "[w]e are once again referring to *capital discipline* as a key theme for PETROBRAS." Throughout the Relevant Period, therefore, investors and the media continued to seek assurances from the Company that Petrobras was spending the billions of dollars in investor capital appropriately and cost-effectively. Petrobras provided these assurances at every turn, insisting that there was "no overbilling" in its capital projects and no "irregularities" in its relationships with outside contractors.

97.    However, as at least two former Petrobras executives have now admitted in guilty pleas and the Company has acknowledged, every one of these assurances was false when made. Indeed, as has now been revealed, Petrobras's capital costs were dramatically inflated due to a

decade-long scheme of kickbacks and graft. This scheme caused the Company—and its investors—to grossly overpay outside contractors in exchange for direct cash bribes to top Company executives and government officials.

A. **Petrobras Touts New Capital Projects as Critical to Its Future and Emphatically Denies Allegations of Pricing Irregularities**

98. Throughout the Relevant Period, Petrobras and its executives repeatedly assured investors that there were no irregularities at any of its major construction projects. However, as discussed below in Section V.B, most, if not all, of these projects were riddled with fraud and bribery, which inflated the costs of each projects. The following key projects are just significant examples of the widespread corruption at the Company.

1. **The Pasadena, Texas Refinery**

99. During the Relevant Time Period, the market was concerned over potential overpricing at a massive oil refinery that Petrobras acquired in Pasadena, Texas (the "Pasadena Refinery"). In response to these concerns, Petrobras and its executives adamantly denied that the huge costs of the Pasadena Refinery were the result of any form of corruption or fraud.

100. In 2006, the Company decided to significantly expand its operations in the United States by signing a joint venture agreement with Transcor Astra Group SA ("Astra") in which Petrobras paid $360 million for a 50% stake in the Pasadena Refinery. This amount alone was stunning, because Astra had purchased the entire refinery for only $42.5 million just a year before. Interest payments and legal fees brought the price tag for Petrobras's stake in the refinery to $820.5 million. Ultimately, following a protracted litigation over Astra's exercise of a put option requiring Petrobras to buy the remaining 50% stake, Petrobras paid a total of ***$1.18 billion*** for Pasadena.

101.     As the costs for the Pasadena Refinery escalated, the Company forcefully denied any claims that the decision to invest in the refinery at such a high price was the result of fraud or corruption.  For example, in August 2013, Gabrielli appeared before a Brazilian Senate committee to defend Petrobras's purchase.  As set forth in an August 7, 2013 post on *Facts and Data*, Gabrielli insisted that: "According to our Former Chairman, the acquisition [of the Pasadena Refinery] was a ***normal operation, based on market conditions***."  The Company further insisted in a May 23, 2014 statement on *Facts and Data*:

> *We have strict legal procedures for payments, including for the purchase of Pasadena.*
>
> The payments made for any reason and in any country follow strict and clear procedures and relevant legislation. Additionally, we have a structured Internal Audit group, which has unrestricted access to any unit of the Petrobras System to verify the compliance of procedures and transactions made.

(Emphasis in original).

102.     Later, in 2014, Brazil's Attorney General raised concerns about the exorbitant cost of Pasadena, but exonerated Petrobras's Board of Directors.  However, as Costa eventually admitted, the Pasadena acquisition was the direct result of the Company's "institutionalized" bribery scheme.  In reality, the Company's International Director, Cerveró, was incentivized to push through this unfavorable transaction in order to reap $20 to $30 million in bribes from Astra.

### 2.     The Abreu Refinery

103.     In 2005, Petrobras approved plans to build Abreu, one of Brazil's first new oil refinery projects in over 20 years.  Costa, as Director of the Downstream Division, was primarily responsible for Abreu, including negotiating with contractors to work on the project.

104.     Investors began raising concerns over increasing costs and delays at the refinery soon after development began.  Initially budgeted at a total cost of $2.4 billion in 2006, the anticipated cost of the Abreu tripled to $12 billion in just three years.

105.     Petrobras countered media and investor inquiries into the project's ballooning costs with an aggressive public relations campaign.   In response to reports in the Brazilian press regarding cost overruns at Abreu, Petrobras emphatically stated in a January 28, 2010 *Facts and Data* post:  "Petrobras reiterates **that there are no irregularities in contracts for the construction of the Abreu[] Refinery**."  The next day, on January 29, 2010, Petrobras stated on *Facts and Data* that the Company "reaffirms that there was no 'overbilling' or 'overpricing' in the construction works of the Abreu [] refinery."

106.     Petrobras's representations had their intended effect of reassuring analysts and investors over the growing costs of the Abreu refinery.  For example, following a meeting with Costa and Barbassa on November 19, 2010, Morgan Stanley analysts "walked out of the presentation . . . **convinced that the concerns surrounding the construction of the refineries are overstated**" and explained that Costa "made a thorough presentation touching on every single controversy raised by the market over the past 18 months and justifying every decision made by the company based on economics," including those related to Abreu.   Based on Costa's representations, Morgan Stanley estimated a "capex reduction of up to 35% due to fiscal benefits and the **competitive bidding process potentially escalating returns to double-digit levels**" and stated that "Petrobras is not investing in refineries for political reasons," reiterating its "overweight" rating (or "most positive" buy recommendation).

107.     UBS analysts were similarly impressed, noting in a November 22, 2010 report that their three-hour in-person meeting with Costa and Barbassa, in which "the high costs of Abreu" were discussed, had positively influenced their assessment of the Company.   UBS analysts stated that they "came out of the meeting slightly more positive on improved transparency," and credited Costa and Barbassa's comments that it was "not fair" to compare Abreu's costs with other

worldwide refineries because its costs were attributable to the "extra infrastructure costs . . . plus its peculiar design." Deutsche Bank was similarly reassured by "initiatives being taken in order to reduce the new refineries' construction costs."

108. Petrobras continued to defend its expenditures on Abreu even as they continued to climb. For example, on January 7, 2013, in response to questions posed by the *Jornal Nacional* (Brazil's leading primetime television news program), including questions regarding the project delays and the fact that the budget was expanded more than eight times and was expected to cost more than **R$41 billion** (US$20.2 billion), Petrobras again professed that there were "no irregularities in the construction of the Abreu[] Refinery."

109. Abreu finally began operations in November 2014—approximately four years behind schedule—at a cost-to-date of $18.6 billion, or over five times its original budget, making it one of the most expensive refineries ever built. While the refinery was expected to process 230,000 barrels of crude oil per day, it will likely not reach that level until the second half of 2015. As detailed below, Costa and others have now confessed that Abreu served as a slush fund for hundreds of millions of dollars in kickbacks to Petrobras executives and Brazil's governing political parties.

### 3.     The Comperj Refinery

110. Like Abreu, Petrobras represented that its Petrochemical Complex of Rio de Janeiro, or Comperj, was key to the Company's future profitability. According to Costa in a 2009 interview with *Petrobras Magazine*, the Comperj refinery alone would generate "annual savings of around US$2 billion" for Petrobras by reducing its dependence on more expensive imported petrochemical products. Originally conceived in 2004, Comperj was initially expected to be operational by 2011 and to cost approximately $6.1 billion. By 2006, the expected cost rose to $8.4 billion, with an operation start date pushed back until 2012.

111.    As costs associated with Comperj grew and its opening was delayed, Petrobras again executed a public relations campaign to counteract market concerns.  For example, when the TCU raised concerns regarding certain Comperj contracts in October 2010, Petrobras denied any "irregularities."  Among other things, the TCU highlighted an R$53 million (US$31.5 million) contract for a water treatment unit that was being constructed in Rio de Janeiro by the same contractor for a third of that amount.  In an October 8, 2010 *Facts and Data* post, Petrobras responded that there was "***no overpricing***" at Comperj, and that it had "strictly observe[d]" competitive bidding mandates governing the Company's business.

112.    When the media raised further questions, Petrobras again denied any wrongdoing.  Responding to reports from both *Globo TV* and *Jornal Nacional* on January 6 and 7, 2013, respectively, Petrobras reaffirmed that there were "***no irregularities***" at Comperj.  According to Petrobras, the increase in costs was attributable to changes in the scope of the project, as the "initial project has undergone several modifications" since it was first conceived more than seven years earlier.

113.    Notwithstanding the Company's assurances, Comperj's costs continued to spiral out of control.  By January 2015, the Comperj refinery was still not complete, and faced a new set of delays after at least 23 contractors responsible for Comperj projects were implicated in the criminal proceedings examining the bribery scheme at Petrobras.  According to news reports, Petrobras is now expected to delay the start of the Comperj refinery complex until 2018.  The current cost for Comperj now stands at $21.6 billion.

### 4.    SBM Offshore Projects

114.    Petrobras also partnered with multiple international corporations as outside contractors.  As discussed above, Petrobras relied upon enormous FPSOs to process and store the oil or gas extracted from the Company's pre-salt fields.  One of Petrobras's most significant FPSO

lessors was SBM Offshore N.V. ("SBM"), a Dutch engineering company that owned and operated the world's largest fleet of FPSOs.

115.    On February 13, 2014, following media reports of suspected bribes being paid by SBM to Petrobras executives, Petrobras purported to initiate an internal investigation.  On March 31, 2014, the Company announced the "Completion Of Internal Verification," stating:

> Petrobras announces that the Internal Investigation Commission, created on 02/13/2014, to look into accusations of supposed bribe payments made to employees of the Company, involving the company SBM Offshore, concluded that, based on work performed and limited to its regulatory scope, ***no facts or documents were found that prove the payment of bribes to employees of Petrobras***.

116.    As late as June 11, 2014, Foster publicly claimed that "no irregularities were discovered" between SBM and Petrobras.

### 5.    Transpetro Subsidiary

117.    In addition to extracting and refining oil and gas, Petrobras also operates a vast transportation network to transport those oil and gas products from the sea and to bring them to market through its wholly owned subsidiary, Transpetro.

118.    The Company touted Transpetro throughout the Relevant Period as a critical component of the Company's "integrated" business plan to generate returns through the Company's pre-salt discoveries and revitalize Brazil's shipping industry through the Company's Fleet Modernization and Expansion Program, or "PROMEF."  The Company repeatedly claimed that it strictly adhered to a competitive bidding process, which ensured the money spent to develop its transportation infrastructure was prudent and in the best interests of investors.

119.    When investors and analysts began raising concerns over the large amounts Transpetro was expending in connection with PROMEF, the Company vehemently defended its bidding process and expenditures.  For example, in response to *O Globo* articles detailing specific contractual terms in a February 27, 2011 report, Petrobras stated that complaints of "alleged

overbilling against the administration of Transpetro . . . are unfounded." According to Petrobras, Transpetro's "management is transparent, always focused on the public interest and continuously monitored by supervisory bodies and other competent authorities."

120.     As investors began to learn late in 2014, Transpetro's CEO, Sergio Machado, was engaged in the bribery scheme, and was directly implicated by Costa, who claimed that Machado paid him a $500,000 bribe in exchange for his approval for a shipping contract. Machado was subsequently forced out of Transpetro after Petrobras's internal auditors refused to certify any financial statements while he remained CEO.

     **B.**     **Unbeknownst to Investors, Petrobras's Contract Costs, Asset Values and Net Income Were Grossly Inflated by Cartelization and Graft**

121.     Contrary to Petrobras's repeated reassurances concerning the Company's commitment to "transparency," its "strict" compliance with laws governing competitive bidding, the legitimacy of its financial results, and the absence of "any irregularities" or "overpricing," Petrobras's senior-most executives were secretly engaged in a massive kickback scheme that grossly inflated the value of Petrobras's construction and services contracts, along with the financial results that Petrobras reported to the SEC throughout the Relevant Period.

122.     This scheme, and its impact on the Company's financial condition, has been admitted in sworn testimony provided by, among others, Costa—one of the senior-most executives at the Company during the Relevant Period—who explained that, prior to and during the Relevant Period, the Company operated as part of a criminal enterprise together with a select group of suppliers consisting of up to 16 of Brazil's largest construction companies called the "Cartel." With Petrobras's knowledge, the members of the Cartel routinely inflated the terms of purportedly competitive bids for Petrobras construction projects by up to 20%.

123.     This inflation did not just benefit the Cartel members.  The inflated contract prices also included a 3% kickback that was divided among Petrobras executives, Brazilian politicians, and money launderers who helped conceal the illegal transfers.  Petrobras's senior-most executives, including Costa, Duque and Cerveró, were instrumental in the scheme and received hundreds of millions of dollars in kickbacks.

124.     To date, multiple Petrobras executives, Cartel members, and other participants in the scheme have pled guilty to corruption and bribery and have provided sworn testimony and documents describing the scheme to Brazilian investigators.  These individuals include:

- Costa, who was one of the senior-most executives at Petrobras during his tenure as Director of the Downstream Division Supply.  Along with Duque, Petrobras's Director of Services, Costa was responsible for all contracts with outside contractors in the Downstream Division.  As set forth in an October 21, 2014 *Bloomberg* article, during his tenure at the Company, Costa was the "charismatic face" of Petrobras.  Costa was arrested in 2014 and has since admitted to his role in the bribery scheme and his personal receipt of millions of dollars in bribes.

- Barusco, a former Petrobras executive who was the "right hand man" to Duque in the Services Division.  Barusco has admitted to the scheme and agreed to return over *$100 million* that he personally reaped from these illegal bribes, an amount that places Barusco among the largest known bribery recipients in Brazil's history, and represents the largest amount ever turned over to Brazil from a single person.  In his plea deal, Barusco admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization crimes, among others, involving the company Petróleo Brasileiro S/A."

- Youssef, a convicted black market money launderer, who has admitted to personally delivering cash payments to Petrobras executives and Brazilian politicians.

- Augusto Ribeiro de Mendonça Neto ("Mendonça Neto"), who served as a director of Toyo Setal.  Toyo Setal was an engineering, procurement and construction ("EPC") contractor in Brazil, an affiliate of Japanese engineering firm Toyo Engineering Corporation, and a member of the Cartel.

125.     In addition to the sworn written and oral testimony from these key players, the Brazilian investigation has made public thousands of pages of documents, account statements,

handwritten and other recorded minutes and spreadsheets documenting the bribery payments, and other evidence of the scheme. Former Petrobras employees have also voluntarily stepped forward to confirm that there were noisy objections to these practices within the Company. This includes, as discussed below, at least one former senior executive, Velosa, who identified numerous irregularities in Petrobras's bidding and contract processes and repeatedly brought concerns about these irregularities to Foster herself. After Velosa raised these concerns, the Company sent her to Singapore where she was relieved of her duties, and her family was threatened.

### 1. Petrobras and Its Contractors Engaged in Bid-Rigging

#### (a) Petrobras's Contractors Dictated Which Companies Would Bid on Petrobras Projects

126. In stark contrast to the Company's repeated statements touting Petrobras's transparency, as Costa testified in 2014, "[i]n reality, what was happening within Petrobras, primarily from 2006 onward, was a process of 'cartelization.'" According to Costa, the Cartel, which consisted of the largest construction companies in Brazil—including Odebrecht, Camargo Correa, Andrade Gutierrez, Iesa, Engevix, Mendes Junior, UTC, OAS, and Queiroz Galvão— coordinated the bids they submitted for Petrobras contracts.

127. Barusco corroborated Costa's statements in his sworn testimony offered in connection with his plea bargain. Specifically, in Annex No. 5 to his plea bargain with the Brazilian Federal Police, Barusco testified:

> THAT the cartel's action at Petrobras had been going on for a long time, but was made easier from 2006 until 2011, due to the high volume of big constructions, where the technical criteria to select the companies at Petrobras would always indicate the same companies of the cartel and others that were "supporters," which allowed for the actions *of the cartel in the sense of* dividing the works among themselves;
>
> THAT the companies that made up a sort of "hard core" of the cartel were around 14 (fourteen), namely CAMARGO CORREA, ANDRADE GUTIERREZ, ODEBRECHT, SETAL/SOG ÓLEO E GÁS, OAS, UTC, SKANSKA, PROMON

ENGENHARIA, TECHINT, QUEIROZ GALVÃO, ENGEVIX, MENDES JÚNIOR, SCHAIN and MPE;

THAT those were the companies that received most of the invitations, the ones that did most of the work inside of PETROBRAS;

THAT there were also supporting companies that accepted to "discuss with the cartel" above mentioned and eventually took part in bids, acting together with the companies from the "hard core," namely CARIOCA, TOMÉ ENGENHARIA, TKK, ENGESA, JARAGUÁ, ALUSA, GDK, among others.

128.    Mendonça Neto confirmed Costa's and Barusco's testimony regarding the history

of the Cartel:

> That was an initiative that started in the late nineties, but it wasn't very effective because there were only a few companies in on it, because they were nine companies in a broader market, so those companies didn't have… they only had the protection system running between them, and it became more effective around maybe, the end of 2003/2004, when these things started to be set up with Petrobras' Directors. So that the companies that were invited were the ones that might be participating in the activities of, or in that group. After that, it became more effective. Contracting began to work out. And after 2006, late 2006, some other companies were included, by imposition of the market, or even Petrobras. Initially they were nine, seven more got in, and they were sixteen, all operating in the same way.

129.    As Mendonça Neto testified to Brazilian federal authorities, Petrobras and the

Cartel members adhered to a set, formalized procedure.  *First*, the members of the Cartel held

meetings where they exchanged information concerning upcoming procurement invitations from

Petrobras.   The Cartel meetings were attended by high-level executives with "decision

powers . . . so that the meetings would be secret and safe in the first place, and, second, that

everything that was agreed upon would be followed by the company[.]"  Indeed, Costa testified

that his personal contacts were "always at the level of president and director of the [contractor]

companies, I had no contact with the people from operation, execution."

130.    *Second*, once the list of upcoming projects was finalized, Youssef testified that the Cartel determined which Cartel member would receive which contract, considering, among other things, the number of contracts that member had already amassed.

131.    *Third*, the Cartel finalized the list of companies that would be invited to bid on a particular project.  The agreed-upon list was sent to Duque and Costa, "who ultimately had the power to grant final approval for the companies that would be invited to each procedure."  Youssef also corroborated, in sworn testimony to the Brazilian judge, that bidding for Petrobras projects was never competitive, and that contractors determined the winner of each tender before it was conducted.  As Youssef explained, the Cartel would "previously define the winner" of the Petrobras bids.  Youssef confirmed during his testimony:

> **JUDGE:** Do you know of this . . . if there were, regarding Petrobras, for those companies to obtain those contracts, any frauds in the bidding, or any arrangements between the companies? Do you have any knowledge of that?

> **ALBERTO YOUSSEF:** What I am aware of is that there was an arrangement between the companies, not in the matter of bidding, but when there was a package of projects at Petrobras, the [Cartel] companies, ***they, among themselves, would connect and arrange who would be the winner of that project***.

132.    As Mendonça Neto explained, the Cartel members memorialized the "rules" that would govern their bid-rigging operation.  In 2010, certain Cartel members voiced complaints that they were not receiving as many contracts as other members of the Cartel.  In a document titled the "Sports Championship," which was handed out at Cartel meetings, the Cartel members agreed on procedures concerning the bidding for projects relating to Comperj.  According to Mendonça Neto, the document reflected the Cartel's new agreement that past contracts would not be taken into account when assigning winners to new contracts, and that in effect, "what's done is done, we will not be arguing who got more contracts and who didn't, up to now."  In other words, "[a]ll the

teams"—i.e., the Cartel members, "will have their times, records, etc. back to zero" and "we are playing the game from now on."

133. In addition, as *Valor International* revealed in February 2015, Petrobras employees and executives actively assisted the members of the Cartel in ensuring that their bids were accepted by the Company. Indeed, Petrobras held meetings with Cartel members during the Relevant Period at the Company's offices in Rio de Janeiro to discuss the process of submitting bids to Petrobras. As reflected in the minutes of such meetings, Petrobras employees "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal" by the Company.

134. Contracts with Cartel members accounted for a vast amount of Petrobras's reported fixed assets during the Relevant Period. Indeed, in January 2015, Petrobras confirmed that over **R$188 billion (US$73 billion)** in assets—"or 1/3 of the [C]ompany's total fixed assets"—relate to contracts entered into with Cartel members between 2004 and April 2012 alone.

**(b) Bid-Rigging by the Cartel Inflated Petrobras's Project Costs**

135. Unsurprisingly, this illegal coordination among Cartel members removed all competition from Petrobras bids, causing bids to skyrocket. As Costa explained, the coordination of bids and the pre-selection by the Cartel of the winning bidder "obviously result[ed] in an excessive delta price"—or overcharge—to Petrobras.

136. The bids Cartel members submitted to Petrobras during the Relevant Period consistently met or exceeded the maximum amounts that were internally budgeted by the Company. Costa testified that Petrobras calculated the expected cost of supplies and labor (the budget), and had a general prohibition on accepting bids that came in higher than 20% over budget. Initially, Cartel members would bid at prices high above Petrobras's 20% limitation. At that point, Petrobras would contact the bidders and would request a "rebid." The winning Cartel member

would then "arbitrate its price close to the additional 20%, as a rule, and the others with amounts a little higher." In other words, as a matter of practice, contracts bid on by Cartel members were inflated to the greatest extent that Petrobras and its executives could conceivably permit without drawing obvious attention to the scam.

137. Barusco's plea agreement similarly stated that Petrobras entered into inflated contracts with Cartel members for projects at Abreu and that the Cartel wanted to impose contract prices that were "way above budget." Barusco's plea agreement also confirmed that "in the case of [Abreu] there was a clear overbilling."

138. According to Barusco, Petrobras's contracts with Cartel members were always "signed near the maximum amount for the internal budget of Petrobras."

139. As detailed in a December 11, 2014 complaint filed by the Brazilian federal public prosecutors' office against Costa and eight others (the "December 11 Prosecutor's Complaint"):

> [The participants in the scheme] managed to frustrate the competitive nature of bidding for large works conducted by **PETROBRAS**, attaining consistent advantages by imposing higher prices compared to a freely competitive environment, ensuring contracts of a given volume of works and choosing the works most convenient according to region or technical know-how, among other advantages.

140. The December 11 Prosecutor's Complaint included a chart, derived from material provided by Petrobras and excerpted below, with examples of massive projects where the Cartel members submitted winning bids for Abreu and another refinery, Repar, that were at or near the internal "maximum" bid:

| AGREEMENT | ESTIMATED AMOUNT | MAXIMUM CONTRACT LIMIT (ESTIMATED AMOUNT + 20%) | AGREEMENT AMOUNT / AGREEMENT AMOUNT IS X% HIGHER THAN ESTIMATED AMOUNT | WINNER BID PERCENTAGE RELATIVE TO MAXIMUM CONTRACT LIMIT |
|---|---|---|---|---|
| REPAR – [IERP] 111 | R$2,076,398,713 (~US$1,292,660,000) | R$2,491,678,455 (~US$1,551,190,000) | R$2,252,710,536 (~US$1,402,420,000) | 90.44 % |
| REPAR – [IERP] 112 | R$2,093,988,284 (~US$1,303,610,000) | R$2,512,785,941 (~US$1,564,330,000) | R$2,488,315,505 (~US$1,549,100,000) | 99.08 % |
| ABREU – | R$2,892,667,038 (~US$1,667,950,000) | R$3,216,200,446 (~US$1,854,500,000) | R$3,190,646,503 (~US$1,839,760,000) | 99.80 % |

### 2. Petrobras Executives Demanded that All Contracts Include an Additional "Bribe Fee"

141.    Petrobras executives not only knew about the Cartel's overpricing and bid-rigging activities during the Relevant Period—they personally profited from them. Indeed, Petrobras executives, including Costa, Duque and Barusco, required that Cartel members' inflated bids include an extra "bribe fee" that was set aside for kickbacks to Petrobras executives and bribes for government officials. Specifically, "every" Petrobras contract with Cartel members included a surcharge of up to 3% that would be "allocated to political agents," and Petrobras executives. This "bribe fee," which was incorporated into the bid price submitted by Petrobras's contractors, further inflated Petrobras's project costs.

142.    According to Costa, in connection with Cartel contracts, 2% was allocated to the Services Division. Of the remaining 1%, "60% went to the [Progressive Party], 20% was for expenses . . . and the remaining 20% was allocated—70% to me and 30% either to [José] Janene or Alberto Youssef." Thus, for every $100 million contract entered into by Petrobras and a member of the Cartel over which Costa had an interest, the co-conspirators typically allocated the accompanying bribe as follows:

| Bribes for Every $100 Million Contract | | |
|---|---|---|
| % Allocation | Amount Allocated | Recipient |
| 2% | $2,000,000 | PT (Workers' Party) –Services Division |
| .8% | $800,000 | PP (Progressive Party) and expenses |
| .14% | $140,000 | Costa |
| .06% | $60,000 | Youssef or other money launderer |

143.    Mendonça Neto corroborated that approximately 3% of all contract amounts were paid to Petrobras executives and politicians as bribes.  According to Mendonça Neto, the Cartel members knew that the payment of bribes to Petrobras senior executives, including Duque and Costa, was the only way to secure the contracts, and the Cartel members were not in a position to object:

> **Public Prosecutor:** At the meetings, besides the division of the construction projects, the cartel deals, was payment of undue advantages to Petrobras' Directors ever discussed, if it would be convenient to uphold those promises of payment or not, regarding the cartel's activities?

> **Mr. Augusto:** Basically, the division of the construction projects was discussed. And as for the payment of commissions to Petrobras' directors, maybe that didn't even merit a discussion, because ***everyone was aware that it would be very much mandatory***.

144.    For Toyo Setal's part, Mendonça Neto admitted in court testimony that Toyo Setal had paid bribes to Costa for at least one contract related to Petrobras's Repar refinery and at least two contracts relating to Petrobras's Replan refinery.

145.    Other Cartel members have continued to come forward and have provided additional evidence detailing the bribery scheme.  For example, Julio Camargo, another Toyo-Setal executive, testified that he paid R$12 million (approx. US$5.1 million) in bribes to Costa and Duque to build a major component, known as a coking unit, at the Repar refinery.  According to Camargo, the bribes were a "***rule of the game***, which means that if there was no bribe for the supply department and for the engineering department, the negotiations wouldn't be successful."

146. Similarly, according to press reports, Erton Medeiros Fonseca ("Fonseca"), the CEO of leading Brazilian construction company Galvão Engenharia, provided receipts to Brazilian prosecutors evidencing bribes paid to Duque. According to Fonseca, Galvão was extorted by Costa, and Fonseca explained through his attorney that "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by [José] Janene," a black market money launderer who facilitated Cartel bribes to Petrobras executives. At a meeting at Fonseca's house in 2010, Janene informed Fonseca "in a very truculent way . . . that *to be able to win contracts, he would have to pay.*" Once Fonseca started paying the bribes, Galvão Enginharia's bids "started getting approved." According to Fonseca's testimony, the contracts that Galvão Engenharia won from Petrobras after the alleged bribe payments included projects as large as R\$2 billion to R\$3 billion (approx. US\$1.1 billion to US\$1.7 billion), such as construction contracts at Abreu.

147. This "rule of the game" applied to non-Cartel members as well, who were also forced to include a 3% "bribe fee" in their contracts with Petrobras. Indeed, as multiple witnesses have since testified, these bribes were standard operating procedure for Petrobras and were a "mandatory" part of nearly every Petrobras contract executed before and during the Relevant Period. As Youssef testified:

> **JUDGE:** Can you enlighten me, you yourself mentioned that you were a part of some of those meetings to define those . . . this percentage. What was the . . . ? How was that negotiation? What was the company's gain? How would they gain, making that payment of 1%, for instance?

> **ALBERTO YOUSSEF:** The truth of it is, they would win the work. If they didn't pay, . . . *they wouldn't get the work if they didn't pay.*

148. The payment of these massive bribes was well-organized. Mendonça Neto explained that with respect to Cartel members, once a Cartel member was chosen for a project, the Cartel member would arrange for the payment of bribes through Youssef, explaining that "[a]fter

we agreed on an amount, dates of payment, [Youssef] would arrange things and he would intervene if there were any problems, delays, things like that" for bribes funneled to Costa. According to Mendonça Neto, bribes paid to Duque were discussed directly with Costa, the Director of Supply, and the "payments were made either as deposits in an account abroad or in cash here in Brazil."

149.    In addition, Barusco maintained a spreadsheet that detailed the payment of bribes in connection with some of Petrobras's key refinery projects, including Abreu and Comperj. As explained above, the conspirators would allocate a specific percentage of each contract among: (i) the "house," or "casa," which referred to Petrobras executives and included Duque, who Barusco nicknamed "MW" or ***"My Way"*** (after the Frank Sinatra song); and (ii) the political parties—such as PR and/or PART—that participated in the scheme.[2]  As reflected in Barusco's spreadsheet (excerpts of which are reproduced below), which featured a column delineating the percentage to be paid as a bribe (the "%" column), the scheme impacted billions of dollars in Abreu contracts alone:

| COMPANY | | NAME OF PROJECT | DATE | AMOUNT | % | DIVISION | AGENT | COMPANY CONTACT | DOC DATE |
|---|---|---|---|---|---|---|---|---|---|
| Alusa | C | CAFOR da Abreu e Lima | 29/8/08 | R$966,103,305.78 US$591,395,266 | 2 | 1PR 0,5 PART 0,5casa (0,6MW 0,4Sab) | Luiz Eduardo Barbosa | Cesar Godoi Mario | 29/8/08 |
| Alusa Barbosa Mello | C | Pacotel-Carteira Enxofre Abreu Lima | 3/12/10 | R$651,760,449.82 US$385,451,801 | 2 | 1PR 1Part | | | |
| Camargo CNEC | C | UCR da Abreu e Lima Tipico + 17% | 10/9/09 | R$3,411,000,000.00 US$1,868,733,907 | | | | | 10/9/09 |
| Camargo/ Galvao /Odebrecht/ Queiroz Galv5o | C | Terraplanagem Abreu e Lima | 10/7/07 | R$429,207,776 US$226,626,420 | 2 | 1PR, 1PART | | Eduardo Leite Erton Fonseca Rogerio Araujo Idelfonso Colares | 10/07/2007 31/07/07 |
| Engevix EIT Engeform | C | Edificagoes Abreu e Lima | 10/2/09 | R$591,324,228.09 US$262,577,366 | 2 | 1PR 0,5PART 0,5casa | Milton Pascovich Shinko Nakandakari | Gerson Almada Marco Pinto Rola | 10/2/09 |
| Odebrecht OAS | C | Consorcio RNEST CONEST Abreu e Lima | 26/8/09 | R$1,485,103,583.21 US$795,790,153 | | | Rogerio Araujo e Agenor Medeiros | Rogerio Araujo e Agenor Medeiros | 26/8/09 |
| Odebrecht OAS | C | Consorcio CONEST/ UHDT Abreu e Lima | 20/8/09 | R$3,190,646,503.15 US$1,731,600,186 | | | Rogerio Araujo e Agenor Medeiros | Rogerio Araujo e Agenor Medeiros | 20/8/09 |

---

[2]    Plaintiffs' counsel has replicated this chart exactly except to translate terms and to provide the approximate U.S. dollar equivalent.

| Queiroz IESA | C | Interligaçoes da ABREU e LIMA (15%) | 13/1/10 | R$2,694,950,143.93 US$1,545,801,390 | 2 | 1PR, 0,5Part, 0,5casa | Idelfonso Colaraes | Idelfonso Colaraes | 13/1/10 |
|---|---|---|---|---|---|---|---|---|---|
| | | | TOTAL | R$13,420,095,989.98 US$7,407,976,489 | | | | | |

150.     The spreadsheet also reflects the payment of bribes to Sete Brasil chairman Joao Ferraz, who was referred to as "Mars," or "Marshall," and Barusco, who used the name "SAB," a reference to his girlfriend Sabrina.

151.     Barusco provided another spreadsheet to authorities reflecting that payments from the Jurong Shipyard, totaled millions of dollars per month and continued until **at least** 2014. Indeed, in a February 21, 2015 article in Brazilian publication *Veja*, Ricardo Pessoa, the jailed president of construction company and accused Cartel participant UTC, explained that UTC had illegally funneled R$30 million (approx. US$10.5 billion) as part of the Petrobras bribery scheme to Rousseff's re-election campaign in 2014 alone.

152.     According to Costa, the Cartel was able to operate in secret for so long because of the tremendous power that the "political agents" had over the fate of Petrobras's suppliers.  As Costa explained, there was "never, never" an instance where a Cartel member refused to pay the illegal bribes because:

> [If the Cartel member] did not contribute to a certain political party at that time, this would be reflected in other works at the government level, and the political parties would not look kindly to this . . . . If you create a problem on one side, it can create a problem on the other. So in my time there, I do not remember any company that failed to pay. There was, there were some delays, by cartel companies, **but they never failed to pay**.

153.     The bulk of the illicit bribes paid by Petrobras's outside contractors were directed to the coffers of the political patrons of Petrobras executives.  As noted above, each of the members of the Executive Directorate was hand-picked by Brazil's ruling political parties. In exchange for this appointment, according to the testimony of Costa and others, Petrobras's Directors and outside

contractors were supposed to direct substantial contributions to those political parties in connection with each contract.

154.    As Costa explained, Petrobras's senior managers—including Costa, Duque, Foster, and Gabrielli—owed their jobs to the politicians and political parties that had appointed them to those posts.  Costa stated:

> Other departments such as gas and energy and exploration and production, were also PT [Workers Party], so there was PT in the exploration department, PT in the gas and energy department and PT in the service department. So the comment in the company is that in this case the 3 percent went direct to the PT, PP [Progressive Party] did not participate in that because they were departments nominated for both execution of services and for business, PP with PT.  So what happened within the company was that the total amount would be fully for PT.

155.    Highlighting the role of different political patrons for different divisions, Costa further testified:

> The international department senior management was appointed by the Democratic Movement Party of Brazil (PMDB), so they also had funds which were passed on to the PMDB. In the international department.

156.    Costa also testified that it was crystal clear to all parties involved that enormous bribes were being directed specifically to fund politicians and political campaigns:

> **YOUSSEF'S DEFENSE LAWYER:** The companies knew that these monies, this money that was being paid, was also going to a public agent?

> **PAULO ROBERTO:** Yes.

> **YOUSSEF'S DEFENSE LAWYER:** They knew for sure that the money was going to finance politicians and political campaigns.

> **PAULO ROBERTO:** Of course. Yes, the answer is yes.

> **YOUSSEF'S DEFENSE LAWYER:** That is, this scheme (please forgive me for using this word but it has been used here) of bribery was also used to finance Brazilian politicians and the politicians' campaign scheme.

> **PAULO ROBERTO:** The answer is yes.

157.     As Barusco testified, "the payment of bribes and their amounts intensified with the increase of the billing of Petrobras, the increase of prices that were charged by the companies and the high demand of the company."   For example, in 2003 (when Barusco was hired as the Technology Manager in Petrobras's Board of Exploration and Production) the Services Division managed and made around US$3 billion per year.  By 2011 (when Barusco was Executive Manager of Engineering reporting to Duque) the Services Division was earning that amount *per month*, leading to a "proportional" and "mathematical" increase in the size of bribes he and other Petrobras executives received.

158.     In fact, Barusco testified that he and Duque received bribes "between US$40 to US$50 million dollars" in connection with "*90 (ninety)* PETROBRAS contracts" between 2003 and 2013.  These contracts included the $3.9 billion in contracts for the UHDT Hydrotreatment Unit for Abreu, in which Cartel members Odebrecht and OAS participated.  As Barusco explained, because Duque was "disorganized" and "worried that he might be caught," Duque assigned Barusco to act as an "accountant" charged with "manag[ing]" the amounts "owed" by the "hard core" construction companies that made up the Cartel.  According to Barusco, Duque required Barusco to deliver R$50,000 (approx. US$21,500) in cash to his home every two weeks—amounts that were deducted from the bribes Barusco received while he was at the Company.

159.     As confirmed in testimony provided by former Petrobras executives and other Cartel members, the bribery scheme continued throughout the Relevant Period, and bribes were paid to Petrobras executives even after they left the Company.  For example, Barusco detailed how he continued to receive bribes after he left the Company in 2011 to become Chief Operating Officer ("COO") of Sete Brasil, a company formed to provide leasing services to Petrobras.  Barusco worked with his replacement at Petrobras, Roberto Gonçalves, to continue the bribery scheme.

Barusco testified that as COO of Sete Brasil, he helped Sete Brasil obtain 28 contracts with Petrobras for the service and construction of drilling rigs in six Brazil shipyards. As in his role at Petrobras, Barusco was also charged with facilitating the payments of bribes to politicians and Petrobras executives under these 28 contracts, which had a total value of approximately $22 billion. As Barusco testified, while certain amounts varied, approximately 1% of the value of these contracts was to be paid as bribes, with (i) two-thirds of the 1% amount going to the treasurer of the Workers Party, João Vaccari Neto, and (ii) one-third divided between recipients in "House 1"—which consisted of Duque and Barusco's successor at Petrobras, Roberto Gonçalves—and those in "House 2," which consisted of Barusco and other Sete Brasil executives.

160. According to Costa and other witnesses, numerous directors throughout the Company received kickbacks as a result of the scheme, and "everyone" at the Company knew this was the case.

> **JUDGE:** This, let's say, this cartelization and this payment of 3% also existed in the other boards?

> **PAULO ROBERTO:** Yes. Correct.

> **JUDGE:** Do you know whether other directors, like you, also received amounts?

> **PAULO ROBERTO:** Yes, within the service area there was the director Duque, who was appointed at the time by the Minister of Civil Affairs, José Dirceu, right? And he had this connection with João Vaccari within PT [Partido Trabalhista (Worker's Party)] process. Within the International Board of Directors, it was Nestor Cerveró, who was appointed by a politician and had strong ties with the PMDB [Partido do Movimento Democrático Brasileiro (Brazilian Democratic Movement Party)].

> **JUDGE:** But do you know, for example, whether Mr. Nestor Cerveró and Mr. Renato Duque also personally received amounts?

> **PAULO ROBERTO:** *Well, this was talked about within the company and it was clear that yes they did. Yes, the answer is yes.*

161. Barusco echoed these sentiments, stating that bribery and corruption were "*endemic*" and "*institutionalized*" at Petrobras.

162.    In all, the "bribe fee[s]" kicked back to Petrobras executives and government officials, up to 3% of Petrobras's contracts, totaled billions of dollars.  Indeed, Petrobras's January 27, 2015 earnings release, discussed below, indicates that, for Cartel contracts signed between 2004 and April 2012,  this figure amounts to at least *$1.5 billion* (R$4.0 billion).

### 3.    The Company's Senior Officers Orchestrated and Covered Up the Scheme

163.    This massive and elaborate scheme was perpetrated through the extensive efforts of Petrobras's Executive Directorate to conceal the existence of the bid-rigging and bribes.  The cover-up goes back for years.  As discussed above, one of the principal reasons that the 2009 CPI investigation collapsed and failed to expose the true reasons for Petrobras's massive cost overruns in connection with Abreu was because one of the key members of the CPI committee was illicitly paid $10 million to keep quiet.

164.    Indeed, several members of the Executive Directorate were personally involved in and profited from the kickback scheme, including Costa, Cerveró, and Duque.  In addition, Foster, Gabrielli, and Barbassa, who served side-by-side with these Directors, each collaborated in the conspiracy to cover up Petrobras's longstanding fraud.

### (a)    Foster and the Executive Directorate Silenced Velosa and Closed Their Eyes to Evidence of Fraud

165.    Members of Petrobras's Executive Directorate, including Foster, Gabrielli, Costa and Barbassa, were intimately involved in the fraud alleged herein, and silenced employees who threatened to disclose it, including Velosa, a Petrobras executive from 1990 to 2014 who reported directly to Foster and Costa during the Relevant Period.

166.    On December 12, 2014, Velosa appeared on a Brazilian weekly TV news show (*Fantástico*).  That same day, Brazil's premier business newspaper, *Valor*, published an extensive interview citing to "hundreds of internal documents" Velosa provided to the newspaper.  In those

interviews, Velosa described in detail her discovery of significant "irregularities" at Petrobras and how she reported these red flags to Foster, Gabrielli, Costa, Duque and others in 2008 and 2009 before being silenced. Velosa's warnings describing telltale signs of fraud and asset misappropriation are documented in contemporaneous emails and other documents that have been provided to Brazilian federal prosecutors.

167. Velosa had held various positions at Petrobras from 1990 until November 2014, most recently as the managing director of subsidiary Petrobras Singapore since 2010. However, in 2008 and 2009, Velosa was an executive manager under Costa, where her Division was responsible for budgeting and evaluating the economic viability of Downstream projects. Velosa also interacted regularly with Foster. Specifically, Velosa stated to *Fantástico*, "we always had a lot of access. I knew Graças [Foster] when she was manager of technology, in the gas sector; I was manager of the contract management sector. We were close."

168. As reported in *Valor,* in 2008, Velosa led an internal audit of the Downstream Division's communications section and discovered extensive fraudulent billing practices. Velosa provided significant information to Gabrielli and Foster detailing the impact of the overbilling practices and made clear that the overcharges could only have been the result of fraud. These numerous problems included suspected misappropriations for small services billed at R$133 million (approx. US$59 million) between January and November 17 of 2008—a number that well exceeded the R$39 million (approx. US$17.4 million) planned for that year. Velosa's audit also revealed that R$58 million (approx. US$26 million) was paid in communication contracts for services that were never even rendered, including R$38 million (approx. US$17 million) in payments made by Geovane de Morais, the director of the communications sector. Velosa believed that Morais should be fired from the Company immediately and submitted a legal opinion

supporting this assertion from senior Petrobras counsel, Fernando de Castro Sá ("Fernando"). However, Mr. Morais was kept on the Company's payroll until 2013.

169.     Further, Velosa informed both Gabrielli and Foster about problems with bidding relating to the construction of the Abreu refinery, including payments for services that were never rendered.  Velosa testified to the Brazilian Federal Police that her team performed a comparative study examining the cost increases at Abreu to projects in the rest of the world, which revealed "prices for equipment that were four times higher than for the same equipment abroad."  Similarly, Velosa's team discovered that work on an earthmoving contract that was supposedly complete had not in fact been done. As Velosa explained, "there were always gaping holes."  According to *Valor*, a Petrobras internal document shows that Velosa made 107 "Project Change Requests," which would have saved R$947.7 million (approx. US$436.3 million) in the works of the Abreu refinery alone—none of these requests were implemented.

170.     Most significantly, Velosa criticized Petrobras's procurement model, which allowed for significant projects to be contracted out without a bidding process.  According to Velosa, this model often benefited members of the Cartel.

171.     Velosa testified that she reported these and other problems to Duque and Costa (including via emails), but no actions were ever taken.  Usually, Velosa was simply told to proceed as instructed, even when a project would generate a loss for the Company, as with the Abreu refinery.  In one instance, as Velosa told *Fantástico*, Costa confronted her after she raised her concerns.  Costa "pointed towards Gabrielli's [office] and asked:  'Do you want to bring down everybody?'"  According to Velosa, she responded:  "Look, I have two daughters.   I need to put my head onto [my] pillow and be able to sleep.  And the next morning, I have to look them in the eye without feeling embarrassed."

172.     Velosa also told *Fantástico* that she personally met with Foster to discuss these issues and other identified irregularities:

> [I]n 2008, as an executive manager, ***I informed . . . the director at the time, Paulo Roberto Costa. I informed other directors, like Graças Foster***. And, at a different time, as a general manager, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my executive manager at the time. I informed director Cosenza, in his position as director, since he was my peer, and as executive manager. ***I informed president Gabrielli***.

173.     In April 2009, Velosa prepared a memorandum outlining the details of the misappropriation of funds that her team had uncovered in its audit of various projects, which she intended to circulate to senior management. On April 3, 2009, Velosa asked Foster to review the memorandum. At the time, Foster was Petrobras's Director of Gas and Energy. Velosa's email asked: "I would like to have your opinion on a final text that I need to forward. Can I leave it for you to read? You know about the matter. Feel free if you feel better not reading it. ***I await your response to leave or not the material with your secretary***." Foster did not reply.

174.     Hearing nothing from Foster, Velosa circulated her "Internal Document of the Petrobras System," which concluded that "administrative irregularities" existed in the communications unit of the Downstream Division, to the Board of Directors.

175.     Velosa also made recommendations for improving Petrobras's governance practices going forward. For example, Velosa testified that she explained to her superiors that there was a need for a responsibility matrix and fixed milestones. These ideas were presented to Gabrielli, Duque, Costa, Foster and other members of the Executive Directorate. The proposed model was never adopted. According to Velosa, no reasons were provided for not adopting her recommendations.

176.     In October 2009, after reporting the above irregularities and making these recommendations, Velosa was transferred to Petrobras's Singapore office. No reason was

provided to her for transfer and, when she arrived, she was asked not to work and advised to take a training course.

177. Velosa reiterated her concerns about the Downstream Division in an October 7, 2011 email to Foster, stating: "***From the immense pride that I had for my company, I started to feel ashamed***." She continued, "what happened in the [] (the Downstream department) in the area of communications and projects was absolute nonsense." In the email, Velosa explicitly noted that part of the documentation showing the irregularities was already in Foster's possession: "***There are alternatives I'm evaluating despite fears of risking myself and my daughters. I would like to present to you part of the documentation that I already have. Part of it, I know you are already aware of. I would like to hear from you before taking the next step.***"

178. While in Singapore, Velosa continued to report irregularities to her superiors, including significant issues with the Company's purchases of fuel abroad. Velosa reported these additional irregularities to Foster in an email.

179. Finally, as *Valor* put it, on November 19, 2014, "after making hundreds of warnings and recommendations on money misappropriations in the company, [Velosa] was ousted by the current management without being informed the reason, along with several employees suspected of being involved in Operation Car Wash."

180. As *O Estado de Sao Paulo* reported in a December 17, 2014 article, a day after her dismissal, Velosa wrote Foster one last time:

> Since 2008 my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit]. By fighting it, I was threatened and harassed. ***I even had a gun pointed to my head and received threats against my daughters.***" [Velosa] did not detail in the email to Ms. Foster what happened, but she had a gun pointed to her, in the neighborhood of Catete, in Rio de Janeiro. They did not take a penny, but there was a recommendation that she should be quiet.

181. Velosa's email concluded, "I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting. ***I presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain***."

   **(b) Gabrielli and Duque Retaliated Against Fernando After Fernando Warned of Fraud at Abreu**

182. Velosa was not the only Petrobras employee who objected to the Company's improper practices and was dismissed or demoted for her efforts. On January 7, 2015, Brazilian Federal Prosecutors deposed Fernando de Castro Sá (defined above as "Fernando"), a lawyer who worked in Petrobras's Supply Division and regularly interacted with Duque and Gabrielli during the Relevant Period. During the interview, Fernando, who holds a master's degree from the University of California in international trade law, described in detail his discovery of significant "irregularities" at Petrobras and how he reported them to Gabrielli, Costa, Duque and others in 2008 and 2009 before being silenced.

183. Fernando drafted a legal opinion in early April 2009 concluding that Geovane de Morais should be terminated following Velosa's internal inquiry, which determined that Morais was responsible for improper payments in the Communications Department of the Downstream Division. Later that month, Fernando's superior, Nilton Maia, informed Fernando that he had received a call at home from Duque and Gabrielli regarding the Geovane opinion. Nilton stated that Gabrielli was very angry about the opinion. According to Fernando's testimony, Petrobras's senior management determined that "the legal department [would] give an opinion revising the previous opinions" concerning the findings of improper payments.

184. Fernando also testified that in early 2008, as a result of the comparative study conducted by Velosa's team regarding Abreu's expanding costs (discussed above), he spearheaded

an effort to convince the Board of Directors to adopt a systematic procurement model similar to the international benchmark, or Engineering-Procurement-Construction model. The EPC model contained certain key elements that would help address the deficiencies identified in Velosa's study, such as a "single point of responsibility" clause and non-extendable milestones. Although the Board of Directors approved the adoption of the EPC model promoted by Fernando on March 8, 2008, the Services Division, which was responsible for overseeing procurement contracts, continued to use the previous procurement model over Fernando's objection.

185.     When Fernando complained about the Services Division's refusal to follow the Board-approved policy, Gabrielli and other senior Petrobras managers retaliated against him and destroyed the evidence of improper practices he uncovered. Fernando testified that when he questioned contract terms for Abreu, the Petrobras committee responsible for approving them pointed to guidelines established by ABEMI, a lobby group for the Brazilian industrial engineering industry that included multiple significant Cartel members. After being repeatedly told that numerous unfavorable contract terms would not be changed despite his objections, Fernando complained to his superiors that ABEMI was in fact dictating the contracts. Even though Fernando was "very frightened by . . . what [he] was discovering," he received approval from Nilton to draft up a report to document his concerns. On July 8, 2009, Fernando met with Nilton to discuss his findings, who told him: "This is the deal, I do not want to see [the report]. You are already out of here. And it won't help to talk to anyone because I already talked to the president [Gabrielli] . . . I have spoken with the director [Costa] and director Duque."

186.     Soon after, Fernando was transferred to a small, isolated office in the International legal department, with no computer and without any work to do, his salary was decreased, and his former colleagues were instructed not to speak with him. Most importantly, Fernando's new role

did not involve any interaction with outside contractors. When asked during his deposition who was responsible, Fernando replied, "I was told that Gabrielli wanted my resignation, Duque too." According to his testimony, on September 2, 2009, Fernando was informed by a Petrobras executive that a committee set up to investigate his complaints regarding ABEMI "had not established anything, that [the executive] was erasing all documents in the system relating thereto and that he would keep the physical documents."

**(c)**      **Petrobras Removed an Independent Director From the Audit Committee After He Raised Concerns About the Company's Financial Statements**

187. Petrobras also took steps to remove the Company's critics from positions of power where they could uncover the truth about Petrobras's practices. For example, Mauro Cunha is one of the three independent members of the Company's Board of Directors. He has represented minority investors on Petrobras's Board since 2013 and is a vocal critic of the pro-government policies of the Company. In early 2014, Cunha was on the Petrobras Audit Committee investigating the Company's actions in acquiring the Pasadena refinery and constructing the Abreu and Comperj refineries. According to a March 18, 2014 *Dow Jones* article titled "Board Member of Brazil's Petrobras Voted Against 2013 Financial Report," during a February 25, 2014 meeting of the Board, Cunha rejected the Company's 2013 earnings reports because "he didn't have enough time to analyze the firm's finances and [] there was insufficient information and 'apparently inadequate' accounting of the firm's investments in refineries." According to a February 6, 2015 *Bloomberg* article, Cunha complained about Petrobras's conduct to the CVM, Brazil's securities regulatory agency. Cunha sent a letter to the Brazilian regulator following the February 25, 2014 meeting, stating: "They [Abreu and Comperj] are among the world's most expensive refineries . . . . I'm not comfortable with the absence of impairment."

188.     During an April 25, 2014 meeting of the Board of Directors, the Board removed Cunha from the Audit Committee without any explanation.  According to an October 20, 2014 *Bloomberg* article titled "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," Cunha has lodged a complaint with the CVM questioning his removal and the independence of the Petrobras Audit Committee.  In response, Petrobras filed a complaint with the CVM against Cunha regarding statements Cunha made in his capacity as Head of the Brazilian Association of Capital Markets incriminating Petrobras's management team.

### 4.     The Kickback Scheme Had an Enormous Impact on Petrobras's Financial Statements Throughout the Relevant Period

#### (a)     Petrobras's Accounting for the Bribes and Overpayments on Contracts Violated GAAP and IFRS

189.     Petrobras's kickback scheme pervaded the entire Company and inflated the price of contracts in all of the Company's primary business lines.  Both Costa and Barusco testified that every significant Petrobras division—Downstream/Supply, Services, Exploration & Production, Transportation, and Gas and Energy—operated pursuant to the 3% kickback scheme that inflated the Company's contracts.  These facts have been corroborated by Cartel members.  As discussed above, the only significant difference between the divisions was which political party received a cut of the bribes.

190.     In an effort to conceal this widespread kickback scheme from Petrobras's investors, Petrobras improperly recorded the billions of dollars in bribes and overpayments paid throughout the Relevant Period as *assets* on the Company's balance sheet.  Specifically, as Petrobras has since admitted, the bribes and inflated contract amounts that Petrobras paid out on a particular project were included in the value of the asset that Petrobras recorded on its balance sheet.  As a result, the amount of Property, Plant, and Equipment (defined above as "PP&E") that Petrobras reported

to the SEC on a quarterly basis throughout the Relevant Period included billions of dollars in unlawful bribes and overpayments.

191.    Both Generally Accepted Accounting Principles (defined above as "GAAP") (which the company was required to comply with prior to January 1, 2011) and International Financial Reporting Standards (defined above as "IFRS") (which the Company was required to comply with throughout the remainder of the Relevant Period) prohibited Petrobras's capitalization of bribes and inflated costs as assets in the Company's financial statements. IFRS provision International Accounting Standard ("IAS") 16 states that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction." Similarly, under GAAP, Accounting Standards Codification ("ASC") 360 allows companies to record the "historical cost" of PP&E, which includes *only* "the costs necessarily incurred to bring it to the condition and location necessary for its intended use." The cash received by Petrobras executives and Brazilian politicians as bribes and the additional costs incurred due to illegal (but Petrobras-sanctioned) bid-rigging were not cash "given to acquire an asset at the time of its acquisition or construction" under IAS 16, nor were these amounts costs "necessarily incurred to bring [the asset] to the condition and location necessary for its intended use" under ASC 360, and therefore could not be recorded as assets in the PP&E.

192.    Petrobras publicly represented to investors during the Relevant Period that it was valuing its PP&E in accordance with these accounting requirements. For instance, in its 2012 and 2013 Forms 20-F, Petrobras adopted the language of ASC 360 in representing that:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended

use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

193. These representations were demonstrably false, and Petrobras's accounting for the bribes and overpayments violated GAAP and IFRS. By capitalizing amounts paid out in bribes and inflated contract prices as PP&E, Petrobras reported materially overstated amounts for PP&E and total assets throughout the entirety of the Relevant Period. This material overstatement also had the effect of inflating Petrobras's reported shareholder equity.

194. Rather than capitalizing these bribes and inflated costs, IFRS and GAAP both required Petrobras to recognize these costs as expenses on Petrobras's income statement during the reporting period in which they were incurred. IFRS states that "*[a]n expense is recognised immediately in the income statement when an expenditure produces no future economic benefits* or when, and to the extent that, future economic benefits do not qualify, or cease to qualify, for recognition in the balance sheet as an asset." IFRS CF 4.52. Similarly, under GAAP, "expenses and losses are generally recognized when an entity's economic benefits are used up," meaning that expenses that result in no future economic benefit to a company must be recognized immediately. FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 85. There can be no dispute that these bribes and inflated costs produced no "future economic benefits" to the Company throughout the Relevant Period. Accordingly, putting aside that the bribes were illegal and should never have been paid, accounting rules required Petrobras to immediately disclose and record the bribes as expenses.

195. In addition, Petrobras misreported net income in each of its quarterly and annual financial statements by failing to record an impairment charge necessitated by the overstatement of the Company's PP&E and total assets. Moreover, Petrobras misreported net income in each of

those periods during which a bribe was paid and improperly capitalized instead of having been expensed immediately.

196.     In sum, as alleged below in ¶¶ 299-302, by wrongfully recognizing as assets the cash paid out as bribes and overpayments on contracts, Petrobras materially overstated the amount of PP&E, total assets and net income in each of its quarterly and annual financial statements filed with the SEC during the Relevant Period.

(b)     **Petrobras Has Admitted It Must Record a Massive Writedown to PP&E to Account For Improperly Capitalized Expenses**

197.     Petrobras has since ***admitted*** that the Company improperly recorded these inflated sums as assets during the Relevant Period, and that the capitalization of such costs during the Relevant Period (i) amounts to a violation of GAAP and IFRS; and (ii) necessitates a massive writedown.  On November 14, 2014, the Company disclosed that it would be unable to meet its deadline to file third quarter 2014 results accompanied by a review report by its outside auditor, Pricewaterhouse Coopers ("PwC").  Specifically, the Company stated:

> [A]s a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) ***make any adjustments to the financial statements based on the accusations and investigations related to [Operation Car Wash]*** and (iii) evaluate the need for internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time.

198.     During the Company's November 17, 2014 conference call, Foster stated that "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, could potentially affect the Company's financial statements."  In particular, Barbassa stated that "PP&E . . . should not include values which are not a fair value for that good or service," and further acknowledged that Petrobras would be required to "deduct from [PP&E] any amount that could be linked to bribery of any sort."  Barbassa also stated that overpayments and bribes "should be removed from the PP&E line item."  Foster likewise admitted during the November 17, 2014 conference call that

the existence of overpricing and bribery would require Petrobras to record a writedown to its PP&E: "You have an obligation to write off from the asset a cost related to corruption . . . [I]f there is a cost relating to corruption in the value of [a] net asset . . . you have an obligation to write off that cost. You have to discount that cost."

199.    In addition, in connection with "contracts entered into between January 1, 2004 and April 30, 2012," Petrobras admitted in its January 27, 2015 unaudited financial report for the third quarter of 2014 that amounts paid as bribes and other inflated costs "*were capitalized* as part of the historical cost of its property, plant and equipment and *are still part of their carrying amount*." Petrobras further admitted that "*those costs should not have been capitalized*."  As a consequence, the Company stated that "it is necessary to correct the amounts related to the misconduct that were capitalized," and, in particular, to "deduct from [PP&E] any amount that could be linked to bribery of any sort."  Accordingly, Petrobras conceded that its financial statements contained "errors in the carrying amount of [PP&E]."  Similarly, in her letter to shareholders that accompanied Petrobras's third-quarter results, Foster admitted that that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were *improperly recognized* as part of the cost of our fixed assets."

200.    Petrobras further conceded on January 27, 2015 that, due to its capitalization of bribes and other inflated charges during the Relevant Period, its financial statements do not fairly present the Company's financial position and do not comply with applicable accounting regulations.  In particular, the Company stated:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position in light of facts known to management and based on documentation available as of

the current date, ***except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of issue of these financial statements, as set out in note 3.***

These consolidated interim financial statements have been prepared in accordance with IAS 34 - Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), ***except for the errors mentioned above and further discussed in note 3.***

201.    The Company stated that it is unable to quantify the size of the required asset writedown.  On January 27, 2015, Petrobras admitted that it could not file third quarter 2014 financial statements that contained a reasonable estimate of the necessary write downs to the Company's assets.  According to Petrobras, the fraud—which affected at least R$188.4 billion (US$73 billion) in assets—was so pervasive that the Company still could not quantify the full extent of the misstatements on its financial statements.  Instead, the Company indicated that its assets could be overvalued by anywhere from ***US$1.5 billion (R$4.06 billion) to US$34 billion (R$88.6 billion)***.

202.    The $1.5 billion figure Petrobras provided grossly understates the size of the required writedown.  In its January 27, 2015 earnings release, the Company explained that this figure was derived by writing down the total value of contracts entered into with Cartel members by (i) an average percentage of 3%, which was an "estimation of the magnitude of the error using the average percentage mentioned in [Costa's] deposition," and (ii) "specific amounts of improper payments" mentioned in Costa's and others' depositions.  However, as discussed above, (i) the bribery was not limited to the Cartel companies, (ii) the improper contract inflation was not limited to the 3% in bribes, but instead included additional amounts of up to 20%, and (iii) the bribery scheme did not end in April 2012, but instead continued until 2014.  Recognizing this, the Company acknowledged in the earnings release that even this $1.5 billion writedown figure could

understate the true impact of the bribery on its financial statements, because the Brazilian Federal Police investigation was still ongoing and further wrongdoing could emerge.

203.    In any event, the Board of Directors had in fact quantified the writedown, but was prevented from releasing that figure at the last moment due to political pressures.  Just prior to the release of the third-quarter results, Foster and most of Petrobras's Board had agreed, on January 23, to take a net writedown of R$61.4 billion (US$22 billion) in the third quarter, but President Rousseff, through government-appointed board members, vetoed this proposal, saying it was too large.  The writedown was then rejected by the full Board on January 27, 2015.

> ### 5.    "Operation Car Wash" Has Provided Extensive Testimony and Documentary Evidence Demonstrating the Mechanisms of the Scheme

204.    In addition to the Company's admissions concerning the falsity of its financial statements, multiple Petrobras executives and Cartel members have pled guilty to corruption and provided extensive testimony explaining how the kickback scheme worked.

205.    Brazilian prosecutors uncovered the scheme almost by accident.  According to the prosecutors, their initial focus was on investigating money laundering by Youssef, a convicted career criminal who was known as the Brazilian black market's "central banker."  Operation Car Wash got its name from the fact most of the stolen money was laundered through a network of gas stations and car washes.

206.    According to press reports, Petrobras's scheme was only uncovered when investigators discovered Costa's name in the thousands of documents authorities had compiled through their investigation.  Specifically, investigators noticed that the name of Paulo Roberto Costa—the "public face" of Petrobras during his tenure—appeared together with the name of career criminal Youssef on a proof of address form submitted in connection the purchase of a R$250,000 (approx. US$110,000) Range Rover Evoque.  As explained by the *Financial Times*,

that discovery led to Costa's arrest on March 20, 2014, when Brazilian federal authorities raided Costa's home and seized assets from the former Supply Director, including 6 million Brazilian reais in cash, 25 luxury cars, and the Evoque. According to court records, when the Brazilian Federal Police conducted the raid on Costa's home, a security camera video caught Costa's two daughters and their husbands stuffing suitcases and bags with cash, incriminating documents, and a laptop, all of which they hoped to hide from the police.

207.    Although Costa initially denied the charges—claiming in a June 2014 appearance before a Parliamentary Commission of Inquiry that he "vehemently den[ied] that there was a criminal organization in Petrobras"—he ultimately struck a plea deal with prosecutors. As part of the deal, Costa provided 42 hours of sworn video testimony in which he described how he and numerous Petrobras senior executives pocketed hundreds of millions of dollars through the decade-long criminal kickback scheme. Arrests and plea bargains by other culpable individuals quickly followed.

208.    Following Costa's testimony, the Brazilian Federal Public Prosecutor's Office filed a complaint against Costa and nine others on December 11, 2014. The December 11 Prosecutor's Complaint summarized the course of Operation Car Wash as follows:

> During the operation "BIDONE" investigations, it was found that the criminal organization led by ALBERTO YOUSSEF was also active in offences against the civil service within and against **PETROBRAS**. Thus, the criminal lawsuit [] was proposed through which it was charged against **PAULO ROBERTO COSTA**, former supply director at **PETROBRAS**, for money laundering crimes against the Civil Service and participating in the criminal organization led by **ALBERTO YOUSSEF**, ***based on evidence of overpricing at the Delayed Coking Unit at the Abreu e Lima Refinery in Pernambuco***, charged to the CONSORCIO NACIONAL CAMARGO CORREA, led by contractor CAMARGO CORREA S/A.

*            *            *

67

The existence of a **large criminal scheme** was revealed including crimes against the economy, corruption and money laundering, and the establishment of a large and powerful cartel with participating companies OAS, ODEBRECTH, UTC, CAMARGO CORREA, TECHINT, ANDRADE GUTIERREZ, MENDES JUNIOR, PROMON, MPE, SKANSKA, QUEIROZ GALVÃO, IESA, ENGEVIX, SETAL, GDK and GALVÃO ENGENHARIA. This scheme enabled rigging the competitive bidding processes regarding the major works contracted by **PETROBRAS** between 2004 and 2014, largely increasing the profits of these companies in hundreds of million [reais].

(Emphasis in original).

209.    The December 11 Prosecutor's Complaint further summarized the "large criminal organization," which operated "from 2006 until at least November 14, 2014," as follows:

- The "first nucleus" consisted of executives at Petrobras's outside contractors, which was "was geared to commit cartel and bid rigging crimes against **PETROBRAS**, to corrupt its officers and launder assets received as a result of these crimes."

- The "second nucleus" consisted of Costa and Duque and "other top level PETROBRAS employees," who "assist[ed]" the "first nucleus" in "conduct[ing] the offences of cartel and bid rigging."

- The "third nucleus" consisted of Youssef and "other operators, who enabled the payment of undue advantages to the members of the second nucleus, as well as asset laundering that were the result of crimes committed by the entire criminal organization."

210.    Documents and testimony made public as part of Operation Car Wash contain copious details regarding the fraud.  Indeed, the contracts that Costa, Barusco, Mendonça Neto and Camargo testified were used to funnel bribes to Petrobras executives—including those involving contracts at Pasadena, Comperj, Abreu, and SBM—are the same projects that Petrobras repeatedly claimed were awarded based on a bidding process that "strictly" complied with the law, were free of any "irregularities," and were accurately reflected in the Company's financial statements at values that were "absolutely true and legitimate."

### (a) Bribery in the International Division

211. The corruption scandal at Petrobras included the Company's International Division, which was headed by Cerveró from 2003 to 2008. Documents and testimony revealed through Operation Car Wash have demonstrated that, while the International Division grossly overpaid for certain foreign assets (the value of which the Company overstated throughout the Relevant Period), the principal executives in that Division were accepting enormous bribes.

212. For example, Costa revealed during his sworn testimony that the International Division, and Cerveró in particular, perpetrated the same kickback scheme where 3% of the value of a contract would be diverted to management as a bribe. When asked if the "cartelization and this payment of 3% also existed in the other boards?" and if he knew "whether other directors, like you, also received amounts?" Costa stated: "Yes . . . [w]ithin the International Board of Directors, it was Nestor Cerveró, who was appointed by a politician and had strong ties with the [Brazilian Democratic Movement Party]."

213. Costa also told investigators that he had received $1.5 million from a lobbyist to assist in the purchase of the Pasadena Refinery. Costa stated that he received a visit from Fernando Soares, a lobbyist with ties to one of Brazil's biggest political parties. Costa had a longstanding relationship with Soares, and introduced him to other key members of the bribery scheme, including Barusco, at an Offshore Technology Conference in Houston, Texas. Soares offered Costa the bribe, which Costa accepted, in exchange for not hindering the negotiations as Cerveró proposed the project for approval. Costa stated that he believed the money came from Astra Oil, the owner of the refinery. Moreover, Costa stated that he understood a group headed by Cerveró had received between $20-30 million in bribes for the transaction.

214. In December 2014, Brazilian federal prosecutors filed charges against Cerveró and three others in connection with $53 million in bribes allegedly paid by Samsung Heavy Industries

69

as part of a deal to supply offshore drilling vessels. According to the charges filed, prosecutors say the bribes from Samsung Heavy Industries were solicited and received by Cerveró and other suspects "in order to make feasible" the contracting, by Petrobras, of two drilling vessels. The ships cost $586 million and $616 million, respectively, and were destined for offshore oil fields in Africa and the Gulf of Mexico. Cerveró allegedly shared $40 million of the bribe payments with Soares. Prosecutors say Soares requested the payments from Júlio Camargo, an executive of a Brazilian engineering firm who was acting as a broker for Samsung.

215.    Soares, like Cerveró, was charged with two counts of "passive" corruption and 64 counts of money laundering. Camargo, who allegedly received $13 million in bribes, was charged with "active" corruption, money laundering and financial crimes. The prosecutors specifically noted in their indictment that "[a]lthough it was Fernando Soares who made the deals with Júlio Camargo, there is no doubt that Fernando Soares passed along part of this amount to the former International Director, Cerveró, whose participation was fundamental for the deal between Samsung and Petrobras."

216.    On February 24, 2015, prosecutors filed new charges against Cerveró for "using the influence of his office to obtain contracts by payment of bribes (unfair advantage) under PETROBRAS" through the use of offshore companies located in Uruguay and Switzerland.

### (b)    Abreu and Comperj Refineries: Hundreds of Millions in Bribes and Overpayments

217.    The evidence demonstrating the impact of Petrobras's bribery and corruption scheme on the financial performance of the Company's Downstream (or Supply) Division—the business unit overseen by Costa—is overwhelming. The Downstream Division was responsible for over $70 billion in capital expenditures during the Relevant Period and, as numerous witnesses have now confirmed, a staggering percentage of this amount was paid out as bribes to Petrobras

officials, and as overpayments to contractors for services that should have been performed for billions of dollars less.

218. In fact, Costa has admitted that, contrary to Petrobras's repeated public representations during the Relevant Period, there *was* "overpricing" in all contracts for Abreu involving Cartel members like Camargo Correa, and that virtually every contract involving Costa's Division was inflated by the Cartel's bid-rigging, as well the 3% bribe that was paid to Costa and politicians.

219. Other Petrobras executives have corroborated the scope of the fraud in the Company's Downstream Division and admitted the Division's most important and capital intensive projects, including Abreu and Comperj, were specifically targeted by Cartel members and Petrobras executives. For example, in his November 24, 2014 plea agreement statement (No. 5), Barusco admitted that "in the case of [Abreu], *there was a clear overbilling*." In fact, according to Barusco, the Cartel's coordination of bids for 12 Abreu projects—including four of the largest packages of works related to Abreu—resulted in "contracts at prices at the top echelon of the Petrobras budget." Further, even after the Abreu projects went through a re-bidding process, Barusco explained, the Cartel and Petrobras agreed to inflated contract terms that were just under Petrobras's internal 20% threshold.

220. In other words, at the same time Petrobras was telling investors that it had "rigorously" complied with the bidding and that there were no "irregularities" or "overbilling" at Abreu, Petrobras's senior executives were in truth awarding inflated contracts in order to secure millions of dollars in bribes. Indeed, Barusco confirmed that "*the main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the Abreu e Lima Refinery-RNEST and the Petrochemical*

***Complex of Rio de Janeiro-COMPERJ***, in addition to large-sized packages in some refineries, such as REPLAN, REVAP, REDUC, RELAN and REPAR."

221.     Barusco provided detailed information to the Brazilian Federal Police concerning specific projects performed in connection with the Abreu refinery totaling over ***R$13 billion*** (approx. US$7.5 billion), which were used to divert bribes to Petrobras executives and public officials.  These contracts included, for example, a nearly R$1 billion (approx. US$635 million) contract for the construction of a powerhouse, compressed air unit, input substation, and related structures (the "CAFOR da Abreu e Lima" project) awarded to Cartel member Alusa; a R$3.2 billion (approx. US$1.8 billion) for the UHDT hydrotreatment unit project awarded to Odebrecht and OAS; and a R$3.4 billion (approx. US$2 billion) contract for a Delayed Coking Unit awarded to Camargo and CENC.

222.     As noted and illustrated above (at ¶ 149), the detailed spreadsheet maintained by Barusco memorializes that the bribery scheme impacted billions of dollars in Abreu contracts.

223.     In addition, Costa explained that, after he left the Company in April 2012, he set up a "consulting" company, "Costa Global," in order to facilitate the payment of bribes relating to Abreu and other contracts.  For example, Costa admitted that Costa Global entered into an arrangement with Construtora Comércio Camárgo Corrêa—which performed significant work at Abreu throughout the Relevant Period—through which Costa received R$100,000 per month for 30 months (or approximately US$1 million) through 2013.

224.     Barusco confirmed that the same "tactics" used by Petrobras and the Cartel to bid up prices and pay bribes for Abreu were used at the Comperj refinery as well.  In his plea bargain, Barusco identified numerous instances of Comperj projects that were subject to bid-rigging and bribery. In fact, Barusco admitted that information compiled from his Company computer

demonstrated that a new project relating to the Downstream Division would be tendered practically *every month*, and that each such project would be used to funnel bribes to Petrobras executives—clear evidence of the massive scope of the fraud and its impact on the Company's financial results.

225.     Barusco specifically identified three Comperj projects valued at over R$4.2 billion (approx. US$2.4 billion) that were used to funnel bribes to Petrobras executives—including a R$1.5 billion (approx. US$838 million) project awarded to Alusa to build a Catalytic Hydrocracking Unit (HCC), a nearly R$2 billion (approx. US$1.15 billion) project awarded to Andrade Guiterrez Techint to build a Coking Unit, and another R$820 million (approx. US$484 million) "earthworks" project, as set forth in Barusco's spreadsheet (excerpts of which are reproduced below):

| COMPANY | | NAME OF PROJECT | DATE | AMOUNT | % | DIVISION | AGENT | COMPANY CONTACT | DOC DATE |
|---|---|---|---|---|---|---|---|---|---|
| ALUSA | C | HCC do COMPERJ | 19/2/10 | R$1,460,859,527.26 US$806,748,137 | 2 | 1PR,0,5Part,0,5casa | Luiz Eduardo Barbosa | Cesar Godoi | 19/2/10 |
| Andrade Gutierrez Techint | C | Coque do Comperj Tipico Cartel 15% | 5/3/10 | R$1,938,191,350.00 US$1,087,893,663 | 2 | 1PR,0,5Part,0,5casa | | | 5/3/10 |
| Andrade Odebrecht Queiroz | C | Terraplanagem Comperj | 28/3/08 | R$819,800,000.00 US$469,853,278 | 2 | 1PR 1Part | | | 07/03/08 |

226.     On January 29, 2015, *Valor* reported that the Company's Board of Directors had received an appraisal report prepared by accountants that Petrobras hired to assess the impact of the bribery scheme on the Company's assets, including the Abreu and Comperj refineries. According to *Valor*, the report showed that, while the Company had spent over $18.5 billion on projects relating to Abreu, the refinery was in fact worth just $7 billion, or ***$11.5 billion*** less than its cost, after accounting for the impact of the fraud and overpricing. That same report showed that the entire value of Comperj, which has been built at a cost of $13.5 billion and is still not scheduled to open for at least another year, ***should be written down to zero***.

(c)     **Bribery by SBM**

227.     Directly contrary to Petrobras's claims (discussed above at ¶¶ 115-16) that there were no "irregularities" in its relationship with SBM Offshore, documents and testimony revealed through Operation Car Wash demonstrate that SBM actually paid millions in bribes to Petrobras executives.  As part of Barusco's plea deal, he agreed to repay $100 million in illicit bribes he received in his role as a senior procurement executive.  Barusco made it clear that *$22 million* of those bribes were paid by SBM.

228.     Specifically, as part of Barusco's plea agreement statement (No. 03) with the Brazilian Federal Police, Barusco acknowledged that he began to accept bribes from SBM in "1997 or 1998," which continued until at least October 2010.  Barusco provided the following sworn testimony:

> [T]hat he [Barusco] started to receive bribes from the Dutch company SBM in 1997 or 1998, while he held the position of Manager of Facilities Technology, within the Board of Exploration and Production, from two FPSO contracts signed due to the technical and "essential" participation of the informant, since he was the coordinator of the technical department;

> [T]hat at the time [Barusco] was in charge of formalizing the first freighted FPSO contract and he became an essential piece in the following FPSO contracts signed with SBM, and [Barusco] also started to receive bribes from them;

> [T]hat due to a very close relationship that [Barusco] had developed with the SBM representative, JULIO FAERMAN, both [Barusco] requested and JULIO offered the payment of the bribe, being an initiative that came from both sides and became systematic after the second FPSO contract signed between SBM and PETROBRAS in the year 2000, if I'm not mistaken;

> [T]hat these were long term contracts and, as such, the payment of bribes also lasted for many years while [Barusco] held the position of Manager of Facilities Technology between 1995 and 2003;

> \*       \*       \*

> [T]hat, in the year 2007, a contract was signed between SBM and PETROBRAS for the supply of a FPSO named P57, whose contract value was worth R$

1,258,548,071.75, during the time when [Barusco] already held the position of Executive Manager of Engineering, and received 1% over the contract's amount as a bribe, paid by JULIO FAERMAN between 2007 and until October 2010;

[T]hat this way the informant received, between 1997 or 1998 until October 2010, as a result of contract signed between PETROBRAS and SBM, the approximate amount of US$22 million dollars[.]

229. Barusco's detailed spreadsheet, excerpted below, sets forth bribes (the "%" column) that SBM (among many others) paid Barusco (via Faerman) in connection with at least three separate contracts, set forth in relevant part below:

| COMPANY | | NAME OF PROJECT | DATE | AMOUNT | % | DIVISION | AGENT | COMPANY CONTACT | DOC DATE |
|---|---|---|---|---|---|---|---|---|---|
| SBM | C | Monoboias PRA-1 | 13/3/06 | US$ 61,705,300 | | US$ 200mil fixo SAB/MW | Julio Faerman | Julio Faerman | 13/3/06 |
| SBM | C | P-57 | 19/12/07 | US$1,258,548,071 | 1 | Sab 300mil US part | Julio Faerman | Julio Faerman | 19/12/07 |
| SBM | C | Turret da P-53 | 1/5/05 | US$81,000,000,00 | 1 | Casa 0,6MW 0,4Sab | Julio Faerman | Julio Faerman | 24/4/08 |

230. On November 12, 2014, SBM announced a settlement with the Dutch Public Prosecutors Office of US$240 million in connection with the Dutch officials' investigation in SBM's international bribery scandal. According to SBM in a November 26, 2014 statement, the Dutch Public Prosecutor was able to establish that "payments were made from the accounts of the Company's agent to government officials in Brazil" "using means not available to [SBM]." With this admission and Barusco's plea agreement, the Company finally admitted on November 17, 2014 that there was "overwhelming evidence" that SBM had bribed Petrobras officials. As a result, SBM is now barred from entering into contracts with Petrobras until the allegations are proven, at which point SBM will be further suspended for an additional six months to two years.

**(d)    Bribery at Transpetro**

231.    The corruption at Petrobras also extended to the Company's transportation subsidiary, Transpetro.  Barusco's testimony establishes that at least 28 contracts totaling $22 billion involving shipyards operated by Transpetro were used to funnel bribes to Petrobras executives and affiliated politicians.  According to Barusco, the very PROMEF projects that Transpetro's CEO, Machado, touted as based on a "competitive" bidding process were in fact arranged by an agreement among the Cartel's members.  The costs of those contracts were artificially inflated by up to 20% as a result, and also included hidden bribes that were made to Petrobras executives and Brazilian politicians.  In fact, Costa testified that he himself received a bribe from Machado, who personally delivered a R$500,000 bribe to Costa at Machado's apartment in Rio de Janeiro:

> **FEDERAL JUDGE:** Did this also happen with companies linked to Petrobras, subsidiaries?
>
> **PAULO ROBERTO**:  Well, linked to Petrobras, . . . there's Transpetro, Transpetro has some cases of passing funds on to politicians, yes.  Transpetro.
>
> **FEDERAL JUDGE**:  You, for example, regarding Transpetro, which you said you had more knowledge of, did you ever receive any advantage or bribe through these Transpetro contacts?
>
> **PAULO ROBERTO**:  Yes, I did. I received a payment from Transpetro.
>
> **FEDERAL JUDGE**:  Can you be more specific?
>
> **PAULO ROBERTO**:  If I'm not mistaken, I received 500,000 Reais.
>
> **FEDERAL JUDGE**:  Who paid you?
>
> **PAULO ROBERTO**:  The president of Transpetro, Mr. Sérgio Machado.
>
> **FEDERAL JUDGE**:  When approximately was that?
>
> **PAULO ROBERTO**:  Perhaps I have some difficulty in remembering the dates here, because there were many dates if I'm not mistaken, maybe around 2009, 2010. Around that time, I think.

**FEDERAL JUDGE**:  But did you receive that on a single occasion?

**PAULO ROBERTO**:  From Transpetro, yes. A single occasion.

**FEDERAL JUDGE**:  And can you tell me the reason why that sum was paid?

**PAULO ROBERTO**:  I can, it was due to the contracting of some ships, and that had to go through the supply director.  So it was due to the contracting of ships by Transpetro.

**FEDERAL JUDGE**:  And was the amount delivered directly by Mr. Sérgio Machado?

**PAULO ROBERTO**:  It was delivered directly by him, at his apartment in Rio de Janeiro.

232.    In light of this testimony, as well as the other evidence produced by Costa and Barusco concerning the contract inflation and bribes impacting Transpetro's financial results, PwC has refused to sign off on Transpetro's financial statements for the third quarter of 2014. According to news reports, PwC refused to approve the results given Machado's involvement in preparing them and demanded that Machado be fired—a proposition that was apparently met with resistance by some members of Petrobras's Board of Directors who were concerned that his firing would cause friction with President Rousseff's ruling coalition.  On November 3, 2014, however, Petrobras placed Machado on unpaid leave.  Machado was eventually fired from Transpetro on February 5, 2015.

    **C.**    **<u>Following the Commencement of Operation Car Wash,<br>Petrobras Continued to Mislead Investors by Forcefully<br>Denying the Existence of Corruption</u>**

233.    By the start of 2014, Petrobras had assuaged any lingering concerns over costs and pricing in connection with its refineries and contracts.  Beginning in early 2014, however, several investigations commenced that once again raised the specter of "irregularities" in Petrobras's business dealings, including Costa's arrest.  In each instance, Petrobras and its executives strongly

condemned these allegations and vehemently denied the existence of any irregularities or corruption at the Company.

234. For instance, Petrobras and its executives denied any wrongdoing in response to a newly convened CPI to investigate possible improprieties in connection with Petrobras's purchase of Pasadena. On April 15, 2014, Foster told reporters she "believed one thousand times" in the Company's fundamentals, and later testified before the CPI in defense of Petrobras's performance, stating that the Pasadena deal was simply based on "incomplete data" and nothing untoward. Foster further testified that the Company "found no wrongdoing by Petrobras employees in the purchase" of Pasadena.

235. Similarly, on April 1, 2014, Petrobras announced in a press release that the Company's investigation into the accusation of bribes between SBM and Petrobras "concluded that there are *no facts or documents that evidence the payment of bribes to Petrobras employees*."

236. In May 2014, following his initial release from prison, Costa gave an exclusive interview to Brazilian newspaper *Folha* during which he strenuously defended himself and Petrobras against charges of bribery and fraud. Costa denied any knowledge of Youssef's role as a money launderer and denied having any relationship with him involving bribes. Costa stated that he provided advice to Youssef in 2013, and his payment for that advice was the Range Rover Evoque seized by the Federal Police in March 2014. Costa stated affirmatively that *"[m]y involvement in money laundering and remittance abroad is zero."*

237. Further, on May 10, 2014, the day after Brazilian newspaper *O Estado de São Paulo* reported that SBM's Brazilian representative Jacques Levy purportedly "said members of Petrobras knew of the bribery payments" since 2012, Petrobras issued a "forceful" denial of these allegations. Specifically, the Company stated on *Facts and Data* that it "belie[d], forcefully" the

article "and reaffirm[ed] that it became aware of accusations of alleged bribery payments to employees of the Company, involving the company SBM Offshore" for the first time from a February 2014 article.

238. Two days later, on May 12, 2014, during a conference call held to discuss the Company's first quarter 2014 earnings ("First Quarter 2014 Investor Call"), Foster allayed investors' concerns by reaffirming that Petrobras was not involved in any wrongdoing:

> We have our own internal investigation committee. They conducted investigations during 45 days. And regarding Petrobras action, regarding our operations, ***there are no facts or documents that would document the payment of bribery to any employees of Petrobras***.

239. Petrobras's and its executives' denials of wrongdoing continued throughout the spring and fall of 2014. On June 10, 2014, Costa vigorously defended his and Petrobras's innocence before the CPI, stating:

> I want to state here, first hand, that ***I firmly reject the allegation that Petrobras is a criminal organization, that there was, let's put it that way, someone else that was doing money laundering***.

240. Costa further testified: "I totally repudiate the []truth of this accusation made by the Federal Attorney's Office"; "Petrobras is an extremely serious company"; "***you will not find anything illegal at Petrobras, because there is nothing illegal about Petrobras***"; "[t]here is no criminal organization"; and "[t]here is no laundering of Petrobras money by Alberto Youssef. I do not know how they came up with this story."

241. At the same time, the Company continued to deny the allegations on the *Facts and Data* site, "reaffirm[ing]" on July 12, 2014 that Petrobras "has not found any facts or documents evidencing the payment of bribes to employees of Petrobras." Likewise, on July 14, 2014, Petrobras repeated its mantra that "there is no indication of irregularities" and "there is no overpricing or overbilling in the project of the Abreu [ ] refinery."

242.    Over the weekend of September 6-7, 2014, Brazilian magazine *Veja* leaked information and recordings from the confidential testimony provided by Costa as part of his plea bargain.  In this testimony, Costa stopped protesting his and his accomplices' innocence and for the first time admitted to paying and receiving bribes during his tenure at Petrobras.   Costa also reportedly implicated three state governors, six senators and 25 congressmen from three parties in the governing coalition.  These individuals included the president of the Senate and the speaker of the lower chamber and the treasurer of the Workers' Party.  *The Economist* reported on September 8, 2014 that the beneficiaries of the illegal kickback scheme "are alleged to have pocketed 3% of the value of the contracts signed with Petrobras in return for supporting the government in congressional votes."

243.    In a statement to the *Wall Street Journal*, Petrobras responded that it was cooperating with the investigators but refused to acknowledge its role in the scheme, stating that it was the **victim**, not the perpetrator, of the fraud:  "Petrobras would also like to emphasize that the company is considered by those authorities to be the victim in this investigation process."

244.    In sum, as the accusations of corruption began to mount in 2014, Petrobras executives flatly denied all wrongdoing while the Company maintained that it was the victim of the fraud, thereby perpetuating the fraud on investors.  Notwithstanding these denials, Petrobras and its executives knew that the jig might be up.  Foster immediately transferred her significant real estate assets to her son and daughter.  Similarly, Cerveró donated significant assets to his heirs before his assets were frozen by the Brazilian authorities.

## VI.    THE TRUTH IS REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES

245.    After months of repeatedly and vehemently denying the existence of the bribery and corruption scheme, on October 27, 2014, Petrobras issued a formal statement filed in a Form

6-K with the SEC regarding Operation Car Wash. In this statement, Petrobras acknowledged for the first time that the facts revealed by the police investigation could have a significant negative impact on its business. The Company also outlined the steps the Company was taking in response to the testimony and the investigation. Petrobras announced that it had had hired two "independent specialized investigation companies," later revealed to be two law firms—Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP—to "examin[e] the nature, exten[t] and impacts of the actions that might have been performed" at the Company and to "analyze correlated facts and circumstances that might have [a] material impact over the Company's business."

246. However, Petrobras reinforced that "the relevant government authorities have officially acknowledged the Company as a victim in this investigative procedure."

247. Petrobras's admission that Costa's claims of bribery and graft were legitimate and could have serious financial consequences for the Company's current financial condition stunned the market. In response to its October 27 statement, the Company's securities declined in value, with Petrobras' ADSs falling nearly 14% in a single day on extraordinarily high volume. Specifically, the common ADSs dropped 15.86%, falling from a close of $12.93 per share on October 24, 2014 to a close of $11.16 per share on October 27, 2014. Likewise, the preferred ADSs dropped 17.15%, falling from a close of $13.46 per share on October 24, 2014 to a close of $11.49 per share on October 27, 2014.

248. On November 13, 2014, after the market closed, Petrobras issued a press release, which it filed with the SEC on Form 6-K. The press release revealed for the first time that the allegations of bribery and corruption at Petrobras could potentially impact the Company's financial statements, but it did not specify how. The Company stated that it would be unable to publish its

audited third-quarter 2014 financial statements by the SEC's deadline of November 14, because it required additional time to quantify the impact of the corruption allegations on its financial condition. The Company further stated that it would release unaudited accounting information concerning its third quarter results by December 12, 2014.

249.    On November 14, 2014, Petrobras investors were rocked by more bad news when the Brazilian Federal Police arrested Duque. Duque's arrest revealed to the market that Costa's bribery and graft admissions were not the actions of a rogue employee, but instead spread throughout the Company. That same day, the Brazilian Federal Police arrested 26 other likely Cartel members in connection with the investigation of Petrobras, including senior executives and contractors who had contracts with Petrobras worth approximately $59 billion. The Federal Police also served dozens of search warrants and raided the offices of 11 companies that they suspected of participation in the scam. The *Financial Times* and other publications reported that the offices of Petrobras were among the offices that were raided.

250.    Also on November 14, Brazil's Comptroller General's office announced that it was investigating allegations that Petrobras officials accepted bribes to award contracts to SBM Offshore. Petrobras executives admitted that SBM, one of the world's largest companies, was now formally barred from future bid rounds.

251.    In response to the November 13 and 14 disclosures, the prices of the Company's securities price declined significantly. Specifically, the common ADSs dropped 2.5%, falling from a close of $10.20 per share on Thursday, November 13, 2014 to a close of $9.95 per share on Friday, November 14, 2014. Likewise, the preferred ADSs dropped 2.8%, falling from a close of $10.52 per share on November 13, 2014 to a close of $10.23 per share on November 14, 2014. By

Friday morning alone, shares of Petrobras ADSs had hit a 52-week low in reaction to these disclosures that "intensified" the "corruption scandal," according to *The Street.com*.

252.    In response to these revelations, Bank of America downgraded Petrobras from a "buy" to a "neutral" rating on November 14.  *O Globo* quoted a Professor of Accounting and Finance who "classified [Petrobras's actions] as 'extremely unusual and atypical' and signifying a reduction of the Company's 'trustworthiness.'"

253.    On Monday, November 17, 2014, before the market opened, the Company held its previously-scheduled earnings conference call with investors.  During the call, Foster admitted that while the Company had not yet determined the extent of the corruption scheme, "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, could potentially affect the Company's financial statements."   In fact, after one analyst demanded that the Company disclose "what kind of accounting adjustments could be necessary," Barbassa identified the specific line items on Petrobras's balance sheet and income statement that were impacted by the fraud, stating that "if the accusations are proven to be true . . . payment above what would be a fair value for a good [or] service . . . should be removed from the PP&E line item . . . and should be taken to the result."  Barbassa went on to state that Petrobras's PP&E "should not include values which are not a fair value for that good or service"—i.e., bribes—and that the Company "would deduct from it any amount that could be linked to bribery of any sort; any excessive price that would have been charged."  Likewise, in response to an analyst's inquiry into why the alleged corruption would necessitate an asset writedown, Foster stated:  "***You have an obligation to write off from the asset a cost related to corruption . . . if there is a cost relating to corruption in the value of [a] net asset, even if the asset can pay off that cost, you have an obligation to write off that cost***."

254.     In response to this news, Petrobras securities fell dramatically in value. Specifically, the price of the common ADSs dropped over 6%, falling from a close of $9.95 per share on November 14, 2014 to a close of $9.33 per share on November 17, 2014.  Likewise, the preferred ADSs dropped nearly 6%, falling from a close of $10.23 per share on November 14, 2014 to a close of $9.64 per share on November 17, 2014.  Petrobras bonds trading on the NYSE also fell on this news.

255.     As the *Washington Post* noted in a November 17 article titled "'Operation Carwash' in Brazil causes normally staid business meeting to go off script," the conference call contained "[w]ords that nobody wants to hear at a quarterly results event for a world-renowned oil company with a $220.6 billion business plan to complete: 'corruption,' 'bribe,' 'federal police,' 'internal investigation,' 'over-invoicing,' 'governance,' 'difficult moment' and 'painful.'"  As the *Washington Post* also noted, Foster's representations that no one within the Company "ha[d] any idea of the scale of the corruption problem" in March raised more questions than it answered:  "So nobody knew anything.  If not, why not?  There are billions of dollars involved in Operation Carwash.  Two top executives were jailed."

256.     Following this revelation, Morgan Stanley analysts noted that the Company's representations "raise[] new concerns and impl[y] potentially material adjustments to the financials."  Morgan Stanley further stated that the most immediate outcome of the probe is likely to result in a "sizable asset write-off" of $2 billion to $8 billion and the lowering of dividends for voting shares.  While Moody's had maintained its rating the previous Friday, November 14, on this news, Moody's lowered Petrobras's baseline credit rating to below investment grade, and said the bribery probe contributed to a negative outlook on the entire country.  On November 18, a UBS analyst opined that Petrobras faces a $10 billion impairment on assets resulting from the ongoing

corruption scandal, writing, "[w]e have **become more negative on Petrobras over the past two weeks** and cut our 2014-16 [earnings-per-share] estimates substantially, reflecting weaker BRL . . . vs. co's high leverage and a $10 billion impairment assumption, mostly on refinery projects."

257.    However, because the Company did not provide a range or scope of the potential writedowns, some analysts expressed skepticism that the impact of the scandal on Petrobras's financial condition would be significant.  In an analyst report titled "PBR Conference Call—What Happens Next?" analysts from Itau BBA noted that:

> The adjustments will be based on the testimony of the former executives and companies questioned and considered by the Federal Police to be proof of bribery. We do not expect Petrobras to mark-to-market the cost of the [Abreu] refinery, at least for the time being. Proving the overpricing in this case is likely to be a more difficult task, particularly because the original contracts have been amended numerous times. ***The impact might therefore not be too significant for the time being***, at least not as considerable as the USD 16 billion estimated capex overrun for [Abreu]. Additional adjustments might be required as the investigations evolve.

258.    The Itau BBA analysts concluded that "[t]he impact of a possible write-off, assuming a reduction in the asset value, is therefore minimal."

259.    HSBC analysts stated in a November 21, 2014 report that "[i]t is hard to quantify the impact as of now [because] we have low visibility on the penalties that might by imposed by the Brazilian court and the company management."

260.    Investors looked forward to the Company's December 12 earnings release for clarity as to the impact of the corruption on the Company.  On December 11, 2014, *Forbes* noted that:

> Petrobras is expected to announce its unaudited financial results for the third quarter on December 12, after a delay of more than a month, primarily because of ongoing investigations into the alleged bribery and corruption scandal that has hit the company. We expect a focus on the potential impact of the ongoing probe to overshadow improvements in the company's key business drivers such as net upstream production and downstream margins.

261. However, on December 12, 2014, the Company announced that it would delay *for the second time* the release of its third quarter 2014 financial statements as a result of new developments in the widening corruption probe, including the December 11 indictments of executives at the country's largest engineering firms for their participation in the kickback scheme. While Petrobras had announced December 12 as its deadline for the release of these financial statements, it said in a statement that it actually had until January 15, 2015 to present the unaudited results without breaching any debt covenants. If breached, the covenants could put some of the Company's debt into technical default, forcing early repayment. *Bloomberg* reported that the real reason for delay was due to "disagreement" among Petrobras's Board members, who "differ[ed]" on the size of writedowns stemming from graft-related costs."

262. On the same day, former Petrobras executive Velosa appeared on a popular televised weekly news show in Brazil called *Fantástico* where she explained in great detail the significant efforts she made to alert Foster, Costa and others to the corruption as far back as 2009. As discussed in detail in ¶¶ 165-81 above, Velosa detailed how in 2008, while working under Costa, she discovered numerous irregularities and misappropriation of resources in connection with the constriction of Abreu while working on an analysis of the costs associated with the refinery's construction.

263. Following Velosa's December 12 interview, Petrobras took immediate steps to discredit her. Late on December 12, 2014, Petrobras posted a response on *Facts and Data*, stating that the Company "took all measures to elucidate the facts in [Velosa's] reports" and questioned why Velosa waited five years to bring this information to light, insinuating that this was an act of retaliation and nothing more. Then, late on December 15, 2014, Petrobras sent a formal denial of Velosa's account to the Brazilian CPI.

264.     On December 15, 2014, just weeks after Cerveró appeared before the CPI and denied having received any bribes or knowing about the alleged corruption, Brazilian criminal authorities announced Cerveró's formal indictment for acts of corruption and money laundering. Cerveró was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with his implementation of the suspicious Pasadena acquisition, as well as an additional $53 million in bribes in connection with a deal to supply offshore drilling vessels by Samsung Heavy Industries.

265.     With Cerveró's arrest, investors learned that the corruption at Petrobras was more rampant and broader in scope than had previously been disclosed.  Due to his former position as International Director, Cerveró's arrest indicated that the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope.

266.     As the market absorbed Petrobras's failure to publish its third quarter results, Velosa's allegations, and the news of Cerveró's indictment, the prices of the Company's securities declined, with its common ADSs falling 11.96%, from a close of $7.11 per share on December 12, 2014 to a close of $6.26 per share on December 15, 2014, the next trading day.  Likewise, the preferred ADSs fell 13.66%, from a close of $7.57 per share on December 12, 2014 to a close of $6.66 per share on December 15, 2014.

267.     On Sunday, January 4, 2015, several news sources disclosed significant new information concerning the scope of the fraud and its impact on the Company's financial results. First, *O Globo* published a report disclosing new evidence that bribes were funneled through the construction of the Gasene pipeline—a project that Foster oversaw during her tenure as the CEO of Petrobras's Gas and Energy Division—through "paper companies" that were set up to build the R$6.3 billion undertaking.  Specifically, *O Globo* revealed that a previously confidential TCU

audit had uncovered overpricing in contracts for the Gasene pipeline exceeding *1800%*, prompting calls for the newly-formed CPI to investigate whether the use of "paper companies" and a special purpose entity to fund the pipeline's construction was intended to circumvent competitive bidding requirements. Indeed, just weeks later, on March 10, 2015, Barusco confirmed in testimony before the CPI that, like the other "institutionalized" bribes at Petrobras, contracts associated with the Gasene pipeline involved kickbacks of 3% divided among Petrobras executives and the PT. Second, a report published in *Folha S. Paulo* on January 4, 2015 revealed that an internal Company audit completed in November 2014 concluded that Petrobras would have to record R$1 billion in losses on equipment purchased in connection with projects associated with Comperj that were acquired before the plans for the project had been finalized, and which could no longer be used. Further, *Folha* reported, the internal audit identified other "irregularities" in connection with a R$3.8 billion contract for Comperj that was awarded without competitive bidding to Cartel members Odebrecht, UTC and Toyo. In both cases, the internal audit concluded, the Comperj contracts had been influenced by "pressures" from Duque and Costa.

268.    In response to these disclosures, the price of Petrobras's securities declined with its common and preferred ADSs falling approximately 8%. Specifically, Petrobras common ADS fell from $7.06 per share on January 2, 2015 to $6.57 per ADS on January 5, 2015, and Petrobras preferred ADSs dropped from $7.58 to $6.95 over that same time – reaching their lowest level in over a decade.

269.    Analysts and commentators immediately identified these revelations—including evidence of bribery in connection with one of the most significant projects that Foster oversaw during her tenure as chief of the Gas and Energy Division—as significant new information concerning the fraud. For example, Brazil's leading financial news site *InfoMoney* published a

report prior to market open on Monday, January 5, 2015, stating that the revelations in *O Globo* and *Folha de S. Paulo* concerning the Gasene pipeline and Comperj overbilling were "shaking the news" that morning, and reported later that day that Petrobras shares had fallen "[i]n the midst of very busy news and various clarifications during the weekend," including those related to the *O Globo* report. Similarly, *Valor Economico* reported that Petrobras common shares declined to their lowest level since 2004 following "new allegations" and the "bad news" in *O Globo* and *Folha*, and the Associated Press reported that while oil prices had also declined, Petrobras investors were in fact "react[ing] to the sequence of news about corruption and mismanagement," including the new facts revealed in *O Globo*. As *Reuters* reported, Petrobras shares had plunged in the face of "an avalanche of bad news."

270. Then, on January 6, 2015, Petrobras disclosed that the unpaid leave of Transpetro CEO Machado would be extended until January 21, 2015, following a confidential meeting of the Board of Directors on January 5, 2015. In response to this disclosure, the Company's securities prices declined with its common ADS falling to $6.02 per share, while Petrobras preferred ADS declined to close at $6.14 per share on January 6, 2015.

271. Finally, after the markets closed on January 27, 2015, Petrobras released its unaudited third-quarter financial statements. The Company's external auditor, PwC, did not sign off on Petrobras's third quarter financial statements, and its reported results did not contain any writedowns of Petrobras's PP&E.

272. Nevertheless, in its January 27, 2015 earnings release, which it filed with the SEC on Form 6-K on January 28, 2015, Petrobras revealed the staggering scope of the corruption scheme. In Note 3 to the release, in a heading titled "Reasons to correct the carrying amount of specified property, plant and equipment," the Company acknowledged that "[t]he information

currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people." Petrobras further disclosed that ***R$188.4 billion (US$73 billion)*** of the Company's assets, "or approximately 1/3 of the company's total fixed assets," relate to "contracts signed between Petrobras and the [Cartel] companies . . . from 2004 to April 2012," and are thus impacted by the corruption charges.

273. The Company also admitted that it improperly capitalized as assets the inflated contract amounts confessed to by Costa, resulting in the material overstatement of its PP&E:

> The payments related to the misconduct previously mentioned were recognized as part of the cost of certain property, plant and equipment and, as of September 30, 2014, most of those assets were under construction or were recently completed, and therefore, had little accumulated depreciation.
>
> No impairment losses have been recognized in the past for the property, plant and equipment affected by the payments related to misconduct because their recoverability is tested for impairment in cash-generating units (CGU), whose value-in-use has been historically higher than their carrying amounts. The recoverable amount calculated under the value-in-use approach includes the benefits of existing synergies between the assets that comprise the CGU.
>
> ***Therefore, under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized.***

274. In the January 27, 2015 earnings release, Petrobras repeatedly admitted that it needed to "correct" the carrying value of its PP&E. The Company likewise acknowledged in Note 2 that the failure to correct the carrying value of PP&E meant that its financial statements contained material errors and did not comply with IFRS:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position

in light of facts known to management and based on documentation available as of the current date, *except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of issue of these financial statements, as set out in note 3*.

These consolidated interim financial statements have been prepared in accordance with IAS 34 - Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), *except for the errors mentioned above and further discussed in note 3*.

275.     While Petrobras acknowledged that the corruption scandal would result in significant financial adjustments to the Company's balance sheet and income statement, it did not record an asset writedown.  However, as the Company disclosed, its internal review of certain assets impacted by the fraud indicated a range of potential writedowns between $1.5 billion and $34 billion.

276.     Similarly, in a January 27, 2015 letter to shareholders that accompanied Petrobras's third-quarter results, Foster admitted that that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." Foster also admitted that an internal review of assets impacted by the fraud uncovered R$88.6 billion reais (US$34 billion) of overvalued assets and R$27.2 billion reais (US$10 billion) of undervalued assets.  As Reuters reported: "If confirmed by auditors, that would lead to a 61.4 billion [reais (US$22 billion)] writedown, an amount equal to more than half the company's current 120 billion-real ($43.3 billion) market value."

277.     Additionally, in her letter to shareholders, Foster stated that the Company was working with PwC to adjust its financial statements *and* to "enhance [its] internal controls."  The Company's earnings release identified several measures it was implementing in order to strengthen its internal controls.

278.     Petrobras's startling admissions concerning the material errors in its financial results and the vast scope of the fraud, coupled with its internal control weaknesses and its continued lack of transparency regarding the quantification of the writedown, immediately caused the Company's securities to plunge on January 28, 2015.  Specifically, the common ADSs fell 11.95%, from a close of $7.45 per share on January 27, 2015 to a close of $6.56 per share on January 28, 2015.  Likewise, the preferred ADSs fell 11.7%, from a close of $7.86 per share on January 27, 2015 to a close of $6.94 per share on January 28, 2015. The announcement kicked off a damaging week during which Petrobras lost nearly $9 billion in market capitalization.

279.     In response to this disclosure, analysts noted the Company's inability to produce audited financials and its failure to take a writedown.  Morgan Stanley wrote, "[a]fter great expectation about the publication of PBR's write-off amount, no consensus was reached internally on the value and 3Q14 came out without a charge.  We think this was the worst outcome and expect the stock to be under pressure . . . the worst outcome is the continuation of the uncertainty [and there is] . . . no visibility as to when audited financials will be reported."  Similarly, Itau BBA, in a report entitled, "No News Is . . . Bad News!" explained that the Company's decision to not record a writedown would likely result in "a pretty negative market reaction to this decision of excluding the write-offs, as we read it as a sign of lack of an agreement between the company and its board, which may, at the limit, jeopardize the attempt to get an audited balance on schedule (by the end of June at the latest)."

280.     Brazilian analysts at Votorantim Corretora noted that Petrobras's "Financial Figures [Were] Less Important than Lack of Information," "believ[ing] that investor sentiment will drive the shares much more than the financial figures" and that "the market has been eager to ascertain the impact of the impairments arising from the [Operation Car Wash] investigation on

the company's balance sheet. Nonetheless, the extent of the damage to the company's financial figures remains unknown . . . . So, investors remain in the dark, and this will severely harm the shares."

281.   The media also noted the market's negative and surprised reaction to this disclosure, with the *Wall Street Journal* commenting that, "'[w]hen it didn't [announce a write-down], **the credibility went down the drain and nothing else matters**. We need to see, as investors, a credible statement with the numbers.'" On January 30, 2015, *Reuters* noted that the Company's decision not to provide a "monetary estimate for how much the company's assets were overvalued as a result of the corruption scheme" was "a surprise decision."

282.   Also following the release of the Company's third-quarter earnings, both Moody's (on January 29) and Fitch (on February 3) downgraded the Company to the lowest level of investment grade. Both credit rating agencies cited as a main reason the risk resulting from the Company's inability to quantify the costs of the corruption scandal, and the liquidity pressures that follow as investors are left in the dark.

283.   Petrobras's wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs. The disclosures of previously misrepresented and concealed facts about Petrobras's involvement in a decade-long bribery scheme and its impact on the Company's financial statements, set forth in ¶¶ 245-82 above, caused the price of Petrobras's securities to decline markedly, wiping out billions of dollars in shareholder wealth.

284.   It was entirely foreseeable to Petrobras that concealing from the public, *inter alia*, its involvement in a bid-rigging and bribery scheme that vastly inflated the value of Petrobras's construction contracts and its improper capitalization of overpayments and bribes would artificially inflate the price of Petrobras's securities. It was also foreseeable that the disclosure of

this information, and the materialization of concealed risks associated with Petrobras's misconduct, would cause the price of Petrobras securities to decline as the inflation caused by Petrobras's earlier misrepresentations and omissions was removed from the price of Petrobras's securities. Accordingly, the conduct of Petrobras, as alleged herein, proximately caused foreseeable losses for Plaintiffs, who purchased Petrobras securities during the Relevant Period.

## VII. RECENT EVENTS CONTINUE TO EVIDENCE MASSIVE FRAUD AT THE COMPANY

285. Following the Company's January 27, 2015 disclosures, events continue to unfold (on an almost daily basis) that confirm the immense scope of the underlying fraud, the continued political abuses and corruption plaguing the Company, and the fallout for investors.

286. On February 4, 2015, Foster, Barbassa and four other executives (constituting nearly all of the Executive Directorate), left the Company due to the corruption scandal. At first, these departures were well received by the market, as investors hoped that Petrobras's management would be independent from political pressures. But this positive reaction was short-lived. On February 6, President Rousseff signaled that she would maintain tight control over the Company by appointing a confidante, banker Aldemir Bendine, as the new CEO of Petrobras. Investors reversed course. According to *Reuters*, investors became concerned that "the government appointed [Bendine] to limit the political fallout from a writedown rather than clean out dead-wood in the company's accounts."

287. On February 13, 2015, *Bloomberg* reported that Brazil's Federal Attorney General was granting leniency to at least eight contractors implicated in the bribery scheme "to prevent a slowdown in infrastructure work that could derail efforts to revive the economy." According to the article, by admitting guilt and repaying graft money, companies would avoid being declared unfit to bid for public contracts or take loans from public banks.

288.     On February 20, 2015, the Brazilian federal prosecutor's office filed lawsuits against six members of the cartel (Camargo Corrêa SA, the Brazilian unit of Japan's Sanko Co Mendes Junior Engenharia SA, OAS SA, Galvão Engenharia SA, and Engevix Engenharia SA) seeking R$4.47 billion (US$1.55 billion) in damages in connection with contract-fixing, bribery and political kickbacks at Petrobras.

289.     Following dozens of indictments and arrests of Petrobras and Cartel executives over the last couple of months, on February 24, Brazil's Attorney General, filed criminal charges against Cerveró.   These charges accuse Cerveró of money laundering and criminal conspiracy for scheming with a lobbyist and the head of an Uruguay-based company to hide bribes, in part through the purchase of a R$7.5 million (US$2.6 million) apartment.

290.     On the same day, Moody's Investors Services slashed the debt rating of Petrobras to Ba2, or junk status, and signaled that more downgrades may come in the future.  The *Wall Street Journal* reported that the size and timing of the downgrade not only "surprised" analysts "and sent the country's leaders into a defensive crouch," but was "an unequivocal blow" to the administration of President Rousseff.

291.     On March 3, 2015, Brazil's head of MPF called on Brazil's Supreme Court to open an expansive new phase of the Petrobras investigation, looking into the actions of 54 people, the majority of whom are said to be high-ranking political figures.

292.     On March 5, 2015, new sources reported that the Brazilian Congress, as part of its corruption probe into Petrobras, called Barusco to testify.  Barusco testified that he used several bank accounts in Switzerland to launder the $100 million in bribes he received as part of the Petrobras graft ring.  Based on the amount he received, Barusco estimated that Brazil's ruling Workers' Party received as much as $200 million in bribes.  He said he started receiving bribes

from some of the country's top construction firms 18 years ago, as early as 1997, but by 2003 and 2004, the bribes became more "institutionalized."

293.     On March 11, Brazil's Office of the Comptroller General, the CGU, said it opened a case (beyond the eight core Cartel members) against ten additional construction firms with ties to Petrobras.

294.     That same day, Braskem S.A. ("Braskem"), Latin America's largest petrochemical's producer, whose shares trade on the NYSE, suffered its biggest intraday drop in 20 years, plunging as much as 21% following the release of testimony from Costa and Youssef confirming that Braskem made "under-the-table payments" to Petrobras in exchange for contracts. Costa testified that the bribes, which amount to at least $5 million annually from 2006 to 2012, were first discussed with Braskem executives and then ratified by former CEO Jose Carlos Grubisich. Barbassa previously served together with Foster and Costa on the Braskem board of directors and resigned from that position on February 6, 2015.

295.     On March 16, Renato Duque was arrested by Federal Police for the second time as part of the investigation into Petrobras and formally charged with the crime of money laundering.

296.     On March 17, Brazilian prosecutors formally charged the treasurer of the ruling Workers' Party (PT), Joao Vaccari Neto, with corruption and bribery in connection with the graft scheme at Petrobras.

297.     On March 18, 2015, the Attorney General of Switzerland announced that Switzerland had frozen *$400 million* in assets linked to the Petrobras scandal.

298.     As of the filing of this Complaint, Petrobras has still not released its audited third-quarter 2014 financial statements, originally slated for release on November 1, 2014. According

to media reports, the Company is seeking advice from the SEC on how to quantify its required asset writedown.

## VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS RELATED TO THE EXCHANGE ACT CLAIMS

### A. Petrobras's Materially False and Misleading Statements Concerning Its Financial Condition and Compliance with GAAP and IFRS

299. Petrobras reported materially false and misleading financial results at the end of each quarter and fiscal year throughout the Relevant Period. In particular, the PP&E, total assets, expenses and net income figures that Petrobras reported to the market during the Relevant Period, which are set forth in detail in ¶¶ 301-02 below, were materially false and misleading when made for the following reasons:

a)  Petrobras admitted in January 2015 that:

- The "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets."

- "[C]ontracts entered into between January 1, 2004 and April 30, 2012 (the period during which the scheme operated, as stated in the depositions described above) with the suppliers and contractors named in the [Costa, Youssef, Camargo and Mendonça Neto] depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

- "[A]mounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. *However, those costs should not have been capitalized*."

- "[I]t is necessary to correct the amounts related to the misconduct that were capitalized" and, in particular, to "deduct from [PP&E] any amount that could be *linked to bribery of any sort*."

- While the Company did not correct its misstated PP&E figure (or its misstated total assets, expenses and net income figures), it provided two possible methodologies for quantifying the required writedown. This analysis indicated a potential writedown between R$4.06 billion (US$1.5 billion) and R$88.6 billion (US$34 billion) with respect to contracts Petrobras signed with the Cartel companies between January 1, 2004 and April 30, 2012.

b) Costa has admitted that the value of Petrobras's construction contracts were overstated by up 3% due to the bribes, and by additional amounts of up to 20% due to the Cartel's overpricing of Petrobras contracts.

c) The Company's January 27, 2015 estimates of a PP&E misstatement of between R$4.06 billion (US$1.5 billion) and R$88.6 billion (US$34 billion) were vastly understated because they only accounted for the contracts entered into with known Cartel members before April 30, 2012. As alleged above (¶¶ 147, 151, 202, 209), the fraudulent scheme was not limited to Cartel members and did not stop on April 30, 2012. As a result, the range provided by the Company downplayed the overstatement.

d) As described above at ¶¶ 189-96, Petrobras's improper capitalization of these bribes and inflated costs throughout the Relevant Period violated both IFRS and GAAP.

e) As set forth above at ¶ 226, accountants hired by Petrobras found that while the Company spent over $18.5 billion on projects related to Abreu, the refinery is only worth $7 billion and while the Company spent $13.5 billion building Comperj, the refinery should be written down to zero.

300. By wrongfully recognizing the cash paid out in bribes as assets instead of expenses, Petrobras materially overstated the amount of **PP&E** and **total assets** in each of its quarterly and annual financial statements for the period beginning January 1, 2004 (the point at which the Company itself has acknowledged improper bribes and bid-rigging began to occur) through the present. In addition, Petrobras misreported **net income** in each of its quarterly and annual financial statements by failing to record an impairment charge necessitated by the overstatement of the Company's PP&E and total assets. Moreover, Petrobras misreported net income and the

Company's total costs and expenses in each of those periods during which a bribe was paid and was improperly capitalized instead of having been expensed immediately.

301. Specifically, the Company reported the following figures throughout the Relevant Period, which were materially false and misleading when made. Unless otherwise indicated, all figures are taken directly from Forms 6-K or 20-F filed with the SEC and are presented in $ millions:

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 3/24/10 press release filed on Form 6-K | $136,167 | $200,270 | $15,504 | | 4Q and FY 2009 |
| 3/26/10 Form 6-K (the "March 26, 2010 Form 6-K") | $136,167 | $200,270 | $15,504 | $70,000 | 4Q and FY 2009 |
| 5/20/2010 Form 20-F (the "2009 Form 20-F") | $136,167 | $200,270 | $15,504 | $70,000 | 4Q and FY 2009 |
| 5/27/2010 press release filed on Form 6-K | $140,574 | $204,215 | $4,366 | | 1Q2010 |
| 5/28/2010 Form 6-K (the "May 28, 2010 Form 6-K") | $140,574 | $204,215 | $4,366 | $21,350 | 1Q 2010 |
| 8/24/2010 press release filed on Form 6-K | $147,083 | $210,564 | $8,563 | | 2Q 2010 |
| 8/25/2010 Form 6-K (the "August 25, 2010 Form 6-K") | $147,083 | $210,564 | $8,563 | $44,758 | 2Q 2010 |
| 11/23/2010 press release filed on Form 6-K | $206,278 | $298,136 | $13,288 | | 3Q 2010 |
| 11/24/2010 Form 6-K (the "November 24, 2010 Form 6-K" | $206,278 | $298,136 | $13,288 | $69,854 | 3Q 2010 |
| 3/15/2011 press release filed on Form 6-K with SEC | $218,567 | $308,683 | $19,475 | | 4Q and FY 2010 |

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 3/17/2011 Form 6-K (the "March 17, 2011 Form 6-K") | $218,567 | $308,683 | $19,475 | $95,894 | 4Q and FY 2010 |
| 5/24/2011 press release filed on Form 6-K | $230,370 | $330,551 | $6,524 | | 1Q 2011 |
| 5/26/2011 Form 20-F (the "2010 Form 20-F") | $218,567 | $308,683 | $19,184 | $95,894 | 4Q and FY 2010 |
| 5/26/2011 Form 6-K (the "May 26, 2011 Form 6-K") | $230,370 | $330,551 | $6,524 | $25,219 | 1Q 2011 |
| 8/24/2011 press release filed on Form 6-K | $247,276 | $350,661 | $13,576 | | 2Q 2011 |
| 8/25/2011 Form 6-K (the "August 25, 2011 Form 6-K") | $247,276 | $350,661 | $13,576 | $56,382 | 2Q 2011 |
| 11/22/2011 press release filed on Form 6-K | $220,306 | $308,956 | $16,833 | | 3Q 2011 |
| 11/22/2011 Form 6-K (the November 22, 2011 Form 6-K) | $220,306 | $308,956 | $16,833 | $87,921 | 3Q 2011 |
| 2/28/2012 press release filed on Form 6-K | $182,465 | $319,410 | $20,121 | | 4Q and FY 2011 |
| 2/29/2012 Form 6-K (the "February 29, 2012 Form 6-K") | $182,465 | $319,410 | $20,121 | $110,102 | 4Q and FY 2011 |
| 4/2/2012 Form 20-F (the "2011 Form 20-F") | $182,465 | $319,410 | $20,121 | $110,102 | 4Q and FY 2011 |
| 5/15/2012 press release filed on Form 6-K | $194,099 | $337,971 | $5,212 | | 1Q 2012 |
| 5/17/2012 Form 6-K (the May 17, 2012 Form 6-K") | $194,099 | $337,971 | $5,212 | $30,751 | 1Q 2012 |

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 8/3/2012 press release filed on Form 6-K | $184,997 | $310,704 | $4,527 | | 2Q 2012 |
| 8/10/2012 Form 6-K (the August 10, 2012 Form 6-K") | $184,997 | $310,704 | $4,527 | $62,721 | 2Q 2012 |
| 10/26/2012 press release filed on Form 6-K | $191,395 | $318,467 | $7,271 | | 3Q 2012 |
| 10/30/2012 Form 6-K (the "October 30, 2012 Form 6-K") | $191,395 | $318,467 | $7,271 | $94,855 | 3Q 2012 |
| 2/4/2013 press release filed on Form 6-K | $204,901 | $331,645 | $11,034 | | 4Q and FY 2012 |
| 2/6/2013 Form 6-K (the "February 6, 2013 Form 6-K") | $204,901 | $331,645 | $11,034 | $127,727 | 4Q and FY 2012 |
| 4/29/2013 Form 20-F (the "2012 Form 20-F") | $204,901 | $331,645 | $11,034 | $127.727 | 4Q and FY 2012 |
| 4/26/2013 Press Release filed on Form 6-K | $214,457 | $345,274 | $3,854 | | 1Q 2013 |
| 4/30/2013 Form 6-K (the "April 30, 2013 Form 6-K") | $214,457 | $345,274 | $3,854 | $31,410 | 1Q 2013 |
| 8/9/2013 press release filed on Form 6-K | $203,716 | $338,068 | $6,850 | | 2Q 2013 |
| 8/13/2013 Form 6-K (the "August 13, 2013 Form 6-K") | $203,716 | $338,068 | $6,850 | $61,613 | 2Q 2013 |
| 10/25/2013 press release filed on Form 6-K | $208,362 | $340,106 | $8,334 | | 3Q 2013 |
| 10/28/2013 Form 6-K filed | $208,362 | $340,106 | $8,334 | $93,167 | 3Q 2013 |

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 2/25/2014 press release filed on Form 6-K | $227,901 | $321,423 | $11,094 | | 4Q and FY 2013 |
| 2/26/2014 Form 6-K (the "February 26, 2014 Form 6-K") | $227,901 | $321,423 | $11,094 | $125,768 | 4Q and FY 2013 |
| 4/30/2014 Form 20-F (the "2013 Form 20-F") | $227,901 | $321,423 | $11,094 | $125,768 | 4Q and FY 2013 |
| 5/9/2014 press release filed on Form 6-K | $240,793 | $354,403 | $2,280 | | 1Q 2014 |
| 5/12/2014 Form 6-K (the "May 12, 2014 Form 6-K") | $240,793 | $354,403 | $2,280 | $31,433 | 1Q 2014 |
| 8/8/2014 press release filed on Form 6-K | $253,955 | $363,392 | $4,505 | | 2Q 2014 |
| 8/11/2014 Form 6-K (the "August 11, 2014 Form 6-K") | $253,955 | $363,392 | $4,505 | $64,514 | 2Q 2014 |

Each of the foregoing financial figures was materially false and misleading when made for the reasons set forth in ¶¶ 299-300 above.

302.    In addition to its quarterly and annual SEC filings, the Company also published its financial statements in the prospectus supplements that it filed with the SEC in advance of its U.S. securities offerings. During the Relevant Period, Petrobras's prospectus supplements disclosed the following amounts for PP&E, total assets and net income (in $ millions):

| Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income |
|---|---|---|---|
| 9/28/10 Prospectus Supplement filed on Form 424(b)(2) (the "September 2010 Prospectus Supplement") | $136,167 as of 12/31/09; $84,719 as of 12/31/08; $84,282 as of 12/31/07; $58,897 as of 12/31/06; $45,920 billion as of 12/31/05; $147,083 as of 6/30/10 | $200,270 as of 12/31/09; $125,695 as of 12/31/08; $129,715 as of 12/31/07; $98,680 as of 12/31/06; $78,638 as of 12/31/05; $210,564 as of 6/30/10 | $15,504 as of 12/31/09; $18,879 as of 12/31/08; $13,138 as of 12/31/07; $12,826 as of 12/31/06; $10,344 as of 12/31/05; $8,563 as of 6/30/10; $6,627 as of 6/30/09 |
| 2/3/2012 Prospectus Supplement filed on Form 424(b)(2) (the "February 2012 Prospectus Supplement") | $218,567 as of 12/31/10, $136,167 as of 12/31/09, $84,719 as of 12/31/08, $220,306 as of 9/30/11; $206,278 as of 9/30/10 | $308,683 as of 12/31/10; $200,270 as of 12/31/09; $125,695 as of 12/31/08; $308,956 as of 9/31/11; $298,136 as of 9/30/2010 | $19,184 as of 12/31/10, $15,504 as of 12/31/09, $18,879 as of 12/31/08, $17,031 as of 9/30/11, and $13,288 as of 9/30/10 |
| 5/15/2013 Prospectus Supplement filed on Form 424(b)(2) (the "May 2013 Prospectus Supplement") | $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; $214,457 as of 3/31/13 | $334,654 as of 12/31/12; $319,914 as of 12/31/11; $310,194 as of 12/31/10; $345,274 as of 3/31/13 | $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $3,854 as of 3/31/13; $5,212 as of 3/31/12 |
| 3/11/2014 Prospectus Supplement filed on Form 424(b)(2) (the "March 2014 Prospectus Supplement") | $227,901 as of 12/31/13; $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; $128,754 as of 12/31/09 | $321,423 as of 12/31/13; $327,396 as of 12/31/12; $316,414 as of 12/31/11; $310,194 as of 12/31/10; $199,442 as of 12/31/09 | $11,094 as of 12/31/13; $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $15,308 as of 12/31/09 |

Each of the foregoing financial figures was materially false and misleading when made for the reasons set forth in ¶¶ 299-300 above.

303. In addition, the May 28, 2010 Form 6-K represented that Petrobras's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles

(U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements." Petrobras made the same representations in the March 26, 2010 Form 6-K; August 25, 2010 Form 6-K; November 24, 2010 Form 6-K; March 17, 2011 Form 6-K; May 26, 2011 Form 6-K; August 25, 2011 Form 6-K; and November 22, 2011 Form 6-K. Likewise, Petrobras represented in the 2009 Form 20-F and 2010 Form 20-F that the Company's "audited consolidated financial statements . . . and the accompanying notes, contained in this report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

304. Each of these representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with U.S. GAAP. Specifically, as discussed above at ¶¶ 189-96, 299, the Company's financial statements violated, among other GAAP provisions, FASCON 6 and ASC 360.

305. Following Petrobras's transition to IFRS reporting, the Company represented that Petrobras's financial statements were "presented" and/or "prepared" "*in accordance with IAS 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)*" in its May 17, 2012 Form 6-K, August 10, 2012; October 30, 2012 Form 6-K; April 30, 2013 Form 6-K; August 13, 2013 Form 6-K; October 28, 2013 Form 6-K; May 12, 2014 Form 6-K; and August 11, 2014 Form 6-K. Similarly, the Company's 2011 Form 20-F; 2012 Form 20-F; 2013 Form 20-F; February 29, 2012 Form 6-K; February 6, 2013 Form 6-K; and February 26, 2014 Form 6-K represented that Petrobras's financial statements were "presented" and/or "prepared" "*in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB)*."

306. These representations were false and misleading when made, because the Company's financial statements were not prepared in accordance with IFRS. Specifically, as discussed above at ¶¶ 189-96, 299, the Company's financial statements violated, among other IFRS provisions, IFRS CF 4.52 and IAS 16.

307. The 2009 Form 20-F and 2010 Form 20-F contained certifications executed by Gabrielli and Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "*fairly presents, in all material respects, the financial condition and results of operations of the Company.*" The 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F contained the same certifications executed by Foster and Barbassa. These certifications were materially false and misleading when made for the reasons set forth in ¶¶ 299-300 above.

308. The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E:

> *Property, plant and equipment are measured at the cost to acquire or construct*, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

This statement was materially false and misleading for the reasons set forth in ¶¶ 299-300 above.

309. Petrobras repeatedly stressed to investors that Petrobras's financial statements had been subjected to scrutiny by the Company's management and outside auditors and the Company was subject to the requirements of the SEC. For example, during the Company's August 6, 2012 conference call to discuss the Company's second quarter 2012 financial results, Foster reassured analysts:

We have qualified people. We know how to work. We know how to operate. We have invested along our history billions dollars in our development and we know what we are doing. ***Our results are absolutely true and legitimate***.

310.   This statement was false and misleading because the Company's financial results were not "true and legitimate" and instead the Company's financial results were inflated by massive bribes and bid-rigging, as set forth above in ¶¶ 299-300.

311.   On May 9, 2014, in response to an interview question asking Foster to identify "the most important aspects of the company's governance," Foster stated that Petrobras "compl[ies] with the rules of the Securities and Exchange Commission (SEC) and the NYSE in the United States, the Latibex and Bolsa y Mercado Españoles, Spain and the National Securities Commission (CNV) and the Buenos Aires Stock Exchange, Argentina."

312.   Foster's statement attesting to Petrobras's compliance with the SEC's and NYSE's rules, including the SEC's requirement that all financial statements be accurately reported, were false and misleading for the reasons set forth above in ¶¶ 299-300.

313.   Similarly, in a September 6, 2011 post on *Facts and Data*, Petrobras represented that its "activities are fully guided by principles of ethics and transparency" and further stated:

It is important to note that Petrobras has analyzed their accounts permanently and continuously, by internal and external audits, through the Comptroller General (CGU) and the Court of Audit (TCU). In addition, ***the Company meets the requirements of agencies such as the Securities and Exchange Commission (CVM), Securities and Exchange Commission (SEC), the US, and the Sarbanes-Oxley Act, with its audited financial statements and approved in all instances***.

314.   These statements were false and misleading because, as set forth above at ¶¶ 299-300, the Company did not meet the requirements of the SEC or the Sarbanes-Oxley Act because its financial statements were inaccurately reported, as the Company later admitted. These statements were also false and misleading because the Company omitted to disclose that its

"audited financial statements" were materially misstated and did not comply with GAAP or IFRS (as applicable) at all times during the Relevant Period.

315.    Similarly, on December 29, 2012, Petrobras posted the following on *Facts and Data*:

> All the activities from Petrobras are monitored by the Shareholders, which are Government representatives and private shareholders. ***The accounts of Petrobras are analyzed permanently and continuously by internal and external audits***, through the Government Accountability Office (CGU) and Federal Accounts Court (TCU). ***The Company meets the requirements of agencies like the Brazilian Securities and Exchange Commission (CVM), Securities and Exchange Commission (SEC), of the United States and the Sarbanes-Oxley Act, and its financial statements are audited and approved in all courts.***

316.    This statement was false and misleading for the reasons set forth above at ¶¶ 299-300.

## B.    Petrobras's Materially Misleading Omissions and False Denials Concerning the Overpricing of Its Refineries and Other Projects

### 1.    Pasadena, Texas Refinery

317.    During the Relevant Period, Petrobras and its executives denied the existence of any irregularities or improprieties related to the Company's purchase of the Pasadena Refinery, even as the cost of the acquisition ballooned from $360 million for the Company's 50% stake in the refinery, to a final cost of $1.18 billion.  As discussed above in ¶ 213, Petrobras's statements regarding the cost of the Pasadena refinery were materially false and misleading or omitted material information because Petrobras's decision to purchase Pasadena was influenced by the payment of bribes.  Among other things, Petrobras failed to disclose the following facts regarding the kickback and contract-fixing scheme:

a)    Costa testified that he received a $1.5 million bribe from Fernando Soares, which Costa believed originated from the Pasadena refinery owner, Astra, in exchange for not hindering the Pasadena acquisition (¶ 213); and

b) Costa further testified that a group headed by Cerveró received between $20-30 million in bribes related to the purchase of the Pasadena refinery (¶ 213).

318. Petrobras made the following materially false and misleading statements regarding the Pasadena refinery:

319. On August 7, 2013, the Company published on *Facts and Data* Gabrielli's testimony to a Brazilian Senate committee that, "[a]s the former President, the acquisition [of the Pasadena Refinery] was a normal operation, based on market conditions."

320. This statement was materially false and misleading because the acquisition of the Pasadena refinery was not done pursuant to "market conditions"; instead, it was pursued and approved in large measure because of tens of millions of dollars paid to Petrobras executives by Astra, as described above in ¶ 317.

321. On May 23, 2014, the Company insisted on *Facts and Data* that:

We have strict legal procedures for payments, including for the purchase of Pasadena.

The payments made for any reason and in any country follow strict and clear procedures and relevant legislation. Additionally, we have a structured Internal Audit group, which has unrestricted access to any unit of the Petrobras System to verify the compliance of procedures and transactions made.

322. This statement was materially false and misleading because the Company did not follow "strict legal procedures" or "strict and clear procedures" for its purchase of the Pasadena refinery (or any other purchase). Instead, the acquisition of the Pasadena refinery was tainted and motivated by tens of millions of dollars paid to Petrobras executives by Astra, as described above in ¶ 317.

### 2. Abreu Refinery

323. As discussed above, throughout the Relevant Period, Petrobras and its executives repeatedly and vehemently denied that the Company was engaged in bribes, fraud, overpricing or

wrongdoing of any kind in connection with the Abreu refinery. Each of these denials was materially false and misleading or omitted material information given the following facts (among others) regarding the kickback and contract-fixing scheme:

a) The bribery scheme inflated the value of all of its contracts with the members of the Cartel, which included the outside contractors responsible for the construction of the Abreu refinery (¶¶ 121-62, 217-223);

b) Costa confirmed in his sworn testimony that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, including Abreu contracts, inflating each contact by up to 20% and including a 3% bribe payment (¶¶ 126, 141-42, 218);

c) Barusco similarly stated in his sworn testimony that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the ABREU E LIMA REFINERY . . ." (¶¶ 219-21);

d) Barusco testified that Duque received bribes in connection with projects at Abreu (¶ 158);

e) Fonseca testified that he paid bribes on projects as large as R$2 billion to R$3 billion, including for construction contracts at Abreu (¶ 146); and

f) Velosa uncovered significant irregularities in bidding and pricing for construction contracts at Abreu (¶ 169).

324. Petrobras's materially false and misleading statements regarding the Abreu refinery included the following:

325. On November 9, 2010, in response to TCU allegations that the Repar and Abreu refinery contracts were overpriced by R$1.4 billion and R$1.3 billion, respectively, Petrobras posted a statement on *Facts and Data* stating: "***Petrobras denies that there were irregularities in the construction works of the Presidente Getúlio Vargas (Repar) and Abreu e Lima (Rnest) refineries***."

326. This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a

result of the "cartelization" of Petrobras, which inflated many of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 323.

327. On August 5, 2012, in response to an article titled "Abreu e Lima Refinery costs three times more than the international similar one," Petrobras stated that it "*does not recognize any of the signs of irregularities identified by the Court (TCU)* . . . . These so-called irregularities found by the Court (TCU) are based in methodological differences between the Court and Petrobras regarding the analysis of the costs of the works." The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and that "its estimates are developed by observation of the prices on the market."

328. Five days later, on August 10, 2012, Petrobras repeated these sentiments:

**Question:** What is the Petrobras' position regarding these new questions in several contracts of the works on Abreu e Lima Refinery?

**Answer**: Petrobras doesn't acknowledge any of the evidences of irregularities presented by the [TCU] during its audit regarding the contracts of Abreu e Lima Refinery, considering these irregularities found by [the TCU] are based essentially in methodological differences between [the TCU] and Petrobras regarding the analysis of the costs of the works.

329. These statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 323.

330. On January 7, 2013, in response to questions concerning potential overpricing, Petrobras stated:

***Petrobras reaffirms that there are no irregularities in the construction of the Abreu e Lima Refinery in Pernambuco***. The report[ ] broadcasted on *Fantástico* improperly compares the values of the basic design of the refinery, which was prepared seven years ago, with what is now being built. The initial project has suffered several modifications, due to changes in the scenario. The Company further reaffirms that there are no irregularities in the construction works of the

Petrochemical Complex of Rio de Janeiro. Petrobras has clarified all questions made by the [TCU], and reaffirms that until now there hasn't been any definitive trial that has observed any irregularity.

331. This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 323.

332. On May 19, 2014, Petrobras made the following statement on its *Facts and Data* website concerning the Abreu refinery:

> **Petrobras restates that there is no "overcharging of R$69.9 million" in the contract with the consortium Abreu e Lima**. Since 2008, the company has been telling the TCU that there are methodological divergences in accounting for items that are specific to the oil industry. The court itself has revised the values, after the clarification, for R$19 million. The company is still communicating with the TCU to demonstrate that there is no overpricing or overbilling in the works.

The Company issued virtually identical statements on *Facts and Data* again on May 20, 2014, June 17, 2014, June 21, 2014, June 22, 2014, June 23, 2014, and July 14, 2014.

333. These statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 323.

334. On July 23, 2014, Petrobras stated: "Regarding the matter 'TCU points to irregularities,' Petrobras reaffirms that **there is no overbilling in its works**." It went on to state: "Regarding the work at Abreu e Lima refinery, Petrobras reaffirms that there is **no overbilling or overpricing**."

335. This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a

result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 323.

### 3. Comperj Refinery

336.  Like the Abreu e Lima refinery, Petrobras made a series of materially false and misleading statements and omissions concerning its construction of the Comperj refinery in which it either omitted or flatly denied the existence of overpricing or other irregularities in the Comperj contracts.  Each of these statements was materially false and misleading or omitted material information given the following facts regarding the kickback and contract-fixing scheme:

a)  The bribery scheme inflated the value of its contracts with the members of the Cartel, which included significant outside contractors responsible for the construction of the Comperj refinery, and materially and falsely inflated the value of the Comperj assets reported by the Company (¶¶ 121-62, 224-226);

b)  Costa confirmed in his sworn testimony that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, which included many Comperj contracts, inflating each contract by up to 20% and including a 3% bribe payment (¶¶ 126, 141-42);

c)  Barusco similarly stated that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the . . . PETROCHEMICAL COMPLEX OF RIO DE JANEIRO – COMPERJ[.]" (¶¶ 220, 224); and

d)  Barusco identified three Comperj projects valued at over R$4.2 billion (approx. US$2.4 billion) that were used to funnel bribes to Petrobras executives (¶ 225).

337.  Petrobras's materially false and misleading statements regarding the Comperj refinery included the following:

338.  On October 8, 2010, the Company issued a statement in response to an October 8, 2010 *Folha.com* report titled "TCU says it found overbilling in works of Petrobras in Rio." Petrobras stated:

> **Response:** Petrobras reaffirms that ***there are no irregularities on the contracts of the Petrochemical Complex of Rio de Janeiro (Comperj).***  In the hiring model by

overall price, what matters is that the final overall price is the one that is more economical and advantageous to Petrobras. It is not the item to item detailing, as the TCU intends.

***There is no overbilling***. Petrobras reaffirms that there are technical disagreements between the methodology adopted by the company and by the TCU. The criteria used by the Court are insufficient and they are not applicable to works such as the Comperj, which is far more complex and with unique specificities. Petrobras cooperated with the TCU on all requests and there was no obstruction on any occasion.

339.    These statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Comperj were tainted by "irregularities" and "overbilling" as a result of the "cartelization" of Petrobras, which materially inflated most of the Comperj contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 336.

340.    Similarly, on January 7, 2013, in response to questions from *Jornal Nacional* concerning potential cost overruns at Comperj, Petrobras stated on *Facts and Data*:

The Company further reaffirms that there are ***no irregularities*** in the construction works of the Petrochemical Complex of Rio de Janeiro. Petrobras has clarified all questions made by the [TCU], and reaffirms that until now there hasn't been any definitive trial that has observed any irregularity.

341.    This statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Comperj were tainted by "irregularities" and "overbilling" as a result of the "cartelization" of Petrobras, which materially inflated most of the Comperj contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above at ¶ 336.

### 4.    SBM Contracts

342.    During the Relevant Period, Petrobras issued statements in which it falsely denied allegations that the Company had paid bribes to SBM in connection with construction contracts. Petrobras's denials of overpricing in the SBM contracts were directly contradicted by the

Company's subsequent admission that there is "overwhelming evidence" that SBM had paid Petrobras officials, including Barusco's admission that he received $22 million in bribes based on Petrobras's contracts with SBM between 1997 or 1998 and October 2010.

343. Petrobras's materially false and misleading statements regarding SBM included the following:

344. On March 31, 2014, the Company announced the "Completion of Internal Verification," in connection with the SBM bribery allegations, stating:

> Petrobras announces that the Internal Investigation Commission, created on 02/13/2014, to look into accusations of supposed bribe payments made to employees of the Company, involving the company SBM Offshore, concluded that, based on work performed and limited to its regulatory scope, ***no facts or documents were found that prove the payment of bribes to employees of Petrobras.***

345. Similarly, on April 1, 2014, Petrobras announced in a press release that the Company's own internal investigation into the alleged SBM bribes "concluded that there are no facts or documents that evidence the payment of bribes to Petrobras employees."

346. In its April 30, 2014 Form 20-F, Petrobras reconfirmed that: "On March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

347. The statements set forth in ¶¶ 344-46 were materially false and misleading and omitted to disclose the material fact that the Company and its executives had engaged in a long-running scheme to accept bribes from SBM, as described above at ¶¶ 121-62, 227-30, 342.

348. On April 4, 2014, Petrobras posted the following letter that it wrote to a Brazilian state agency concerning SBM Offshore and Pasadena, in which it denied any wrongdoing and defended its short-lived internal investigation into bribery by SBM:

> Petrobras strongly rejects the terms used by the reporter . . . The reporter committed improprieties and injurious falsehoods by deeming as "work of fiction" the work of

senior company managers in the internal investigation relating to accusations made by the press over alleged bribes by the Dutch company SBM to Petrobras employees.

By evaluating the period of duration of the works (February 13 to March 29 of 2014) and stating that it could have been summarized into one day of analysis, the reporter casts doubt on the internal investigation methodology conducted by Petrobras executives, having no grounds for doing so. If the period were a single day, then it would be hurried and fragile, as the journalist suggests.

Historically, Petrobras has routinely looked into any and all accusations it receives in any unit, via the General Ombudsman or due to facts reported internally or externally to the company. At the same time, it has cooperated with external oversight bodies such as the CGU, TCU, and Federal Public Prosecutor. In the case of Pasadena, likewise, Petrobras created a special commission to investigate, within 45 days, all of the facts related to its acquisition process.

The company's main corporate environment is related to employees that joined the company by public entrance exam, have internationally renowned technical excellence, and adhere to ethical standards in their internal and external relations. *These employees, when faced with evidence of improper conduct, do not hesitate to take punitive actions of all kinds. To ignore that evidence is to ignore the public track record of a 60-year-old company, which does not have as a standard practice to get rid of complaints, but rather to clarify the real facts internally and externally, and to provide appropriate answers to the appropriate agencies*.

It is unacceptable that this work, so believable, is compared to a "three real bill" without proper investigation or clarification of the facts. It is unacceptable for a piece of journalistic work to mention fraud, when there has been no proper information gathering.

The company's [executive] directors, led by the Executive Directorate, have the appropriate autonomy to investigate any and all irregularities, as they always have. Also in this case, the reporter, in doubting that autonomy, does so without objective evidence, which good journalism requires.

349. The Company's response defending its investigation was false and materially misleading because it failed to disclose the material fact that the Company's executives had engaged in a long-running bribery scheme with SBM, as discussed above at ¶¶ 121-62, 227-30, 342.

350.    On June 11, 2014, Foster testified to the CPI concerning the alleged improprieties in its contracts with SBM, stating that "***no irregularities were discovered***" in the Company's dealings with SBM.

351.    Foster's statement was materially false and misleading because it concealed the material fact that the Company's executives had engaged in a long-running bribery scheme with SBM, as discussed above at ¶¶ 121-62, 227-30, 342.

### 5.    Transpetro Contracts

352.    As with the allegations pertaining to the SBM contracts, Petrobras denied that the Company paid bribes in connection with Transpetro contracts during the Relevant Period.

353.    On February 27, 2011, in response to questions from *O Globo* newspaper regarding a piece the newspaper was writing about Transpetro contracts awarded without any bidding process—which claimed that the National Confederation of Waterway and Aerial Workers ("Conttmaf") had filed a complaint with the TCU—Petrobras stated: "The complaints of the alleged overbilling against the administration of Transpetro that were made public by Conttmaf are unfounded."

354.    The foregoing statement was materially false and misleading when made for the reasons set forth in ¶¶ 121-62 above, and given that Machado, Transpetro's CEO, was fully involved with and complicit in the bribery scheme, as evidenced by:

a)    PwC's refusal to accept financial statements signed by Machado in late October 2014 due to his involvement in the scheme (¶ 232); and

b)    Costa's testimony that he received a bribe of R$500,000 from Machado in connection with Transpetro contracts (¶ 231).

### 6.    Repar Refinery

355.    On October 9, 2011, in response to an article published in *Época* magazine regarding the Repar refinery titled "Money Leaving Through The Pipe," Petrobras stated on *Facts*

*and Data*:  "The Company reaffirms that **there is no overbilling, overpricing or any other irregularity** in the construction works of the Presidente Getúlio Vargas Refinery (Repar)."  The following day, on October 10, 2011, the Company issued another statement responding to the same *Época* magazine article, stating:

> Petrobras disclaims information on the alleged irregularities in works at Presidente Getúlio Vargas Refinery (Repar), published in the magazine *Época* in the article "Dinheiro saindo pelo duto" (Money leaving through the pipe).

> The Company reaffirms that there is no overbilling, overpricing or any other irregularity in the construction works of the refinery. What can be observed in the cases pointed out by the [TCU] are formulations and interpretations that differ from those adopted by the Company.

356.     Each of the foregoing statements regarding the Repar refinery was materially false and misleading when made for the following reasons:

a)      The bribery scheme inflated the value of its contracts with the members of the Cartel, and materially and falsely inflated the value of the Repar assets reported by the Company (¶¶ 121-62);

b)      Costa testified that the illegal overpricing and bribery scheme impacted all contracts with the Cartel, which included Repar contracts (¶¶ 126, 141-42);

c)      Barusco similarly stated that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the . . . large-sized packages in some refineries, such as REPLAN, REVAP, REDUC, RELAN and ***REPAR***" (¶ 220);

d)      Mendonça Neto testified that Toyo Setal paid bribes to Costa in connection with certain contracts at Repar (¶ 144); and

e)      Camargo testified that he paid R$12 million to Costa and Duque in connection with a construction project at the Repar refinery (¶ 145).

**C.      Petrobras's Materially False and Misleading Statements Attesting to Its Transparency and Denying the Existence of Corruption**

357.     Throughout the Relevant Period, Petrobras made statements attesting to the Company's purported commitment to strong corporate governance, transparency, and compliance

with applicable disclosure regulations, while affirmatively denying the existence of corruption and

fraud. For example, Petrobras falsely stated on December 29, 2012 on *Facts and Data* that "all

the activities from Petrobras and its employees are totally guided by ethics and transparency

principles. ***Petrobras System rejects any corruption practices and uses strict management***

***methods*** to assure the protection of its shareholders' interests." Similarly, on November 8, 2011,

Petrobras stated on its *Facts and Data* website: "Petrobras clarifies that there is no overbilling,

overpricing, or any other irregularity in its works."

358.    These statements were materially false and misleading for the following reasons:

a)      The Company has admitted that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." (¶ 199);

b)      The Company has further confirmed that its prior denials were false by stating that it needed to "correct the carrying amount of specified property, plant and equipment" and further admitting that "[t]he information currently available to the Company indicates that the contracts entered into between January 1, 2004 and April 30, 2012 . . . with the suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people." (¶ 272);

c)      Costa testified that 3% of every contract with the "Cartel" companies was returned to certain Petrobras executives and Brazilian politicians as a bribe. Costa also confirmed that the illegal overpricing and bribery scheme impacted all contracts with the Cartel. (¶¶ 126, 141-42);

d)      Barusco, as part of his cooperation agreement with the Brazilian Federal Police, admitted to accepting over $100 million in illegal bribes in connection with the scheme and stated that the payment of these bribes started as early as 1997 or 1998. Barusco admitted that between 1997 or 1998 and October 2010, he received approximately $22 million in bribes resulting from the contract between Petrobras and SBM. Barusco also stated that a 0.9% bribe was added to each Sete Brasil contract for the construction of rigs. With respect to bribes for contracts involving the Board of Supply, Barusco explained that these contracts usually had a 2% bribe, of which 1% was allocated to Costa to distribute to individuals within Petrobras and 1% was allocated to the PT. Barusco further confirmed that "the bribe was

embedded within the formation of the price proposal, in the 'spreadsheet item' of the company" and that the bribes impacted nearly every supply arrangement that Petrobras entered into. Barusco also stated that the amount of the illegal bribes increased proportionally with the growth of the Company. (¶¶ 121-62, 204-232, 398, 415-21);

e)      Costa, Duque, Cerveró, Machado and Barusco, among others, were aware of and complicit in the Cartel's bid-rigging scheme which resulted in "an excessive delta price," or overcharge, to Petrobras. Mendonça Neto confirmed that the Cartel's contracts with Petrobras were routinely inflated by 20% or more through the bid-rigging and that approximately 3% of all contract amounts was paid to Petrobras executives and politicians as bribes. Mendonça Neto further stated that the bribes were "very much mandatory" in order to do business with Petrobras. He explained that 1% of the contract amount would be paid as a bribe to the Supply Director (Costa) and "something closer to 2%" would go to the Services Director (Duque). (*Id.*);

f)      Foster and Gabrielli, among others, were informed of overpricing and cost manipulation by Velosa as far back as 2009, and did nothing to curb these illegal practices. (¶¶ 165-81);

g)      Youssef similarly testified that Petrobras mandated that the Company's suppliers and contractors pay the illegal bribes and that "***they wouldn't get the work if they didn't pay***." (¶ 147);

h)      Camargo likewise stated that bribes were a "rule of the game" and everyone at Petrobras knew it. (¶ 145); and

i)      Barusco stated that "the payment of bribes" was "'endemic' and institutionalized." (¶ 161).

359.    Petrobras also made similar false statements in multiple underwriting agreements with U.S. and international banks, including banks like Defendants Citigroup and JP Morgan. For example, on September 29, 2010, Petrobras filed with the SEC a Form 6-K, which was signed by Barbassa and attached as Exhibit 1.1 an Underwriting and Agency Agreement between the Company and several underwriters, including certain Underwriter Defendants (the "September 29, 2010 Underwriting Agreement"). The September 29, 2010 Underwriting Agreement stated:

Neither the Company [Petrobras] nor any of its Subsidiaries, nor any director or executive officer of the Company or any of its Subsidiaries, nor, to the best knowledge of the Company, any agent, employee or other person associated with

or acting on behalf of the Company or any of its Subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any applicable provision of the Foreign Corrupt Practices Act of 1977 ["FCPA"]; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

360. This statement was false and misleading because, in reality and as discussed above at ¶ 358, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

361. On January 27, 2011, Petrobras filed with the SEC a Form 6-K, that attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters (the "January 27, 2011 Underwriting Agreement"). The January 27, 2011 Underwriting Agreement stated:

Neither of the Companies [Petrobras and its wholly-owned subsidiary] nor any of their subsidiaries, nor any director or executive officer of the Companies or any of their subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of their subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

362. Petrobras repeated this same representation in the following documents:

a) a December 9, 2011 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

b) a December 12, 2011 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

c) a February 6, 2012 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

363. Each of these statements was false and misleading because, in reality and as discussed above at ¶ 358, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

364. On September 26, 2012, Petrobras filed with the SEC a Form 6-K which attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters (the "September 26, 2012 Underwriting Agreement"). The September 26, 2012 Underwriting Agreement stated:

> Neither of the Companies [Petrobras and PGF] nor any of Petrobras' subsidiaries, nor any director or executive officer of the Companies or any of Petrobras' subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of Petrobras' subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

365. Petrobras repeated this same representation in the following documents:

a) a May 15, 2013 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters.

b) a January 9, 2014 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters.

366. Each of these statements was false and misleading because, in reality and as discussed above at ¶ 358, the Company's executives passed along millions of dollars in "direct

[and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

367. On March 11, 2014, Petrobras filed with the SEC a Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters (the "March 11, 2014 Underwriting Agreement"). The March 11, 2014 Underwriting Agreement stated:

> Neither of the Companies [Petrobras and PGF] nor any of Petrobras' subsidiaries, nor any director or executive officer of the Companies or any of Petrobras' subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of Petrobras' subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - *Nova Lei Anticorrupção Brasileira* of 2013 (New Brazilian Anti-Corruption Law); or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

368. This statement was false and misleading because, in reality and as discussed above at ¶ 358, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

369. Further emphasizing the Company's purported commitment to ethical practices, Petrobras issued a release on May 28, 2013 containing the "Code of Ethics of the Petrobras Group," the purpose of which was to "clearly define the ethics principles that guide the actions and conduct of the Petrobras Group, institutionally and in relation to its employees. In doing so, the Code makes the ethical meaning of the Group's Mission, Vision, and Strategic Plan explicit." Petrobras specifically identified its affirmative disavowal of "corruption and bribery":

The Petrobras Group Code of Business Conduct

In its relationship with the Society, the Government and the State, the Petrobras Group commits itself to:

*     *     *

8.8 Refusing any corruption and bribery and bribery practices and keeping formal control and disciplinary procedures for any possible violation of this principle;

8.9 Refusing to support and contribute with political parties or political campaigns of candidates to elective positions.

370. This statement was false and misleading because, in reality and as discussed above at ¶ 358, the Company's executives passed along millions of dollars in bribes to Brazilian politicians and Petrobras employees.

### D. Petrobras's Materially False and Misleading Statements About Competitive Bidding

371. During the Relevant Period, Petrobras made multiple statements reassuring investors that Petrobras engaged in competitive, arms' length bidding, and that, as a result, there was no improper overbilling or overpricing in its projects. Each of these statements regarding Petrobras's bidding process was materially false and misleading because, as discussed above in ¶¶ 121-40, the bidding process was not conducted at arm's length in accordance with applicable laws and regulations but rather was rigged to award contracts to the Cartel companies at inflated prices in exchange for kickbacks to Petrobras executives.

372. Petrobras's materially false and misleading statements regarding Petrobras's bidding and project costs included the following:

373. On July 11, 2011, Petrobras stated, in response to an article published in the newspaper *O Estado de S. Paulo* asserting that Petrobras had received complaints about its bidding processes, "Petrobras rejects accusations of fraud and denies having received denouncements regarding the bidding."

374. The foregoing statement was materially false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts by up to 20%, as discussed more fully above at ¶¶ 121-40.

375. On August 15, 2011, Petrobras represented on *Facts and Data*:

Petrobras contracts are carried out in accordance with Decree 2745 of 24 August 1998. From this Decree Petrobras was relieved to fulfill the Law 8666/93, which regulates hiring in the public sector, and began to conduct their hiring according to the rules of the Bidding Simplified procedure established by Decree 2745. It is important to clarify that **the companies participating in the bidding process at Petrobras have to prove legal, technical, economic and financial qualification and tax compliance**.

376. The foregoing statement was materially false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts by up to 20%, as discussed more fully above at ¶¶ 121-40.

377. On January 22, 2012, Petrobras rejected the notion that it engaged in anything other than a competitive bidding process, stating:

[W]e must highlight that bidding is mandatory for any procurement for works, supply of goods or services to Petrobras. However, there are cases provided for by law, in which the bid or is waived or is even unenforceable by an absolute impossibility of competition (examples: the supplier is holder of patent or copyright on the product or service requested, or has exclusive commercial representation of foreign manufacturer).

But even if the legislation eliminates the formal bid, **the practice of Petrobras is to always seek the competition** and quote at least three (03) price proposals in order to ensure competition between suppliers.

378. The foregoing statement was materially false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of

Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts by up to 20%, as discussed more fully above at ¶¶ 121-40.

379. On November 13, 2013, Petrobras published a "Clarification" on its *Facts and Data* website responding to allegations in an *O Estado de S. Paulo* article regarding the Company's contracts with Odebrecht. In this posting, the Company discussed its bidding process, stating: "The bidding, contracting and performance of services processes of Petrobras are constantly being assessed by its Internal Audit and its recommendations are diligently reviewed, aiming at protecting the interests of the Company."

380. This statement was false and misleading because it failed to disclose the material fact that Odebrecht—a Cartel member—was involved in the bid-rigging scheme that inflated the Company's contracts with Odebrecht by up to 20%, as discussed more fully above at ¶¶ 121-40. Accordingly, the Company's bidding processes with Odebrecht did not "aim[] to protect[] the interests of the Company" but instead protected the interests of Odebrecht, Petrobras executives, and government officials at the expense of Petrobras investors.

### E. Petrobras's Materially False and Misleading Denials of Fraud, Bribery and Corruption as Investigations Commence

381. Between March and August 2014, as Operation Car Wash began to unfold, Petrobras, Foster and Costa vehemently denied any participation in or knowledge of the bribery scheme, affirming repeatedly that there were "no facts or documents that evidence the payment of bribes to Petrobras employees," that Costa's "involvement in money laundering and remittance abroad is zero," that "you will not find anything illegal at Petrobras, because there is nothing illegal about Petrobras," that "there is no indication of irregularities" at Abreu and "there is no overpricing or overbilling in the project of the Abreu e Lima refinery."

382.     Each of these statements, which are set forth fully below, was materially false and

misleading when made for the following reasons:

a)     The Company eventually admitted that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets." (¶ 199)

b)     The Company further confirmed that these denials were false by stating that it needed to "correct the carrying amount of specified property, plant and equipment" and further admitting that "[t]he information currently available to the Company indicates that the contracts entered into between January 1, 2004 and April 30, 2012 . . . with the suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people." (¶ 272)

c)     Costa testified that 3% of every contract with the "Cartel" companies was returned to certain Petrobras executives and Brazilian politicians as a bribe. Costa also confirmed that the illegal overpricing and bribery scheme impacted all contracts with the Cartel. (¶¶ 126, 141-42)

d)     Barusco, as part of his cooperation agreement with the Brazilian Federal Police, admitted to accepting over $100 million in illegal bribes in connection with the scheme and stated that the payment of these bribes started as early as 1997 or 1998. Barusco stated that between 1997 or 1998 and October 2010, he received approximately $22 million in bribes resulting from the contract between Petrobras and SBM. Barusco also stated that a 0.9% bribe was added to each Sete Brasil contract for the construction of rigs. With respect to bribes for contracts involving the Board of Supply, Barusco explained that these contracts usually had a 2% bribe, of which 1% was allocated to Costa to distribute to individuals within Petrobras and 1% was allocated to the PT. Barusco further confirmed that "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company" and that the bribes impacted nearly every supply arrangement that Petrobras entered into. Barusco also stated that the amount of the illegal bribes increased proportionally with the growth of the Company. (¶¶ 121-62, 204-232, 398, 415-21)

e)     Costa, Duque, Cerveró, Machado and Barusco, among others, were aware of and complicit in the Cartel's bid-rigging scheme which resulted in "an excessive delta price," or overcharge, to Petrobras. Mendonça Neto confirmed that the Cartel's contracts with Petrobras were routinely inflated by 20% or more through the bid-rigging and that approximately 3% of all contract amounts was paid to Petrobras executives and politicians as bribes. Mendonça Neto further stated that the bribes

were "very much mandatory" in order to do business with Petrobras. He explained that 1% of the contract amount would be paid as a bribe to the Supply Director (Costa) and "something closer to 2%" would go to the Services Director (Duque). (*Id.*)

f)    Foster and Gabrielli, among others, were informed of overpricing and cost manipulation by Velosa as far back as 2009, and did nothing to curb these illegal practices. (¶¶ 165-81)

g)    Youssef similarly testified that Petrobras mandated that the Company's suppliers and contractors pay the illegal bribes and that "***they wouldn't get the work if they didn't pay***." (¶ 147)

h)    Camargo likewise stated that bribes were a "rule of the game" and everyone at Petrobras knew it. (¶ 145)

i)    Barusco stated that "the payment of bribes" was "'endemic' and institutionalized." (¶ 161)

383.    In its April 30, 2014 Form 20-F, Petrobras firmly denied any noncompliance with applicable laws or regulations and represented that:

- Petrobras had five active internal investigation commissions in place to evaluate "aspects of the Pasadena refinery acquisition;" evaluate contracts with several "service providers;" and evaluate contracts with specific service providers involved in the Abreu and Comperj refineries; and

- While none of those five commissions had completed their work, "[b]ased on the information that is currently available, ***we do not believe that the findings of any of these internal commissions would have a material effect on our financial statements.***"

384.    The Company's statement that it did not believe that "the findings of any of these internal commissions would have a material effect on [its] financial statements" was materially false and misleading because, for the reasons set forth above in ¶ 382, Petrobras had no reasonable basis to make such a statement.

385.    On May 12, 2014, Petrobras held a conference call for analysts and investors to discuss the Company's first quarter 2014 financial results. During the First Quarter 2014

Conference Call, Foster denied the accusations of bribery and corruption at the Company, stating in pertinent part:

> Finally, this is not a slide, but it's my final comment to you. [This] [r]efers to the processes of investigation we've set up in the last few months. We have answered different questions. We have been inquired not only at the House of Representatives but also at the Senate. We have answered questions about facts which are extremely unfavorable for our Company, and we have been working hard to investigate many of these episodes, such as the SBM Offshore situation.

> We have our own internal investigation committee. They conducted investigations during 45 days. And regarding Petrobras action, regarding our operations, ***there are no facts or documents that would document the payment of bribery to any employees of Petrobras.*** The final report by the investigation committee was offered to the national authorities, as not only executive and legislative but also judicial authorities.

386. Foster's statements that the Company "ha[s] been working hard to investigate many of these episodes, such as the SBM Offshore situation" and that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras" were materially false and misleading because they omitted the material facts set forth above in ¶ 382.

387. On July 12, 2014, Petrobras responded to a *Los Angeles Times* article titled "Petrobras shares fall, analysts point to poor management by Brazil." The article discussed, among other things, how the Company had become "ensnared in political scandals," including charges of having "drastically overpaid" for the Pasadena Refinery and the open criminal investigation into the allegations that Petrobras employees accepted $139 million in bribes from SBM for steering oil platform and drilling contracts to the Dutch company. In responding to this article on *Facts and Data*, on July 12, Petrobras denied the allegations, reaffirming that Petrobras "has not found any facts or documents evidencing the payment of bribes to employees of Petrobras."

388.    The Company's statement that there was no "evidenc[e] [of] the payment of bribes to employees of Petrobras" by SBM was materially false and misleading for the reasons set forth above in ¶ 382.

**F.      Petrobras's Materially False and Misleading SOX Certifications and Statements Concerning the Adequacy and Effectiveness of Its Internal Controls**

389.    Throughout the Relevant Period, Gabrielli, Foster and Barbassa certified the effectiveness of the Company's internal controls and procedures.  Specifically, each of the Company's Forms 20-F included a certification signed by Barbassa, as well as Gabrielli (for the 2009 Form 20-F and the 2010 Form 20-F) and Foster (for the 2011 Form 20-F, the 2012 Form 20-F, and the 2013 Form 20-F), stating that:

> 4.      The Company's other certifying officer and I . . . have:
>
> *        *        *
>
>  (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles</u>;
>
> *        *        *
>
> 5.      The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):
>
> (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
>
> (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

390.     Additionally, the February 29, 2012 Form 6-K, the 2010 Form 20-F and the 2011 Form 20-F contained the following statement:

> [M]anagement assessed the effectiveness of [the] Company's internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on that assessment, management has concluded that as of December 31 [of the reporting year,] [the] Company's internal control over financial reporting is effective.

391.     The 2012 Form 20-F, the 2013 Form 20-F and the March 7, 2014 Form 6-K filed with the SEC contained the following representation:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control—Integrated Framework [(1992)] issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31 [of the reporting year].

392.     Each of the statements set forth above in ¶¶ 389-91 was materially false and misleading for the following reasons:  As described in detail herein, Petrobras's internal controls were grossly ineffective and were routinely overridden during the Relevant Period.  Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-rigging on construction contracts and the overpayment of costs in connection with these contracts in exchange for substantial kickbacks to Petrobras executives.  In the wake of the testimony from Costa and others involved in the scheme, Foster expressly admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls."  The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading because Velosa informed Gabrielli and Foster as early as 2008 of the "[i]rregularities,"

including "contracts that . . . were overbilled," yet no action was taken by the Company to discontinue the fraudulent scheme.

## IX.    SUMMARY OF SCIENTER ALLEGATIONS

393.    Petrobras knowingly and/or recklessly made the materially false and misleading statements and omissions of material fact alleged herein.  Throughout the Relevant Period, Petrobras's former executives, including former CEOs Foster and Gabrielli, former CFO Barbassa, and former Executive Directorate members Costa, Duque and Cerveró were active, culpable, and primary participants in the fraudulent scheme.  These executives were also responsible for issuing the materially false and misleading statements and omissions of material fact alleged herein based upon:  (i) their actual issuance of and/or control over Petrobras's materially false and misleading statements, and (ii) their knowledge or reckless disregard of the fraudulent and criminal conduct described herein.  These senior executives made or had control over the statements alleged in Section VIII herein and knew or recklessly disregarded that each of these statements was materially false and misleading and/or omitted material facts at the time it was made.

394.    As discussed more fully above, Petrobras's knowledge and/or reckless disregard of the falsity of the Company's statements is evidenced by, *inter alia*, (i) the fact that several of Petrobras's most senior officers, including Costa and Barusco, have admitted that the Company was engaged in a scheme that involved the overpricing of contracts through bid-rigging and the payment of bribes, and have further admitted to personally receiving millions of dollars in bribes; (ii) Costa's and Barusco's plea agreements, including their agreement to repay $127 million in bribes that they accepted prior to and during the Relevant Period; (iii) the evidence produced through criminal proceedings against Gabrielli, Costa, Duque and Cerveró demonstrating their involvement in the kickback and bid-rigging scheme at Petrobras and the fact that they pocketed

millions of dollars in illegal bribes; and (iv) the statements of Velosa, who informed Foster of the bid-rigging and bribery activity on multiple occasions before being removed from her position.

395.    Petrobras's Executive Directorate (or Executive Board) was composed of the CEO and six senior-most officers of the Company and the heads of the Divisions of Finance, Gas and Energy, Downstream (or Supply), Services (or Engineering, Technology and Materials), International, and Exploration and Production.   Prior to and during the Relevant Period, the Executive Directorate was populated by individuals who either were the masterminds of or active participants in the bid-rigging and bribery scheme or, at the very least, knew of the scheme and its impact on the Company's financial statements, including but not limited to the following individuals:

| Paulo Roberto Costa | Director of Downstream/Supply and a member of Petrobras's Executive Directorate from May 14, 2004 to April 2012.  Arrested, indicted and pled guilty to bribery and corruption in connection with Operation Car Wash. |
|---|---|
| Renato Duque | Chief Services (or Engineering, Technology and Materials) Officer and member of Petrobras's Executive Directorate from 2003 until April 2012.  Arrested and indicted in connection with Operation Car Wash. |
| Pedro Barusco | Duque's right-hand man and former Executive Manager of Engineering, was arrested and indicted and has pled guilty to bribery and corruption.  Barusco provided testimony demonstrating Duque's and numerous other Petrobras executives' involvement in bribery scheme. |
| Nestor Cerveró | Former director of the International Division and member of Petrobras's Executive Directorate from 2003 until 2008.  Arrested and indicted in connection with Operation Car Wash. |
| Maria das Graças Silva Foster | Director of Gas and Energy from 2007 to February 12, 2012; CEO from February 13, 2012 until February 4, 2015 and member of Petrobras's Executive Directorate from 2007 through February 4, 2015, when she was forced to resign. |
| Almir Guilherme Barbassa | CFO and member of the Executive Directorate from 2005 through February 4, 2015, when he was forced to resign. |

| Jose Sergio Gabrielli de Azevedo | CEO and member of Petrobras's Executive Directorate from 2005 until February 13, 2012. Indicted in connection with Operation Car Wash in December 2014. |
|---|---|

396.     These Executive Directorate members reviewed and approved nearly every single contract entered into by Petrobras that had been procured and inflated by the bribes and bid-rigging. As Foster stated in a February 6, 2013 Form 6-K, the Executive Directorate met "twice weekly to focus on the physical and financial monitoring of the principal projects in [Petrobras's] investment plan."

397.     In addition, the members of the Executive Directorate were directly involved in the preparation of Petrobras's materially false and misleading financial statements during the Relevant Period. In fact, Petrobras's by-laws mandate that the Audit Board is responsible for "analyz[ing], at least quarterly, the interim balance-sheet and further financial statements periodically *prepared by the Board of Executive Officers*."

398.     Barusco stated in his plea agreement that illegal bribes were "embedded" within the construction contracts signed by Petrobras during the Relevant Period, and that the contracts "were approved by the Executive Board of PETROBRAS" during the Relevant Period. Velosa likewise stated that the Executive Directorate "had access to [the] irregularities in the executive board meetings."

399.     The December 11 Prosecutor's Complaint also provides information that explains how the fraud was evident to all members of the Executive Directorate because nearly every contract with Cartel members was "close to the maximum amount ('ceiling') estimated by [Petrobras], and sometimes they even exceeded that." That Petrobras continued to contract for services and goods that consistently exceeded the Company's own estimates for those services and goods by up to 20% was a red flag that would have alerted members of the Executive Directorate

that the Company's reported assets were overstated due to inflated contract prices. Of course, however, the members of the Executive Directorate were already aware of the fraud given that they personally benefitted from it, as described herein.

400. Given the numerous red flags identified herein indicating that Petrobras's construction contract values were materially overstated prior to and throughout the Relevant Period, and the fact that multiple members of the Executive Directorate had direct knowledge of or access to facts concerning the bribery scheme, Petrobras and the Executive Directorate knew or recklessly disregarded that the Company's capitalization of these costs caused its financial statements—and, in particular, its PP&E, assets and net income—to be materially overstated throughout the Relevant Period.

### A. Petrobras's Scienter Is Established Through the Admissions of Senior Officers

401. Costa's and Barusco's criminal guilty pleas and related testimony given in connection with those guilty pleas establish the Company's scienter. Indeed, such testimony confirms that the fraud at Petrobras was a criminal conspiracy that was both "endemic" and "institutionalized," as Barusco testified, involved senior Petrobras executives, and was perpetrated to secure the business of Cartel members and curry the continued favor of politicians at whose discretion Petrobras's key executives served.

#### 1. Costa

402. Costa was the head of the Supply Division and served on the Executive Directorate until his departure from the Company in 2012. Costa was directly responsible for Petrobras's financial statements and personally signed many of Petrobras's inflated contracts during the Relevant Period. Costa has admitted to the criminal conspiracy underlying the fraud alleged

herein. Those admissions provided one of the primary bases for the filing of the December 11 Prosecutor's Complaint against Costa and others.

403.     As set forth in the December 11 Prosecutor's Complaint, Costa, as a member of the Executive Directorate for much of the Relevant Period, worked together with Duque, Barusco and other "top level civil servants at Petrobras" to "rig[] the competitive bidding processes regarding the major works contracted by PETROBRAS between 2004 and 2014, largely increasing the profits of those companies in [the amount of] hundreds of million [reais]." Those amounts were then falsely reported as *assets*, rather than expenses, on Petrobras's financial statements.

404.     Costa's admissions made clear that the Cartel's illegal inflation and bribery scheme "had the support of PETROBRAS directors and equivalent civil servants" including Costa and Duque, "who made sure the intent of the criminal group was attained."

405.     As discussed above in ¶¶ 121-62, 218, Costa has admitted that after assuming the position of Chief Downstream Officer in 2004, he was aware that Petrobras had built a figure of approximately 3% into *every one* of its contracts with the "Cartel" companies to be paid out as bribes to Petrobras officers and directors and, ultimately, Brazilian government officials. Costa, who personally signed many of these inflated contracts, further admitted to his direct involvement in the overpricing of contracts and payment of bribes throughout the Relevant Period.

406.     In particular, Costa testified to Brazilian prosecutors that he worked directly with Alberto Youssef, José Janene and the presidents and/or directors of the construction companies in order to execute this fraudulent scheme:

> So, I would sign the contract, some time would pass, then after the contract was signed, the first billing event Petrobras generates for services is 30 days . . . the service is executed, Petrobras does the calculation and pays 30 days later. So normally there is a gap of 60 days between the execution deadline and final payment deadline. Normally after these 60 days it was possible to make those payments. So Deputy José Janene - at the time former Deputy because in 2008 he

was no longer a Deputy, he maintained contact with these companies, also with people not just at senior management and presidency level, but also operational personnel, and those amounts were then passed on to him and then on to Alberto Youssef. Within the companies, there were people who operationalized that, I had no contact with those people, I was not in contact with them, I didn't know those people. So what happened? Let's say, Alberto or Janene made that contact and the money then went for political distribution through them.

407. Costa specifically detailed how every division of Petrobras was involved in the taking and dissemination of the illegal bribes, explaining how Foster's Gas and Energy Division funneled bribes directly to the PT (Labor Party):

**FEDERAL JUDGE:** And the Petrobras directors, did they also receive a part of those amounts?

**PAULO ROBERTO:** Look, in respect of the services department, everyone knew that they had a percentage of those contracts in the supply area; of the 3 per cent, 2 per cent was for the Labor Party (PT), through (indiscernible) of the service. Other departments such as gas and energy and exploration and production, were also PT, so there was PT in the exploration department, PT in the gas and energy department and PT in the service department. So the comment in the company is that in this case the 3 per cent went direct to the PT, the PP did not participate in that because they were departments nominated for both execution of services and for business, PP with PT. So what happened within the company was that the total amount would be fully for the PT.

408. Costa further admitted that he personally received tens of millions of dollars in bribes as part of this fraudulent scheme that affected nearly every construction contract at Petrobras:

**FEDERAL JUDGE:** Right, but the question I specifically asked was if the directors, for example, if you received any part of those amounts?

**PAULO ROBERTO:** Yes. So, in average amounts, what would happen? Of the one per cent for the PP, on average, obviously after (indiscernible) contract, could be a little more or a little less, 60 per cent went to the party, 20 per cent was for expenses, sometimes for invoices, issue costs etc., they are all average amounts, the amounts could be altered, and the remaining 20 per cent was allocated - 70 per cent to me and 30 per cent either to Janene or Alberto Youssef.

**FEDERAL JUDGE:** And how did you receive your part?

**PAULO ROBERTO:** I received it in cash, normally at my home or the shopping mall or in the office after I opened my consultancy company.

**FEDERAL JUDGE:** Who delivered these amounts to you?

**PAULO ROBERTO:** Normally Alberto Youssef or Janene.

409.     Costa testified that he continued to receive bribes even after he left the Company in April 2012:

**FEDERAL JUDGE:** But did you continue to receive amounts from this, let's say, scheme?

**PAULO ROBERTO:** Yes, I had some outstanding amounts to receive after my leaving Petrobras, from April 2012, there were some outstanding amounts, and some contracts were signed with my consultancy company, which I set up in August 2012, the contracts were signed in 2013 and I received some amounts from contracts, let's say, in respect of provision of services with these companies, yes. The answer is yes.

410.     Costa also admitted that—in addition to the 3% bribe paid to Petrobras executives and politicians for each contract—he knew that the Cartel was rigging bids for Petrobras contracts, and that this bid-rigging secretly inflated the Company's contract costs.  Specifically, Costa stated:

"*[I]t was clear to me that there was, quote-unquote, a prior 'agreement' between the [contractors] in respect of the works . . . that cartelization, obviously, results in an excessive delta price*."  Costa further acknowledged that these companies entered into a "prior agreement to define the price proposal that they would submit" to Petrobras, and that embedded within that inflated price was a 3% "political adjustment," i.e., bribe.

411.     Costa also testified that he kept a "daybook" that detailed the payment of bribes to Brazilian politicians:

**FEDERAL JUDGE:** These politicians, for example, these public officials, that they received their portion, how you know about this?

**PAULO ROBERTO:** We had regular meetings with this political group, you know? And then we regularly talked. "Oh, we got this, we got that," etc. In my daybook, that was seized in my residence, there is a table that was specific -, detailed with the Public Prosecutor's Office, and the table shows several amounts

of politicians from various political parties that were ... relating to the 2010 election. I copied this table at the office of Alberto, at a meeting that I had there with him.

412.    Costa also admitted that significant acts in furtherance of Petrobras's criminal scheme and assets involved in the underlying fraud took place or are located in the United States. For example, Costa told investigators that he accepted a $1.5 million bribe from business lobbyist Fernando Soares "'to keep from interfering' with the potential acquisition of a refinery in Pasadena, US, during a board meeting to approve the deal."    Costas stated that these bribes influenced Petrobras's decision to go forward with the Pasadena investment in the face of internal doubts about the viability of the refinery.  As *Agencia Brasil* reported:

> Costa told investigators he was contacted by [lobbyist] Fernando Soares with a bribe offer and accepted it. The payment was made offshore, and the money is believed to have been provided by Astra Oil, which owned the refinery. Also according to Costa, rumor had it at Petrobras that the company's former international boss, Nestor Cerveró (who is now jailed), along with politicians and Soares, split bribe money ranging somewhere in between $20 million and $30 million, probably paid by Astra.

413.    In his plea bargain agreement, Costa further confirmed that the International Division headed by Cerveró also had a "need for transfers to political groups."  There, he said, Soares had the role of "ensuring part of the kickback payments was channeled" to their political and Petrobras recipients.

414.    In addition to admitting to his direct involvement in the fraudulent scheme, Costa has agreed to repay approximately $27 million in bribes that he received throughout his tenure as the Chief Downstream Officer.

### 2.    Barusco

415.    Barusco, Services Director and Duque's right-hand man, has admitted to the receipt of nearly $100 million in bribes.  In his plea deal, Barusco admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization

crimes, among others, involving the company Petróleo Brasileiro S/A," and agreed to "giv[e] back nearly everything of what he improperly received as a result from bribes."

416.     In a November 20, 2014 "Term of Cooperation," Barusco stated that "the payment of bribes within PETROBRAS was something *'endemic' and institutionalized*; that when [Barusco] became Executive Manager of the [Services] Department, the payment of bribes by the construction companies already existed and he understood that it was 'a part of the relation.'"

417.     Barusco explained how "a project for the COMPERJ utilities was devised" by a Cartel member and that the bidding for that project was done with Costa (and not Duque and Barusco) such that that particular "bribe would 'naturally' be paid to [Costa]."

418.     Barusco also acknowledged his awareness that the Cartel members were rigging the bids they submitted to Petrobras.  According to Barusco, the price proposals Petrobras received from Cartel companies were always "signed near the maximum amount of the internal budget for Petrobras," and "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company."

419.     Barusco testified to at least one instance, in connection with the construction of the Abreu refinery, where he was approached by a director of Odebrecht "who presented a list . . . containing the list of companies that should be invited to bid on the biggest packages of the works in RNEST."  According to Barusco, Odebrecht "had already agreed . . . with PAULO ROBERTO COSTA, who was, at the time, Director of Suppl[y], the list of companies that were going to take part" in bidding.  Barusco stated that "on a later date [he] verified that the companies invited for the RNEST bids were the ones mentioned in the list delivered by" Odebrecht.  Barusco also stated that there was "organized pressure" to "close the values of the [RNEST] contracts at the top echelon of the PETROBRAS budget."

420.     Barusco further detailed how the bribery increased in magnitude as the Company grew and engaged in many new projects.  He admitted that "the payment of bribes and their amounts intensified" during his tenure at the Company due to "the increase of the billing of Petrobras, the increase of prices that were charged by the [Cartel] companies and the high demand of the company."  For example, he explained how "in 2003 the [Services] Department managed and made around US$3 billion per year and, when [Barusco] left the company in 2011, around US$3 billion per month was being invested."  As a result, the bribes increased "proportional[ly]" because such an increase "is mathematical"; there was a direct correlation between Petrobras's increased capital expenditures and new projects and the increase in bribes paid to Petrobras executives and politicians.

421.     In total, Barusco has admitted to the receipt of $97 million in bribes from over "60 (sixty) contracts signed between companies or consortia of companies and PETROBRAS."  Moreover, Barusco estimated that Services Director and Executive Directorate member Duque, for whom he collected, accounted and managed the bribes, received a higher percentage of the illegal bribes—approximately $140 million—in exchange for Petrobras's approval of the contracts.

**B.**     **Foster Knew About or Recklessly Disregarded the Bid-Rigging and Kickback Scheme Prior to and During the Relevant Period**

422.     Petrobras's scienter is further evidenced by the scienter of Foster.  At all relevant times, in her position as Chief Gas and Energy Officer and then CEO of Petrobras, Foster was one of a handful of individuals who served on the Company's Executive Directorate.  In this role, Foster was responsible for approving contracts that included the illegal bribes that were built into a significant number of the construction and other contracts executed by Petrobras during the Relevant Period.

423.     Barusco testified that bribes were paid in connection with contracts in the Gas and Energy Division while Foster was in charge of that Division, stating that "whenever the contracts involved the Board of Gas and Energy, whose Chairman was initially ILDO SAUER **and then MARIA DAS GRACAS FOSTER**, the percentage of the bribe usually ranged from 1% to 2%."

424.     In addition, prior to assuming the role of CEO—where she signed SOX certifications in connection with the Company's SEC filings attesting to the accuracy of Petrobras's financial statements—Foster was directly informed of the contract "irregularities" evidencing the bribery scheme alleged herein on numerous occasions.  As set forth above, Velosa, an Executive Manager at Petrobras during the Relevant Period who reported to Costa and was "close" to Foster, stated that after realizing in 2008 "that there was something wrong" in the Downstream business, she began "reporting these problems to [her] superiors," including Foster.  Specifically, Velosa stated in a *Fantástico* interview that beginning in 2008, she began seeing "[i]rregularities regarding the payment of services that were never rendered, contracts that apparently were overbilled, negotiations that were made where a commission was requested for the people in charge of the negotiation and a series of problems that hurt the company's ethical and procedural code."  According to Velosa, she immediately brought these irregularities to the attention of Foster in 2008:

> I met with [Foster] personally when she was the director of the gas and energy sector.  At that time, we discussed the subject.  She received documentation about the denunciation in the communications sector.  After that, we . . . **She had access to those irregularities in the executive board meetings**.

425.     In April 2009, Velosa prepared a memorandum identifying the irregularities and the issues her team had uncovered in its audit of various projects, which she intended to circulate to senior management.  Velosa wrote to Foster on April 3, 2009, when Foster was still the Chief Gas and Energy Officer, and asked for her help to complete the memorandum:  "I would like to

have your opinion on a final text that I need to forward. Can I leave it for you to read? You know about the matter. Feel free if you feel better not reading it. I await your response to leave or not the material with your secretary." Foster did not reply.

426. Later that day, Velosa published and circulated to the Board of Directors her "Internal Document of the Petrobras System" which concluded that "administrative irregularities" existed in the communications unit of the Downstream department. Specifically, Velosa referred to an audit she led to thwart a scheme that diverted million of reais from Petrobras to Workers' Party (PT) members from Bahia—the same political group of then Petrobras CEO Gabrielli.

427. Velosa continued to warn Foster of Petrobras's improper practices throughout the Relevant Period. For example, in October 2011, Velosa sent an email to Foster stating that "what happened in the ABAST (the downstream department) in the area of communications and works was absolute nonsense." Velosa said that "the immense pride she felt towards the company turned into shame" because, among other things, bidding at the Company was occurring "with no apparent efficiency." She further stated: "I write this even knowing that there is the possibility that you will go to [Costa's] office, and that he could then ask me what I was doing in your office." Velosa went on to state that she was bringing the wrongdoing at Petrobras to light "to comply with the rules and with the ethical code of Petrobras." Velosa even offered to provide Foster with documents substantiating her claims of wrongdoing at the Company: "I would like to present to you part of the documentation that I already have. Part of it, I know you are already aware of." Velosa concluded the email by stating: "I would like to hear from you before taking the next step. I don't want to send you anything without a positive sign from you." Shortly thereafter, Velosa was "reassigned" to a new position in Singapore, only to be relieved of her duties upon her arrival.

428. Asked during the *Fantástico* interview whether Foster (who became CEO several months after receiving this October 2011 email from Velosa) understood the accusations that Velosa was making against the Company, Velosa stated:

> What I can say is this. If I say that there are irregularities in the communication sector and problems with bidding, if that's not clear enough then I, as a manager can say this: I would look for an explanation, especially from a person that I have a lot of access to. Because she always did, we always had a lot of access. I knew [Foster] when she was manager of technology, in the gas sector; I was the manager of the contract management sector. We were close. So she would be very comfortable to come to me and say: "Venina, what is going on?"

429. Thus, through Velosa, Foster had access to information and documentation demonstrating that Petrobras's financial statements and Foster's own public representations were false or misleading. Velosa's conversations and emails with Foster, including her offer to provide Foster with incriminating documents to substantiate the corruption, were glaring red flags indicative of fraud that Foster, as CEO, had a duty to monitor, yet knowingly or recklessly disregarded in making and/or approving the false and misleading statements alleged herein. At minimum, even assuming that Foster did not review the documents made available by Velosa, she (and therefore Petrobras) was willfully blind.

430. Petrobras's treatment of Velosa following her allegations of misconduct is powerful evidence of its scienter. During her *Globo* interview, Velosa stated that "[d]uring the whole communication process, [she] was very harassed . . . [and] very pressured." Velosa explained that:

"***[t]he whole time, the president's assistants, the assistants of the directors, they were in my office saying: 'There's a lot of people involved. You can't treat it like this*.'**" Velosa stated that when she began preparing her memorandum identifying her concerns, there "was a great pressure to prevent that from happening." Velosa told her superiors, however: "Look, I'm going to do this. Now, who should I send this to? Shall I send this to the auditing department? Shall I notify legal? Shall I notify the director?"

431.    The fact that Velosa was threatened and ultimately exiled to Singapore after she reported this wrongdoing to Foster and the Board of Directors demonstrates clear culpability and provides additional evidence of Petrobras's scienter.   Velosa noted that in one instance she had a gun pointed to her head, and at other times her daughters were threatened.   Velosa told *Globo*:

> After I determined that the question of the communication area, during that whole process, we received several threats by phone.  My daughters, at the time, were about five and seven years old.  They were quite young.  There were other difficult moments besides that one.  The choice [Petrobras] made in 2009 was really to send me as far away as possible, where I would have as little contact as possible with the company.  Apparently, I was being rewarded going to Singapore but, actually, what really happened was, when I got to Singapore, it was to . . . I introduced myself at the office.  I was [told] that I couldn't work, that I shouldn't have any contact with the business, and that I should really take a course and dedicate myself to the course.

> *         *         *

> I had a family, yes.  I had an apartment, I had a husband, two daughters, my mother.  My family.  What they did, simply, was to send me away from my country, from the country that I loved, from my co-workers.  I went to Singapore, I didn't see my mother become ill.  My mother went blind, my mother had a heart transplant.  I couldn't be beside her.  My husband couldn't work anymore.  He had to come back.  During the whole time, I was pressured into doing things outside of the company's ethical code.  The only thing left was my name.  and when I saw that they put my name associated with things I didn't do, I called my daughters and said "Look, girls, either I react and try to . . . clear my name, or I am going to let this happen, we will have some peace now and then the tractor will hit us afterwards.  What are we going to do?"  My daughters said:  "Let's react."

> *         *         *

> And I am also very afraid, yes.  I can't say that I am not, because when you denounce, instead of getting answers to the denunciations, you . . . simply see the company . . . trying to say that:  "You are not competent.  You did a bunch of wrong things." . . . It's a machine that rolls you over.  And it is coming through.  Am I afraid?  I am afraid, but I won't stop.

432.    Faced with the revelation of facts concerning her involvement in the corruption at Petrobras, Foster expressly denied the allegations, stating on May 12, 2014 that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras"—a claim flatly belied by the documents and emails Velosa later made public.  Indeed, as additional

facts came to light, Foster attempted to resign as CEO, stating "*I need to be investigated*, we all need to be investigated," and only remained in her post until February 2015 because President Dilma Rousseff refused to accept her resignation. Since the allegations of fraud at Petrobras surfaced, Foster has attempted to transfer ownership of certain assets to her children in an effort to avoid having them seized by prosecutors, similarly demonstrating her culpability for the fraud alleged herein.

### C. Additional Members of the Executive Directorate Have Been Implicated in the Fraudulent Scheme

433. In addition to the two guilty pleas by Costa and Barusco, three other Petrobras executives—Gabrielli, the former CEO, and two other former members of the Executive Directorate, Duque and Cerveró—have been charged with corruption and bribery in connection with Operation Car Wash. Details of the evidence released to date against these criminally-charged executives provide additional compelling inferences of scienter, all directly attributable to Petrobras.

#### 1. Gabrielli

434. Gabrielli served as the CEO of Petrobras from July 2005 until February 2012. During that time, Gabrielli signed SOX certifications attesting to the accuracy of Petrobras's financial statements. Gabrielli also served on Petrobras's Executive Directorate during his tenure as CEO.

435. In December 2014, Gabrielli was indicted for fraud. Prosecutors have alleged that Petrobras and Gabrielli conspired with Andrade Guitierrez, a construction and engineering company, to overcharge Petrobras by approximately $11 million in connection with a project to expand Petrobras's Rio de Janeiro research park and data processing center. In connection with this criminal action, prosecutors asked the Brazilian courts to freeze Gabrielli's assets, a request

that was granted on January 29, 2015. In the same order, the court also allowed prosecutors to access Gabrielli's tax, banking and phone records, as well as those of former Petrobras executives Duque and Barusco.

436. Gabrielli's role in the fraud has also been directly confirmed by other co-conspirators. For example, in a February 25, 2015 article in Brazilian publication *Veja*, Ricardo Pessoa, the jailed president of accused Cartel member UTC, gave an interview during which he described the endemic and institutionalized practice of bribery and contract inflation at Petrobras. Specifically, Pessoa described how the scheme of corruption in Petrobras began, to his knowledge, in 2003 after President Lula came to power when the contractors were contacted by government emissaries who explained the new rules "by which everyone came out a winner." According to Pessoa, Gabrielli knew about the bribes and contract inflation as "the scheme of corruption always relied on the knowledge of the ex-president of Petrobras José Sergio Gabrielli" and that the bribes "directly financed the campaign" of the then-Defense Minister Jacques Wagner, one of Gabrielli's political sponsors who helped him secure the CEO spot.

### 2. Duque

437. The indictment and evidence against Duque, Petrobras's former Services Director and member of Petrobras's Executive Directorate who was responsible for the Company's financial statements during his tenure, also demonstrate the Company's scienter. Duque was arrested on November 14, 2014 for his role in the bribery and money laundering scheme, and has remained in jail since that time.

438. Barusco's plea agreement with Brazilian prosecutors confirms that Duque was directly involved in the corruption at Petrobras, and was the recipient of millions of dollars in bribes in connection with the execution of construction contracts:

[T]hat from 2005 to 2010, approximately, [Barusco] and RENATO DUQUE received bribes from over 60 (sixty) contracts signed between companies or consortia of companies and PETROBRAS;

\*      \*      \*

[T]hat the informant cannot tell how much has RENATO DUQUE received from bribes throughout the years he held the position of Services Director of PETROBRAS; that in the division of bribes between the informant and RENATO DUQUE, however, DUQUE generally kept the largest part, that is to say, 60%, and the informant would get 40%, however when there was the participation of an operator, RENATO DUQUE would get 40%, the informant would get 30% and the operator would get 30%.

439.    Barusco stated that "between 2003 and until the end of 2011" Duque received "approximately US$40 million dollars" in bribes.

440.    In addition, Barusco stated that between 2004 and 2011, he attended meetings with Duque and Vaccari where the three discussed "the contracts, the progress of projects and biddings," and "the payment of bribes." Barusco also noted that "RENATO DUQUE was also worried that he might get caught," and identified a spreadsheet "specifying the combinations and divisions of bribes for himself and RENATO DUQUE."

441.    Barusco further stated that he tracked bribes paid to himself and Duque through a spreadsheet which listed code names for each recipient, and that Duque's code name in this spreadsheet was "MW," short for "My Way."

442.    Mendonça Neto, a director of Toyo Setal, testified that he discussed the payment of bribes directly with Duque, and paid bribes to Duque "either as deposits in an account abroad or in cash here in Brazil." Julio Camargo, another Toyo Setal executive, testified that he paid R$12 million in bribes to Costa and Duque in connection with the construction of a coking unit at the Repar refinery.

### 3.    Cerveró

443.     Cerveró, the former Director of Petrobras's International Division and member of the Executive Directorate, was charged with accepting $53 million in bribes, and was subsequently arrested on January 14, 2015.  Cerveró profited from bribes from international companies located largely outside of Brazil and the Cartel.

444.     Cerveró's indictment, dated February 20, 2015, formally accused Cerveró of requesting $40 million in bribes from Samsung Heavy Industries Co. in exchange for awarding Samsung contracts for drilling ships for Petrobras, and of receiving other bribes in exchange for Petrobras contracts.

445.     Prior to having his assets frozen by the Brazilian federal government, Cerveró transferred three apartments he owned and other assets to his family members in order to prevent them from being seized by prosecutors.

446.     Costa has confirmed Cerveró's and Duque's involvement in the kickback scheme, testifying that both Duque and Cerveró personally received bribes in connection with the execution of construction contracts:

> **FEDERAL JUDGE:** This person, you mentioned in passing, but to be clear. Were you on the Executive Board of Directors of Supply?
>
> **PAULO ROBERTO:** Correct.
>
> **FEDERAL JUDGE:** This, let's say, this cartelization and this payment of 3% also existed in the other divisions?
>
> **PAULO ROBERTO**: Yes. Correct.
>
> **FEDERAL JUDGE:** Do you know whether other directors, like you, also received amounts?
>
> **PAULO ROBERTO**: Yes, within the Service[s] [Division] there was the director Duque, who was appointed at the time by the Minister of Civil Affairs, José Dirceu, right? And he had this connection with João Vaccari within the PT [Partido Trabalhista (Worker's Party)] process. Within the International Board of Executive Directors, it was Nestor Cerveró, who was appointed by a politician and had strong

ties with the PMDB [Partido do Movimento Democrático Brasileiro (Brazilian Democratic Movement Party)].

**FEDERAL JUDGE:** But do you know, for example, whether Mr. Nestor Cerveró and Mr. Renato Duque also personally received amounts?

**PAULO ROBERTO:** Well, this was talked about within the company and it was clear that yes they did. Yes, the answer is yes.

**FEDERAL JUDGE:** So these 3% existed in all ... these three divisions, at least?

**PAULO ROBERTO:** Correct.

D.    **Additional Evidence of Scienter**

1.    **The Magnitude and Scope of the Scheme**

447.   The extraordinary scope of the illegal bribery scheme further demonstrates Petrobras's scienter. Petrobras has admitted that the bribery scheme impacted at least one-third of the Company's fixed assets reflected on its financial statements as PP&E, amounting to over $69 billion (R$188.4 billion). The Company has also admitted that the size of the inflation attributable to the criminal scheme could require write-downs of approximately US$34 billion (R$88.6 billion)—an amount that would nearly wipe out the Company's profits for 2012 and 2013 combined.

448.   Further, the fact that so many high-level executives were direct participants in the scheme also establishes the Company's scienter. As reported by the *Wall Street Journal*, Barusco testified before a congressional hearing in Brazil on March 10, 2015 that he first began receiving bribes in 1997, that the bribery scheme became "more widespread and institutionalized by 2003 or 2004," and that it continued to expand in scope after that. Based on the amount of bribes he received, Barusco estimated that Vaccari, the treasurer of the PT, received at least $200 million in bribes.

449.   The Company's scienter is also established through other documentary and testimonial evidence demonstrating the widespread nature of the fraud. For example, Alberto

Youssef testified that it was widely known by Petrobras insiders and their business partners that contractors "wouldn't get the work [from Petrobras] if they didn't pay [the bribes]." Mendonça Neto similarly testified that the payment of bribes was "very much mandatory" in order to do business with Petrobras. Similarly, Fonseca, the CEO of Galvão Engenharia testified that he was told in no uncertain terms by Petrobras executives, including Costa, that his company would have to pay bribes in order to win contracts from Petrobras. According to Fonseca, "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by Janene in Sao Paulo." During a 2010 meeting, Janene informed Fonseca "in a very truculent way . . . that to be able to win contracts [from Petrobras], he would have to pay." Fonseca testified that after Galvão agreed to pay bribes to the Company, Petrobras awarded Galvão contracts valued at R$2 billion to R$3 billion.

450. Petrobras employees also actively assisted members of the Cartel to ensure that their contracts and addenda were accepted by the Company. As reported by *Valor International* on February 11, 2015, Petrobras held periodic meetings with Cartel members at its Rio de Janeiro offices to discuss contracts to be signed between Petrobras and the Cartel companies. Among other things, the minutes of these meetings held at the Company's headquarters reflect that Petrobras workers "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal." These contract addenda "were responsible for the price increases that led the costs of the Refinery Abreu e Lima, in Pernambuco, to reach $18.5 billion, in comparison with $2.3 billion originally estimated."

## 2. Petrobras's Retaliatory Efforts

451. Petrobras's scienter is further evidenced by the efforts the Company's senior executives took to silence individuals who threatened to expose the fraud. In addition to the actions taken against Velosa and Fernando (described at ¶¶ 165-186, 424-32), Petrobras also sought to

quiet the few independent members of the Company's Board of Directors that spoke out against the Company. As set forth above at ¶¶ 187-88, independent board member Mauro Cunha refused to approve the Company's 2013 financial statements at a February 25, 2014 Board meeting because, among other reasons, "the accounting for refineries was inadequate" and he believed an impairment was required. Following the Company's refusal to provide more detail to investors concerning his vote, Cunha filed a formal complaint with the CVM that stated, with respect to Petrobras's accounting for the refineries, that he was "not comfortable with the absence of impairment." Just two months later, at an April 25, 2014 Board meeting, Cunha was inexplicably removed from his position on a committee investigating the Company's Pasadena acquisition and construction of Abreu. As Cunha acknowledged, his removal from the committee was done in retaliation for his efforts to expose the fraud. As Cunha explained to *Bloomberg* in a February 6, 2015 article addressing the appointment of a new CEO to replace Foster, "I would like to say publicly the truth I put in the minutes of the meeting [addressing the appointment of the new CEO], but would risk retaliation as I have suffered in the past."

### 3. Resignations and Terminations of Petrobras Executives

452. Finally, as discussed above, scores of senior executives at Petrobras have resigned or been terminated—including the entire Executive Directorate—as a result of their participation in the fraud alleged herein. During the week of February 2, 2015, just one week after it announced that Petrobras's corruption-related impairment charge could reach $34 billion, Petrobras announced that Foster and Barbassa were leaving the Company. That same week, the Company also announced the departure of: (i) Machado, the head of Transpetro; (ii) José Miranda Formigli Filho, Petrobras's Exploration and Production Officer; (iii) José Carlos Cosenza, Petrobras's Downstream Officer; and (iv) José Alcides Santoro Martins, Petrobras's Gas and Energy Officer. Similarly, *on the very same day* in April 2012, both Costa and Duque—who numerous witnesses

have identified as the two central Petrobras executives involved in the fraudulent scheme—were replaced as the Directors of Supply and Services, respectively. The suspicious timing and nature of these departures strengthens the overall inference of Petrobras's scienter.

## X.    PLAINTIFFS' RELIANCE

### A.    The Fraud-On-The-Market Doctrine Applies

453.    At all relevant times, the markets for Petrobras's securities were efficient for the following reasons, among others:

a)    Petrobras's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient electronic stock market;

b)    As a registered and regulated issuer of securities, Petrobras filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c)    Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Company's websites, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)    Petrobras was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

e)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Petrobras's securities; and

f)    Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired Petrobras securities between the time that Petrobras made the material misrepresentations and omissions and the time that the truth was revealed, during which time the prices of Petrobras's securities were artificially inflated by Petrobras's misrepresentations and omissions.

454.    As a result of the foregoing, the market for Petrobras securities promptly digested current information regarding Petrobras from all publicly available sources, and the prices of Petrobras securities reflected such information. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Petrobras's securities traded at artificially

inflated prices during the Relevant Period. Plaintiffs purchased Petrobras securities relying upon the integrity of the market price of those securities and other market information relating to Petrobras, and were damaged thereby.

**B.**     **SKAGEN's Allegations of Direct Reliance**

455.     During the Relevant Period, SKAGEN employed in-house investment managers to manage its investment portfolios and make investment decisions on its behalf. Throughout the Relevant Period, SKAGEN undertook rigorous, security-specific research to identify companies with significant growth prospects likely to outperform the market.

456.     As reflected on SKAGEN's website, SKAGEN does not rely on index investing. Instead, SKAGEN's investment decisions are based upon its "own research and understanding" of the companies in which it invests. SKAGEN's investment process involves "thoroughly analys[ing] balance sheets, cash flow, profitability, capital structure and capital efficiency, as well as key figures such as price/earnings and price/book in [its] hunt for new investments." SKAGEN's investment process also involves an analysis of a company's business model and growth potential. SKAGEN also "continuously follow[s]" its investments and "takes new information into account," including new financial information.

457.     SKAGEN applied this analytical, research-based approach to investment in order to determine whether to buy, sell, or hold Petrobras securities. This in-depth, fundamental analysis included a detailed review of the financial statements that Petrobras publicly filed with the SEC. As part of this analysis, SKAGEN directly relied upon the information publicly disclosed by Petrobras in the Forms 20-F that it filed with the SEC during the Relevant Period.

458.     In particular, in making its decisions to purchase Petrobras securities, SKAGEN relied upon the financial statements included in Petrobras's 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F, including the Company's representations concerning its net income, total assets

and PP&E throughout the Relevant Period. SKAGEN also relied upon the Company's representations in those filings that its financial statements complied with IFRS and/or GAAP, as well as the certifications issued by Petrobras executives in connection with those filings.

459. SKAGEN relied on the Company's statements in those filings as being materially complete, and as not omitting material information, including information regarding Petrobras's financial condition. SKAGEN did not know, and in the exercise of reasonable diligence could not have known, that Petrobras's Form 20-F filings were materially false and misleading and/or materially incomplete when deciding to purchase, sell or hold Petrobras securities during the Relevant Period.

460. Petrobras's false and/or misleading statements in its Forms 20-F had a material influence on, and were a substantial factor in bringing about, SKAGEN's investment decisions with respect to Petrobras shares. As reflected in Appendix A, these material misstatements caused SKAGEN to purchase Petrobras common and preferred ADSs on the NYSE following Petrobras's issuance of the 2011 Form 20-F, the 2012 Form 20-F, and the 2013 Form 20-F.

## XI.  THE STATUTORY SAFE HARBOR IS INAPPLICABLE

461. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any such forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

462. Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Petrobras is liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker

knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## XII. EXCHANGE ACT CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Petrobras

463. Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This claim is asserted against Petrobras.

464. During the Relevant Period, Petrobras used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Petrobras securities; and (iii) cause Plaintiffs to purchase Petrobras securities at artificially inflated prices that did not reflect their true value. In furtherance of its unlawful scheme, plan, and course of conduct, Petrobras took the actions set forth herein.

465. While in possession of material adverse, non-public information, Petrobras, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Petrobras's securities in violation of Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder. Petrobras is being sued as a primary participant in the wrongful conduct alleged herein.

466. By virtue of their high-level positions at the Company during the Relevant Period, Petrobras's executives were authorized to make public statements, and made public statements during the Relevant Period on Petrobras's behalf. These executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

467. In addition to the duties of full disclosure imposed on Petrobras as a result of its making of affirmative statements and reports to the investing public, Petrobras had a duty to promptly disseminate truthful information that would be material to investors, including information with respect to the Company's operations, so that the market price of the Company's securities would be based on truthful, complete, and accurate information.

468. Petrobras acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that it failed to ascertain and disclose such facts, even though such facts were known or readily available to it. Petrobras's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Petrobras's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its securities.

469. The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Petrobras's securities during the Relevant Period. In ignorance of the fact that the market prices of Petrobras's securities were artificially inflated, and relying directly or indirectly upon the materially false and

misleading statements made by Petrobras, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Petrobras but not disclosed in public statements by Petrobras during the Relevant Period, Plaintiffs purchased Petrobras's securities, including common and preferred ADSs and certain Petrobras debt securities, during the Relevant Period at artificially inflated prices. As the truth eventually emerged, the price of Petrobras's securities substantially declined.

470. At the time of the material misrepresentations and omissions alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the business, operations, performance, and prospects of Petrobras, which was concealed by Petrobras, Plaintiffs would not have purchased Petrobras's securities, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

471. By virtue of the foregoing, Petrobras has violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

472. As a direct and proximate result of Petrobras's wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's securities during the Relevant Period.

## COUNT II
### For Violations of Section 18 of the Exchange Act
### Against Petrobras

473. SKAGEN incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is asserted against Petrobras.

474. As set forth above, Petrobras made or caused to be made statements in its Forms 20-F filed with the SEC which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

475. Petrobras was required to file reports on Form 20-F pursuant to Sections 13(a) and 15(d) the Exchange Act and the rules and regulations promulgated thereunder.

476. In connection with its purchase of the Company's common and preferred ADSs, and as discussed in ¶¶ 455-60, above, SKAGEN specifically read and relied upon the statements made by Petrobras in the 2011 Form 20-F, the 2012 Form 20-F, and the 2013 Form 20-F, including, but not limited to, the Company's statements in those filings concerning its financial condition.

477. SKAGEN relied upon Petrobras's statements as being materially complete, and as not omitting material information, including information concerning the Company's financial condition. SKAGEN relied upon Petrobras's Form 20-F filings not knowing that they were false or misleading.

478. In reliance upon the materially false and misleading statements included in Petrobras's 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F, SKAGEN purchased Petrobras common and preferred ADSs at artificially inflated prices.

479. SKAGEN's reliance on Petrobras's Form 20-F filings was reasonable.

480. When the truth emerged regarding the materially false and misleading statements contained in Petrobras's Form 20-F filings, including statements concerning the Company's financial condition, the price of Petrobras's common and preferred ADSs declined, causing substantial harm to SKAGEN.

481. As a direct and proximate result of Petrobras's wrongful conduct, SKAGEN suffered damages in connection with its transactions in the Company's common and preferred ADSs during the Relevant Period.

## XIII.  SECURITIES ACT CLAIMS

482. In this part of the Complaint, Dankse Invest Management A/S asserts strict liability and negligence claims based on the Securities Act against the Securities Act Defendants. Danske

Invest Management A/S's Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Defendant named in Counts I and II, above. Danske Invest Management A/S's Securities Act claims do not allege, and do not sound in, fraud.

## A. Petrobras Issued Materially False and Misleading Statements in the Offering Documents

483. On or around March 10, 2014, Petrobras and PGF conducted a public offering of approximately *$8.5 billion* in debt securities. The Underwriters for the Offering were Defendants Citigroup, J.P. Morgan, HSBC, Bank of China, BB Securities, Bradesco, Banca IMI, and Scotia Capital.

484. Danske Invest Management A/S asserts the Securities Act Claims in connection with its purchase of the following debt securities in or traceable to the Offering:

  a)   7.250% Global Notes due 2044 (ISIN: US71647NAK54); and
  b)   6.250% Global Notes due 2024 (ISIN: US71647NAM11).

485. Petrobras, PGF and the Underwriter Defendants conducted the Offering pursuant to the following materially false and misleading documents: (i) the automatic Shelf Registration Statement filed on August 29, 2012 by Petrobras and PGF (the "2012 Registration Statement"); and (ii) the Prospectus Supplement dated March 10, 2014 that Petrobras filed with the SEC on Form 424B2 on March 11, 2014 (the "March 2014 Prospectus Supplement" and together with the 2012 Registration Statement and all documents incorporated by reference therein, the "Offering Documents").

486. The Offering Documents incorporated by reference the following documents, among others:

  a)   The 2011 Form 20-F;

  b)   The 2011 Form 20-F/A;

  c)   The 2012 Form 20-F;

d) The August 10, 2012 Form 6-K;

e) The February 26, 2014 Form 6-K;

f) The March 7, 2014 Form 6-K; and

g) The March 11, 2014 Form 6-K.

487. The Offering Documents, through the 2012 Registration Statement, also incorporated by reference "[a]ny future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

488. The Offering Documents contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

### 1. False Financial Statements

489. The Offering Documents (including the documents incorporated by reference therein) provided the following admittedly false financial information (in $ millions):

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses |
|---|---|---|---|---|
| March 2014 Prospectus Supplement | $227,901 as of 12/31/13; $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; $128,754 as of 12/31/09 | $321,423 as of 12/31/13; $327,396 as of 12/31/12; $316,414 as of 12/31/11; $310,194 as of 12/31/10; $199,442 as of 12/31/09 | $11,094 as of 12/31/13; $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $15,308 as of 12/31/09 | |
| 2011 Form 20-F | $182,465 | $319,410 | $20,121 | $110,102 |
| August 10, 2012 Form 6-K | $184,997 | $310,704 | $4,527 | $62,721 |
| 2012 Form 20-F | $204,901 | $331,645 | $11,034 | $127,727 |

160

| SEC Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses |
|---|---|---|---|---|
| February 26, 2014 Form 6-K | $227,901 as of 12/31/13; $204,901 as of 12/31/12; $182,918 as of 1/1/12 | $321,423 as of 12/31/13; $327,396 as of 12/31/12; $316,414 as of 1/1/12 | $11,094 as of 12/31/13; $11,034 as of 12/31/12; $20,121 as of 12/31/11 | |

490. Each of the financial figures contained in the March 2014 Prospectus Supplement were also included in a preliminary prospectus supplement that Petrobras filed with the SEC on Form 424B2 on the morning of March 10, 2014 (the "Preliminary Prospectus Supplement").

491. The foregoing financial figures were materially false and misleading at the time they were incorporated into the Offering Documents for the following reasons:

a) Petrobras admitted in January 2015 that:

- The "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets."

- "[C]ontracts entered into between January 1, 2004 and April 30, 2012 (the period during which the scheme operated, as stated in the depositions described above) with the suppliers and contractors named in the [Costa, Youssef, Camargo and Mendonça Neto] depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

- "[A]mounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. *However, those costs should not have been capitalized*."

- "[I]t is necessary to correct the amounts related to the misconduct that were capitalized" and, in particular, to "deduct from [PP&E] any amount that could be *linked to bribery of any sort*."

161

- Petrobras further admitted that its third quarter 2014 financial statements did not comply with IFRS, including IAS 34, because the Company failed to account for the impact of these improperly capitalized costs on its balance sheet and income statement.

- While the Company did not correct its misstated PP&E figure (or its misstated total assets, expenses and net income figures), it provided two possible methodologies for quantifying the required writedown. This analysis indicated a potential writedown between R$4.06 billion (US$1.5 billion) and R$88.6 billion (US$34 billion) with respect to contracts Petrobras signed with the Cartel companies between January 1, 2004 and April 30, 2012.

b) Costa has admitted that the value of Petrobras's contracts were overstated by up to 3%, and by additional amounts of up to 20% due to the Cartel's overpricing of Petrobras contracts.

c) The Company's January 27, 2015 estimates of a PP&E misstatement of between R$4.06 billion (US$1.5 billion) and R$88.6 billion (US$34 billion) were vastly understated because they only accounted for the contracts entered into with known Cartel members before April 30, 2012. As alleged above (¶¶ 147, 151, 202, 209), the scheme was not limited to Cartel members and did not stop on April 30, 2012. As a result, the range provided by the Company downplayed the overstatement.

d) As described above at ¶¶ 189-96, Petrobras's improper capitalization of these bribes and inflated costs throughout the Relevant Period violated IFRS.

e) As set forth above at ¶ 226, accountants hired by Petrobras found that while the Company spent over $18.5 billion on projects related to Abreu, the refinery is only worth $7 billion and while the Company spent $13.5 billion building Comperj, the refinery should be written down to zero.

492.    By wrongfully recognizing the cash paid out in bribes as assets instead of expenses, Petrobras materially overstated the amount of **PP&E** and **total assets** in each of its quarterly and annual financial statements for the period beginning January 1, 2004 (the point at which the Company itself has acknowledged improper bribes and bid-rigging began to occur) through the present. In addition, Petrobras misreported **net income** in each of its quarterly and annual financial statements by failing to record an impairment charge necessitated by the overstatement of the

Company's PP&E and total assets. Moreover, Petrobras misreported net income and understated the Company's total costs and expenses in each of those periods during which a bribe was paid and was improperly capitalized instead of having been expensed immediately.

493. In addition, Petrobras represented in the March 2014 Prospectus Supplement and in the Preliminary Prospectus Supplement that its audited financial statements incorporated by reference in the prospectus supplements were "prepared in accordance with IFRS." The 2011 Form 20-F and the 2012 Form 20-F similarly stated that Petrobras's financial statements were "presented" and/or "prepared" "in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB)." Likewise, the August 10, 2012 Form 6-K stated that Petrobras' financial statements were "presented" and/or "prepared" "in accordance with IAS 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)." The February 26, 2014 Form 6-K similarly represented that Petrobras's financial statements were "presented" and/or "prepared" "in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB)."

494. The foregoing statements were materially false and misleading at the time they were incorporated into the Offering Documents because the Company's financial statements were not prepared in accordance with IFRS. Specifically, as discussed above at ¶¶ 189-200, the Company's financial statements violated, among other IFRS provisions, IAS 16 and IFRS CF 4.52.

495. The 2011 Form 20-F and the 2012 Form 20-F included certifications signed by Barbassa and Foster that certified to investors that the annual report and all of its contents "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of

1934" and "fairly presents, in all material respects, the financial condition and results of operations of the Company."

496.    The foregoing certifications were materially false and misleading when made for the reasons set forth in ¶ 491 above.

497.    The 2012 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E:

> Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

498.    This statement was materially false and misleading for the reasons set forth in ¶ 491 above.

499.    The March 7, 2014 Form 6-K included the following statement:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

500.    The 2011 Form 20-F, 2012 Form 20-F and March 7, 2014 Form 6-K contained the same representation with respect to the applicable reporting period.

501.    These statements were materially false and misleading materially false and misleading at the time they were incorporated into the Offering Documents because Petrobras's internal controls were ineffective and were routinely overridden during the Relevant Period.  Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-rigging on construction contracts and the overpayment of costs in connection with

these contracts in exchange for substantial kickbacks to Petrobras executives. In the wake of the testimony from Costa and others involved in the misconduct, Foster expressly admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls." The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading because Velosa informed Gabrielli and Foster as early as 2008 of the "[i]rregularities," including "contracts that [] were overbilled," yet no action was taken by the Company to discontinue the payment of bribes.

### 2. False SOX Certifications

502. The Offering Documents also contained false statements regarding the effectiveness of Petrobras's internal controls over financial reporting. Specifically, the Company's 2011 Form 20-F and 2012 Form 20-F falsely represented that Petrobras maintained effective internal controls over financial reporting, and Foster and Barbassa stated that they could "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Foster and Barbassa further certified that they "disclosed . . . [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

503. Management's attestations regarding the strength of internal controls over financial reporting were critical to investors because they (falsely) assured the public that Petrobras's financial statements were reliable and complied with applicable laws.

504. These statements were materially false and misleading at the time they were incorporated into the Offering Documents because Petrobras's internal controls were ineffective and were routinely overridden during the Relevant Period. Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-rigging on construction

contracts and the overpayment of costs in connection with these contracts in exchange for substantial kickbacks to Petrobras executives. In the wake of the testimony from Costa and others involved in the misconduct, Foster expressly admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls." The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading because Velosa informed Gabrielli and Foster as early as 2008 of the "[i]rregularities," including "contracts that [] were overbilled," yet no action was taken by the Company to discontinue the payment of bribes.

### 3. False Statements in the Underwriter Agreement

505. As noted above, the Offering Documents incorporated by reference the March 11, 2014 Form 6-K, which attached a copy of the March 2014 Underwriting Agreement. The March 2014 Underwriting Agreement between Petrobras, PGF and the Underwriter Defendants stated that neither Petrobras nor any of its officers had engaged in any corruption, including making "any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds" or violating "any provision of the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - *Nova Lei Anticorrupção Brasileira* of 2013 (New Brazilian Anti-Corruption Law)." The March 2014 Underwriting Agreement further stated that neither Petrobras nor any of its officers had "made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment."

506. These statements were materially false and misleading because, as discussed above at ¶¶ 121-62, 204-232, Petrobras and its executives have admitted that they had engaged in a pattern of awarding inflated contracts to domestic and foreign companies and including within these contracts a bribe that was paid to Petrobras executives and Brazilian government officials.

## XIV. SECURITIES ACT CAUSES OF ACTION

## COUNT III

### For Violations Of Section 11 of the Securities
### Act Against the Securities Act Defendants

507.    Danske Invest Management A/S repeats and realleges the allegations set forth in ¶¶ 1-18, 21-284, 461-62, and 482-506 as if fully set forth herein.

508.    This Count is asserted against the Securities Act Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Danske Invest Management A/S.

509.    At the time of the Offering, the Offering Documents and the documents incorporated by reference therein contained false statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements contained therein not misleading.

510.    Petrobras and PGF are strictly liable under Section 11 for the materially untrue statements and omissions contained in the Offering Documents.

511.    Each of the remaining Securities Act Defendants named in this Count, including Helms, who signed the March 2014 Prospectus Supplement, is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Documents and documents incorporated by reference therein.  The remaining Securities Act Defendants named in this Count did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of material fact.  Accordingly, the remaining Securities Act Defendants named in this Count acted negligently and are therefore liable to Danske Invest Management A/S.

512.    Danske Invest Management A/S purchased debt securities in or traceable to the Offering and pursuant to the materially false and misleading Offering Documents.

513. Danske Invest Management A/S did not know, nor in the exercise of reasonable diligence could it have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when it purchased or acquired its debt securities.

514. The value of the debt securities issued in connection with the Offering has declined substantially subsequent to the consummation of the Offering, and Danske Invest Management A/S has sustained damages.

515. Less than one year elapsed between the time that Danske Invest Management A/S discovered or reasonably could have discovered the facts upon which this complaint is based. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public.

516. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Danske Invest Management A/S does not allege that the Securities Act Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

517. By reason of the foregoing, the Securities Act Defendants are liable for violations of Section 11 of the Securities Act to Danske Invest Management A/S.

## COUNT IV

### For Violations Of Section 12(a)(2) of the Securities Act Against Petrobras and PGF

518. Danske Invest Management A/S repeats and realleges the allegations set forth in ¶¶ 1-18, 21-284, 461-62, and 482-506 as if fully set forth herein.

519. This Count is asserted against Petrobras and PGF for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2).

520. Petrobras and PGF were sellers, offerors, and/or solicitors of sales of the securities issued in the Offering pursuant to the Offering Documents. The Offering Documents contained

untrue statements of material fact and omitted other facts required to be disclosed or necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

521.     Petrobras and PGF directly solicited the purchase of securities by Danske Invest Management A/S by means of the Offering Documents, motivated at least in part by the desire to serve their own financial interests.

522.     Petrobras and PGF used means and instrumentalities of interstate commerce and the U.S. mail.

523.     Danske Invest Management A/S purchased debt securities issued in or traceable to the Offering and pursuant to the materially false and misleading Offering Documents.

524.     Danske Invest Management A/S did not know, nor in the exercise of reasonable diligence could it have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when it purchased or acquired its debt securities.

525.     The value of the debt securities issued in connection with the Offering has declined substantially subsequent to the consummation of the Offering, and Danske Invest Management A/S has sustained damages.

526.     Less than one year elapsed between the time that Danske Invest Management A/S discovered or reasonably could have discovered the facts upon which this complaint is based.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public.

527.     This claim does not sound in fraud.  For purposes of asserting this claim under the 1933 Act, Danske Invest Management A/S does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

528. By virtue of the conduct alleged herein, Petrobras and PGF violated Section 12(a)(2) of the Securities Act and are liable to Danske Invest Management A/S.

## COUNT V

### For Violations of Section 15 of the Securities Act
### Against Petrobras

529. Danske Invest Management A/S repeats and realleges the allegations set forth in ¶¶ 1-18, 21-284, 461-62, and 482-506 as if fully set forth herein.

530. This Count is asserted against Petrobras for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Danske Invest Management A/S who has asserted claims pursuant to Sections 11 and 12(a)(2) of the Securities Act, as set forth above.

531. At all times relevant hereto, Petrobras was a controlling person of PGF within the meaning of Section 15 of the Securities Act. Because of its position of control and authority over this Defendant, Petrobras was able to, and did, control (a) the contents of the Offering Documents; and (b) the actions of Defendant PGF.

532. By virtue of Petrobras's control over PGF, Petrobras is named herein as a Defendant under Section 15 of the Securities Act with respect to the Offering.

533. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Danske Invest Management A/S does not allege that the Securities Act Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

534. By reason of the aforementioned conduct, Petrobras is liable under Section 15 of the Securities Act to Danske Invest Management A/S, who has asserted claims pursuant to Sections 11 and 12(a)(2) of the Securities Act, as set forth above.

535.    As a direct and proximate result of the conduct of Petrobras, Danske Invest Management A/S suffered damages in connection with its purchase or acquisition of securities in or traceable to the Offering and pursuant to the materially false and misleading Offering Documents.

## XV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, including:

A.    Awarding compensatory damages in favor of SKAGEN, Danske Invest Management, Oppenheimer Developing Markets Fund, Oppenheimer Quest for Value Funds, on behalf of its series Oppenheimer Global Allocation Fund, OFIGTC Emerging Markets Equity Fund, and OFI Global: Emerging Markets Equity Fund, LP against Petrobras for all damages sustained as a result of Petrobras's wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B.    Awarding compensatory damages in favor of Danske Invest Management A/S against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D.    Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.    Awarding such other and further relief as may be just and proper.

## XVI.  JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 23, 2015

Respectfully submitted,

Darren J. Check
Gregory M. Castaldo
Matthew L. Mustokoff
Richard A. Russo, Jr.
Margaret E. Onasch
**KESSLER TOPAZ**
 **MELTZER & CHECK LLP**
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

*Counsel for Plaintiffs SKAGEN, Danske Invest Management Company, and Danske Invest Management A/S*

Blair A. Nicholas
Benjamin Galdston
David R. Kaplan
Lucas E. Gilmore
**BERNSTEIN LITOWITZ**
 **BERGER & GROSSMANN LLP**
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone:  (858) 793-0070
Facsimile:  (858) 793-0323

Gerald H. Silk
**BERNSTEIN LITOWITZ**
 **BERGER & GROSSMANN LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Plaintiffs Oppenheimer Funds and Additional Counsel for Plaintiffs SKAGEN, Danske Invest Management Company, and Danske Invest Management A/S*